IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO. 25 CR 28 |
| V. | : | |
| | : | |
| DARRYL WELLS | : | |
| | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

Darryl Wells, by and through undersigned counsel Shaka M. Johnson, Esquire, now submits for the assistance of the Court this memorandum concerning sentencing in the above-captioned case. This matter arises from the actions of the defendant Darryl Wells, committing the act of Bank Fraud in violation of Title 18 United States Code, Section 1344. Accordingly, for the reasons set forth below, the undersigned counsels recommend that the Court impose a sentence below the recommended sentencing guidelines of one (1) month of incarceration to be served via Intermittent Confinement, three (3) years of supervised release, a $100 special assessment and restitution.

INTRODUCTION

On or about January 23, 2025, a grand jury returned an indictment against Mr. Wells charging him with three (3) counts of Bank Fraud in violation of Title 18 United States Code, Section 1344. On November 18, 2025, Mr. Wells appeared before the Honorable Joel H. Slomsky, accepted responsibility for his actions and pled guilty to count three of the indictment. The underlying facts, as detailed below, warrant a sentence of (1) month of incarceration to be served via Intermittent

Confinement, three (3) years of supervised release, a $100 special assessment and restitution, as recommended by counsels, as the sentence would be sufficient but not greater than necessary to comply with the fundamental aims of sentencing.

## ARGUMENT

Because this incident occurred between December 5, 2018 and January 8, 2019, the Sentencing Reform Act of 1984 applies. Under this Act, the Sentencing Commission developed the Federal Sentencing Guidelines that would help to ensure proportionate sentencing.

Sentencing in the Third Circuit proceeds in three steps, consistent with U.S.S.G. 1B1.1. First, the Court must consider the advisory guideline range for Mr. Well's offense. Second, the Court must consider any departure motions. Third, the Court must analyze and apply the factors set forth under 18 U.S.C. § 3553(a). United States v. Goff, 501 F.3d 250, 254 (3d Cir. 2007). The Court must impose a sentence sufficient, but not greater than necessary, to comply with the basic aims of sentencing. See. 18 U.S.C. § 3553(a). As discussed in further detail below, after adequately considering the Sentencing Guidelines and the § 3553(a) factors, the Court should impose the recommended term of (1) month of incarceration to be served via Intermittent Confinement, three (3) years of supervised release, a $100 special assessment and restitution.

### THE DEFENDANT'S ADVISORY GUIDELINE RANGE SUGGESTS A SENTENCE OF 8-14 MONTHS OF INCARCERATION.

"In determining sentencing, the trial court must calculate the correct guideline range applicable to a defendant's particular circumstances." United States

v. Goff, 501 F.3d 250, 255 (3d Cir. 2007).  The guideline for violation of 18 U.S.C. § 371 is found in U.S.S.G. § 2X1.1.  In order to determine the base offense, the guideline directs one to look to the underlying offense.  In this case, the underlying offense is a violation of 18 U.S.C. §1344.  The guidelines for violations of that statue is found in U.S.S.G. § 2B1.1.  The base offense level is 7. Under subsection (b)(1)(E), the specific offense characteristics call for an increase by 8 levels.

**The adjusted offense level is 15**.

### THE COURT MUST APPLY A CHAPTER THREE PART "E' ADJUSTMENT BECAUSE THE DEFENDANT ACCEPTED RESPONSIBILITY FOR PARTICIPATION IN THE CRIMINAL CONDUCT.

Under §3E1.1 where the defendant clearly demonstrates acceptance of responsibility for the offense, the Guidelines authorizes a decrease in the offense level by 2.  §3E1.1(a).  When a defendant enters a plea of guilty before the commencement of trial coupled with truthfully admitting the conduct comprising the offense of conviction and any other relevant conduct, there is a significant showing of acceptance of responsibility.  Id. at Cmt. n. 3.   In addition, Mr. Wells receives an additional decrease of 2 levels under § 4C1.1 as he is a Zero-point offender.

**The adjusted offense level is 11.**

### FACTORS UNDER 18 USC 3553(A) SUPPORT THE RECOMMENDED SENTENCE

In determining the particular sentence to be imposed, the court shall consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the

purposes of sentencing; (3) the kinds of sentences available; and (4) the kinds of sentence and the sentencing range. 18 U.S.C §3553.

**THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, THE HISTORY, AND THE CHARACTERISTICS OF THE DEFENDANT SUPPORT THE REQUESTED SENTENCE.**

Mr. Wells appears before this Court having accepted responsibility for his actions and with a clear understanding of the harm they caused. He does not seek to minimize the seriousness of his conduct. Instead, he asks the Court to consider the totality of his life: a childhood marked by stability, an adult life defined by sustained employment and enduring relationships, and a demonstrated capacity for accountability and change. These are not abstract qualities. They are reflected in a decade of continuous employment, a long-term partnership, a cooperative co-parenting relationship, and a proactive commitment to treatment in the wake of this case.

This matter has served as a reckoning. Confronted with the consequences of his conduct, Mr. Wells took responsibility not only for the offense, but for the underlying addiction that contributed to it, engaging in counseling and meaningful self-examination without compulsion. Furthermore, Mr. Wells made himself readily available to law enforcement and made several statements against his interests in an attempt to right his wrongs. At the same time, the sentence imposed here will reach beyond him alone, affecting a teenage son who depends on his continued presence and guidance during a critical stage of development. Federal sentencing demands attention to these human realities.

When viewed in full, Mr. Wells presents not as an individual defined by a single chapter, but as someone capable of rehabilitation, stability, and lawful contribution. The sentence requested reflects that reality and asks the Court to impose a punishment that is sufficient, but not greater than necessary, to serve the ends of justice.

**Personal History, Education, and Work Ethic**

Mr. Wells was born to Darryl and Victoria Wells on March 18, 1991. Raised in a two-parent household in Olney, Philadelphia, alongside his sister, Ashley, his early environment was defined by structure and continuity. That early stability shaped how he moved through adulthood: deliberately, anchored by responsibility, and oriented toward long-term commitments rather than short-term choices.

He attended the Philadelphia Electrical and Technology Charter School, graduating in 2009, and went on to earn an associate's degree from the Pennsylvania Institute of Technology in 2011. His educational path was not linear luxury; it was pursued alongside work that began when he was just sixteen years old. From that point forward, employment was not episodic or reactive—it was constant.

That consistency has carried into his adult life. Wells has now spent a decade with American Airlines, where he is employed at Philadelphia International Airport in fleet services. Up until 2024, he was simultaneously employed at the Philadelphia Sheriff's Office in the warrant unit and resigned from the position at

the onset of this matter. Ten years with a major commercial airline is not the mark of someone drifting at the margins. It reflects reliability, institutional trust, and the ability to meet expectations in a highly regulated, safety-sensitive environment. These are not abstract qualities; they are earned, year after year, through showing up and doing the work.

## Gambling Addiction: Risk Factors, Functional Impact, and the Role of Treatment

Contemporary addiction science increasingly recognizes gambling disorder—particularly in the context of mobile sports betting—as a significant public health concern. The National Institute on Drug Abuse ("NIDA") has emphasized that the rapid expansion of app-based sports wagering has fundamentally altered the risk profile of gambling behavior, transforming it from an episodic activity into a continuously accessible, highly reinforcing experience. Unlike traditional gambling environments, mobile betting platforms operate through constant prompts, immediate reward cycles, and individualized inducements, all of which increase vulnerability to compulsive engagement. NIDA situates gambling disorder alongside substance use disorders, noting shared neurobiological mechanisms related to reward processing, impaired impulse control, and persistence of behavior despite adverse consequences, including financial instability, relational harm, and profound shame.[1]

---

[1] Nat'l Inst. on Drug Abuse, *Gambling Disorder in the Age of Mobile Sports Betting* (2025); Matthew Browne et al., *The Association Between Sports Betting Marketing and Gambling Problems Among Young Adults*, J. Gambling Stud. (2024); Alex M. Russell et al., *Young Men, Social Norms, and the Normalization of Sports Betting*, Int'l J.

Empirical research further demonstrates that these risks are particularly acute for younger adults, the demographic most heavily exposed to mobile betting platforms and sports-related gambling marketing. A peer-reviewed study examining sports betting advertising and inducements found that exposure to promotional content was a significant predictor of higher problem-gambling severity scores among young adults, even after controlling for demographic and psychosocial variables. The authors observed that betting inducements—such as bonus bets and promotional offers—were not merely correlated with increased participation, but were associated with greater gambling-related harm, particularly among young male bettors.[2]

Taken together, this body of research underscores that problematic gambling behavior among young adults is not best understood as an isolated lapse in judgment, but rather as the foreseeable outcome of prolonged exposure to highly engineered betting environments during formative years—often compounded by financial stress and limited early intervention. Importantly, the same literature emphasizes that recovery is strongly linked to acknowledgment of harm and engagement in structured counseling and treatment, interventions that have been shown to meaningfully reduce relapse risk and restore stability.

Envtl. Res. Pub. Health (2022); A. Yeola et al., *Growing Health Concern Regarding Gambling Addiction in the Age of Sportsbooks*, JAMA Intern. Med. (2025)

[2] Matthew Browne et al., *The Association Between Sports Betting Marketing and Gambling Problems Among Young Adults*, **J. Gambling Stud.** (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11557612/.

## Family Life and Adult Stability

The same steadiness appears in Mr. Wells's personal relationships. Since 2017, he has been in a committed partnership with Tamar Brown, a relationship that has endured through time and circumstance. It is not incidental that this partnership overlaps with his most stable period of employment and adulthood; both reflect the same underlying orientation toward responsibility and permanence.

Mr. Wells is also the father of Navied Wells, now fifteen years old, whom he shares with his former partner, Katherine DeJesus. They share a commitment to their son. have maintained a healthy and cooperative relationship, one grounded in communication and mutual respect. That dynamic has allowed Navied to grow up with consistent parental involvement rather than conflict—a choice that reflects maturity, restraint, and intentional parenting.

Mr. Wells is an active father, providing guidance, stability, and support at a stage when those influences are especially consequential. Any sentence imposed in this case necessarily reaches beyond him alone and into the life of a teenager who depends on that continued presence. The negative effect that his absence will have on his son is evidenced through empirical research; adolescents, aged 12-18, see negative effects on academic performance and socioeconomic skills, risk behaviors,

delinquent behaviors, externalizing symptoms, internalizing symptoms, at 62.5%, 66.6%, 50%, 60%, and 45.5%, respectively[3].

These outcomes are not speculative, nor are they the product of extraordinary circumstances. They reflect predictable developmental responses to the sudden and prolonged removal of a parent during a period when identity formation, emotional regulation, and academic engagement are most sensitive to disruption. For a teenager who has thus far benefited from consistent parental involvement and a cooperative co-parenting structure, the abrupt loss of that presence introduces precisely the kind of instability that this research warns against.

Accordingly, the Court's sentencing determination carries consequences that reach well beyond punishment of the individual defendant. It directly implicates the wellbeing, educational prospects, and emotional stability of a minor who bears no responsibility for the offense conduct. Recognizing these collateral harms does not diminish the seriousness of the offense; rather, it ensures that the sentence imposed is appropriately calibrated to the full human impact contemplated.

### Mitigating Context

When Mr. Wells' life is viewed in full, a clear pattern emerges. His history is one of sustained work and central family bonds. Those markers matter because they illuminate the aftermath of the conduct underlying this case. Mr. Wells was forced

---

[3] Alicia Herreros-Fraile et al., *Parental Incarceration, Development, and Well-Being: A Developmental Systematic Review*, 20 **Int'l J. Env't Res. & Pub. Health** 3143 (2023).

to confront a longstanding gambling addiction that had gone unaddressed for years. Rather than deflecting blame or minimizing his behavior, he recognized the role that compulsive gambling played in his decision-making and took affirmative steps to address it.

Following the initiation of this case, Mr. Wells voluntarily entered counseling to confront his addiction to understanding the patterns that led him here and to interrupt them[4]. Through counseling, he addressed the difficult work of accountability—examining the financial, emotional, and relational consequences of his behavior and developing strategies to prevent recurrence.

Importantly, Mr. Wells has accepted responsibility for his actions without qualification. He does not ask the Court to excuse his conduct on the basis of addiction. Instead, he offers his treatment history as evidence of insight, remorse, and a genuine commitment to change. Federal sentencing is, at its core, forward-looking. Mr. Wells's willingness to confront the underlying driver of his conduct—on his own initiative and at an early stage—demonstrates precisely the kind of rehabilitative engagement that reduces the likelihood of future harm.

The development of gambling addiction is not random; decades of clinical research identify specific risk factors that elevate an individual's vulnerability to problematic gambling behavior. One meta-analysis concluded that gambling

---

[4] See Exhibit—Mr. Wells was receiving treat from Charles Mirachini, who passed away in 2021. Julian Katz LPC addresses the Court to affirm that all of Mr. Marchini's patient files have been disposed of and thus we are unable to provide the Court with a record of Mr. Wells' gambling treatment

disorder is associated with a constellation of individual, relational, and contextual risk factors—including early onset of gambling activity, impulsiveness, co-occurring risky behaviors, and socioeconomic stressors. Adolescents and young adults who engage in gambling are disproportionately at risk for transitioning from casual play to compulsive behavior, in part because developing neural systems do not yet support mature impulse control or evaluation of long-term consequences.

Mr. Wells's experience aligns closely with the very patterns this literature describes. He began gambling in middle school, a period well understood to be a particularly vulnerable developmental window. Early exposure to gambling normalizes behavior and increases the likelihood of escalation into adulthood; individuals who begin gambling at a young age are at significantly higher risk of developing persistent gambling problems later in life.

The clinical literature also explains why gambling became a coping mechanism for him. For many at risk, particularly those facing financial strain or emotional stress, gambling provides a compelling but ultimately maladaptive form of relief. The same research that links early gambling onset with long-term problems also notes that stress, financial pressure, and limited access to alternative forms of emotional regulation can reinforce gambling as a perceived, if illusory, solution.

These risk factors help explain the real-world consequences Mr. Wells experienced: he lost friendships due to loans and unpaid debts, struggled with

shame that delayed his willingness to confront his behavior, and found himself caught in an escalating cycle before seeking help. Research on gambling addiction consistently identifies shame and secrecy as core aspects of the disorder—barriers that make individuals reluctant to seek treatment until the negative impacts become undeniable.

Importantly, the research also underscores why counseling has been central to his progress. Professional treatment—especially approaches that develop healthier coping strategies, self-reflection, and insight into maladaptive patterns— is repeatedly shown to be the most effective means of reducing gambling behavior. Counseling gives individuals tools to replace gambling with constructive responses to stress, to address underlying emotional drivers, and to rebuild trust in personal relationships and finances.

This case has marked a turning point. By facing his addiction directly and engaging in counseling, Mr. Wells has taken concrete steps to ensure that the behavior before the Court is not repeated. That effort—undertaken without compulsion and sustained through introspection and treatment—should weigh meaningfully in the Court's assessment of an appropriate and proportionate sentence directly to his capacity for rehabilitation and successful reintegration.

A sentence that accounts for these realities—rather than flattening them— would recognize that Mr. Wells brings with him the very characteristics that support accountability outside of prolonged incarceration: structure, employment,

family, and a demonstrated ability to live within the rules of institutions that demand consistency and trust.

**THE NEED FOR THE SENTENCE IMPOSED SUPPORTS THE RECOMMENDED SENTENCE.**

The Court should impose a sentence to (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (b) afford adequate deterrence to criminal conduct; (c) protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Accordingly, the recommended sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. This sentence allows Mr. Wells to take responsibility for his crime. It promotes respect for the law because this criminal conviction will follow him every day for the rest of his life. The defendant will be punished within the authority of the Court; therefore, the recommended sentence would be just. However, the Court should not impose a sentence greater than what would be necessary to further the aims of the criminal justice system. Two of the purposes of the criminal justice system are reformation and reintegration. Specifically, this Court should focus on helping Mr. Wells reform to reintegrate into society successfully.

Although the Court may also consider the need to deter Mr. Wells and others from committing these offenses in the future by imposing a lengthy custodial sentence, the legislature has already sent a message to the community that they will not tolerate this sort of criminal behavior based upon the statutory maximum

fines and penalties permissible. Mr. Wells made a series of poor decisions, decisions he will now have to live with the consequences for the rest of his life. However, he is not past redemption. Changed behavior begins with a changed mindset, and Mr. Wells has chosen to change.

KIND OF SENTENCES AVAILABLE AND SENTENCING RANGES.

The statutory maximum sentence for Bank Fraud is 25 years in violation of 18 U.S.C. §1344. The guideline range for Mr. Wells is 8-14 months in custody. Because Bank Fraud is classified as a Class B Felony, probation is precluded. However, because the applicable guideline range is in Zone B, Mr. Wells is eligible for a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to USSG §5C1.1(e), provided that at least one month is satisfied by imprisonment. **See**. **PSR at p. 16**. Accordingly, this Court is tasked with imposing a sufficient sentence but not greater than necessary to comply with the fundamental aims of sentencing.

SENTENCING RECOMMENDATION

Counsel recognizes the serious nature of the offense before the Court; furthermore, Mr. Wells acknowledges the gravity of his errors. He continues to express monumental remorse for his actions. As such, Mr. Wells's counsel hopes the Court will consider the mitigating circumstances presented on behalf of Mr. Wells and impose a sentence outside of the sentencing guidelines of one (1) month of

incarceration to be served via Intermittent Confinement, three (3) years of supervised release, a $100 special assessment and restitution.

**Wherefore**, for all the reasons detailed above, Darryl Wells, by and through undersigned counsel, Shaka M. Johnson, Esquire, respectfully requests that the Court sentence Mr. Wells to one (1) month of incarceration to be served via Intermittent Confinement, three (3) years of supervised release, a $100 special assessment and restitution.   This sentence would be consistent with punishment goals, including promoting respect for the law, deterrence, and rehabilitation.

DATED: February 26, 2026

                          Respectfully submitted,

                          <u>/s/ Shaka M. Johnson</u>
                          Shaka M. Johnson, Esquire

                          **Law Offices of Shaka Johnson, LLC**
                          1333 Christian Street
                          Philadelphia, PA 19147
                          (215) 732-7900
                          shaka@shakajohnsonlaw.com

UNITED STATES OF AMERICA     :
    :
    :     CRIMINAL NO. 25 CR 28
    V.     :
    :
DARRYL WELLS     :
    :

## CERTIFICATE OF SERVICE

I, Shaka M. Johnson, counsel for Darryl Wells, hereby certify that on this 26th

day of February 2026, I caused a true and correct copy of the instant Memorandum

of Sentencing to be served via the Court's electronic notification system upon:

> Assistant United States Attorneys
> United States Attorney's Office
> Eastern District of Pennsylvania
> 615 Chestnut Street, Suite 1250
> Philadelphia, PA 19106

<br>

> /s/ Shaka M. Johnson
> Shaka M. Johnson, Esquire
>
> **Law Offices of Shaka Johnson, LLC**
> 1333 Christian Street
> Philadelphia, PA 19147
> (215) 732-7900
> shaka@shakajohnsonlaw.com

February 26, 2026

# EXHIBITS

# EXHIBIT A: LETTER FROM KATHERINE DEJESUS

To Honorable Judge Joel H. Slomsky,

My name is Katherine DeJesus and I am writing this letter to speak on behalf of Darryl Wells, the father of our son Naveid Wells. I have known Darryl for many years, and during that time I have seen firsthand the kind of man, father, and overall person he is. I am proud to share my perspective on his character.

Darryl has always been an excellent father to our son. He is deeply involved in Naveid's life and never hesitates to do whatever is needed to support him. Whether it is making sure our son's education is on track, being present for important moments, or simply showing up every day with love and consistency, Darryl has always put Naveid first. His dedication to ensuring a better future for our son is something I admire greatly. He is also hard-working, not only for his child but for his entire family. Darryl has always stepped up for his parents and his sister whenever they needed him. His willingness to support those he loves shows the strength of his character and the values he lives by.

Darryl's work history reflects his strong sense of responsibility and dedication. He previously worked as a Sheriff, bringing the same integrity and commitment from his professional life into his role as a devoted family man. He is an ideal role model to everyone around him, so much that he has inspired me to serve the Commonwealth of Pennsylvania as a Correctional Officer. Throughout the years I have known him, Darryl has consistently proven himself to be dependable, supportive, and genuinely caring. He takes his responsibilities seriously, always strives to do what is right, and is a positive influence on our son and on everyone around him.

Respectfully your honor, I ask for divine favor that you allow Darryl to continue to be an active father in our son Naveid's life. Thank you for taking the time to read my letter. I hope my words help provide a clear understanding of the kind of person Darryl Wells truly is.

Sincerely,
Katherine DeJesus

# EXHIBIT B: LETTER FROM MARISSA MONROE

Marissa Monroe

712 Villa Drive

Chester, PA 19013

Mgrose89@gmail.com

267-353-7503

December 29, 2025


The Honorable Judge Joel H. Slomsky


Re: Character Reference for Mr. Darryl Wells


Your Honor,


Thank you for allowing me the opportunity to write on behalf of my friend, Mr. Darryl Wells. My name is Marissa Monroe, and I have known Darryl for over twelve years, both as a colleague at the Sheriff's Office and as a friend outside of work.

From the moment I met Darryl, his presence and character stood out. He has always been the type of person who brings positivity and integrity into any room he enters. In our years working together, Darryl consistently showed leadership, professionalism, and dedication to the community we served. He led not by authority, but by example, demonstrating strong work ethic, patience, and respect toward both colleagues and the public.

Beyond the workplace, I have had the privilege of seeing Darryl in his most cherished role, as a father. His love for his son is unwavering and deeply evident. He is gentle, attentive, and fully present in his child's life, always striving to provide guidance, encouragement, and stability. Darryl takes immense pride in being a father, and I believe his son thrives because of that love.

While I understand the seriousness of the circumstances before the Court, I also know that this mistake does not define who Darryl is. He has expressed regret, accountability, and a genuine desire to move forward in a better direction. Despite what he is facing, he has remained grounded, supportive to those around him, and committed to bettering himself. That speaks to his character more than anything else.

What stands out most about Darryl is his heart. He has always been loyal to his friends, supportive in times of need, and someone who can be relied upon without hesitation. He is the first to offer help when others are struggling and the first to celebrate their successes. His kindness has shaped countless lives, including mine.

I respectfully ask that the Court consider the good man behind this situation, a devoted father, a hard-working public servant, and a person who, when given the chance, will continue to contribute positively to his family and community. I genuinely believe that this difficult experience has already taught Darryl a great deal, and that he will rise from it with even stronger conviction and purpose.

Thank you for taking the time to read my letter and for considering my perspective. I hope my words help illuminate the true nature of the man I am proud to call a friend.

With sincere respect,

Marissa Monroe

# EXHIBIT C: JETARIA TAYLOR

**Jetaria Taylor**
**Philadelphia, PA, 19102**
**215.834.9632**
**jbt5010@gmail.com**

**December 15, 2025**

To the Honorable Judge Joel H. Slomsky,

I am writing this letter in support of Darryl Wells**,** whom I have known for over twelve years. I first met Darryl at the Sheriff's Academy in 2013, where we trained together during an intensive nineteen-week course. The academy demanded discipline, accountability, teamwork, and perseverance, and it was within that challenging environment that I came to know Darryl's character firsthand.

What began as a professional relationship during our time at the academy quickly developed into a close friendship. Over the years, that friendship has grown into what I consider family. Through shared experiences, mutual trust, and consistent support for one another, our bond has strengthened, allowing me to observe Darryl both in professional settings and in his personal life.

Darryl has consistently demonstrated a strong work ethic and a deep commitment to providing for and supporting his family. His love for his family, especially his son, is evident in everything he does. His son clearly loves and adores him, and Darryl takes great pride in being an involved, caring, and present father. This devotion to family is one of the qualities I admire most about him, including the meaningful relationship he has built with my own son, who recently turned seventeen.

Darryl has been a positive role model, consistently offering guidance, support, and encouragement to my son, who over the years has struggled with behavioral issues. As a single mother, I have always felt confident in the influence Darryl has had on my child. He has consistently demonstrated responsibility, integrity, and the importance of hard work, making a lasting and positive impact on my son's development.

In addition to the impact of my son, I have witnessed Darryl provide great service to the citizens of Philadelphia. Through his previous career in law enforcement, Darryl has worked tirelessly to help those in need especially at-risk youth. In his free time, I have also had the pleasure to work with Darryl as he provided volunteer services to many of my initiatives such as "Beauty, Brains and Badges, an annual brunch to recognize women in law enforcement as well as "Breathe, Shake, Stretch, and Mental Health", an initiative to promote wellness and mental health for law enforcement officers.

I understand the seriousness of the matter currently before the Court. While Darryl made a mistake, I truly believe he has taken responsibility for his actions and has learned from this experience. Throughout the years I have known him, he has shown the ability to reflect, grow, and make better decisions when faced with adversity, and he has continued to take accountability throughout this ordeal.

I respectfully ask the Court to consider the positive qualities outlined in this letter. I firmly believe that if given a second chance, Darryl will continue to demonstrate that he is a hardworking individual, a loyal friend, and a devoted father.

Thank you for your time and consideration.

Respectfully,

Jetaria Taylor, MSW

# EXHIBIT D: ALLAYA HAMMOND



Allaya Hammond

Manager, Customer Operations

Allaya.Hammond@aa.com

817-609-9743

October 29, 29025

To Whom It May Concern,

I am writing to provide a character reference for Darryl Wells, who I have known for 2 years, in my capacity as his manager. During the time I have known Darryl, I have found him to be a person of strong integrity, reliable character, and professional conduct in every setting.

Integrity:

Darryl has always demonstrated honesty and accountability in his actions. Even in difficult circumstances, he takes responsibility for his choices and strives to make things right. I have personally witnessed him act with fairness and sincerity towards others.

Reliability:

Darryl can be counted on to follow through on commitments and to be present when needed. Whether it is fulfilling work responsibilities or supporting family and community, he consistently shows dependability and care.

Professionalism and Conduct:

In the workplace and in daily life, Darryl maintains composure and treats others with respect. He is courteous, thoughtful, and approaches challenges calmly and responsibly.

Beyond technical skills, Darryl exemplifies a strong moral character. He is courteous, dependable, and handles challenges with patience and composure. These qualities make him not only a valued employee, but also a positive presence in the workplace.

I understand that Darryl is appearing before the Court, and I respectfully ask that you take into consideration the positive qualities and contributions that I have described. I truly believe that he is a person of good character who is capable of continued growth and positive impact on those around him.

Please do not hesitate to contact me at 817-609-9743 or allaya.hammond@aa.com, might you require any additional information.

Best Regards,

Allaya Hammond

Manager, Customer Operations

American Airlines

# EXHIBIT E: LETTER FROM LARRY REEVES

Larry Reeves
President
IAM Local Lodge 1776
larry.reevesll1776@gmail.com
(215) 651-8942

10/24/2026

To The Honorable Court:

I am writing this letter on behalf of Mr. Darryl Wells. whom I have had the privilege of knowing and working with for over 13 years through our employment at American Airlines. I wish to offer my sincere perspective on his character, professionalism, and integrity.

In the years I have known Oanyl, he has proven himself to be a hardworking, dependable, and respectful Individual. His commitment to his job and to those around him has always been unwavering. *As* both a coworker and friend, I have witnessed firsthand how seriously he takes his responsibilities, how courteously he treats others, and how consistently he strives to do the right thing.

Darryl has built a strong reputation at American Airlines for his reliability, honesty, and professionalism. He Is someone others turn to for help or advice because of his calm demeanor, fairness, and genuine care for people. Beyond his work ethic. he is a de\'Dced family man who values respect. loyalty, and doing right by others.

I fully understand the seriousness of court proceedings, and it is for that reason that I do not take this statement lightly. I can confidently say that Oarryi Wells is a person of good moral character and integrity. In my experience, he has demonstrated nothing but responsibility, humflity, and kindness.

J respectfully ask the Court to consider his longstanding history of good conduct. his dedication to hls work, and the positive influence he has on those around him.

Please feel tree to contact me if further Information or clarificaoon is needed.

Sincerely,

Larry Reeves
President
!AI( Local Lodge 1776
Jarry.reevesll 1776@gmall.com
(215} 651-8942

# EXHIBIT F: LETTER FROM CHRISTOPHER BARRETT

Honorable Judge,

My name is Christopher Barrett, and I am writing this letter on behalf of my dear friend, Mr. Darryl Wells, whom I've known for many years. Darryl and I first met while working for the Philadelphia Sheriff's Office, where we quickly formed a strong bond a brotherhood that continues to this day.

During our time together in law enforcement, I came to know Darryl as a man of integrity, intelligence, and compassion. He comes from a solid, loving family that instilled in him the values of hard work, honesty, and accountability. Above all, Darryl is a devoted father who deeply loves his son and consistently goes above and beyond to provide for him. That devotion is one of the qualities I admire most about him.

The Darryl I know is not someone who would ever willingly put his livelihood, family, or reputation at risk. His current situation tells me that he must have been under extreme pressure or facing difficult circumstances that led to a poor decision one that does not reflect his true character.

Your Honor, I do not condone what happened, but I know Darryl's heart. He is a good man who made a mistake. Removing him from society would not serve justice it would take away a man who still has much to offer. When we worked together as Deputy Sheriffs, Darryl had a rare gift for connecting with young people, especially those at risk. They listened to him because he spoke from experience and authenticity. I truly believe that Darryl could use this experience to educate and guide others, particularly youth who may not understand the consequences of financial crimes.

If given the opportunity, I believe Darryl can become an asset to his community and help reduce recidivism. He could play a pivotal role in outreach and mentorship programs, turning this difficult chapter into something that benefits others.

Your Honor, I respectfully ask for leniency in his sentencing. Darryl Wells is not a danger to society he is a father, a friend, and a man capable of redemption. With support and guidance, I am confident he will emerge from this situation stronger, wiser, and determined to make a positive impact.

Thank you for your time and consideration.

Respectfully,


Christopher Barrett
(Retired) Deputy Sheriff, Philadelphia Sheriff's Office
(484) 867-5298 (Cell)

chrisbarrett@outlook.com

# EXHIBIT G: LETTER FROM TAMAR S. BROWN

Tamar S. Brown
1625 W. Ruscomb Street
Philadelphia, PA 19141


Re: Darryl T. Wells Jr.


To: The Honorable Judge.

My name is Tamar S. Brown, and I am writing this letter on behalf of my partner, Darryl Wells Jr. I have been honored to know Darryl for nearly ten years, and in that time, he has proven to be one of the most genuine, dependable, and caring people I have ever met. As I type this letter I am truly sadden, never in my lifetime would I think this would need to be done. I am expressing my heartfelt words to you and I hope that by sharing a little about who he is, you can see the man I know — a man of great heart, integrity, and love for his family and his friends.

Darryl is not only my partner but also one of my best friends. He is a hardworking man who takes pride in providing for us and being there in every way he can. Whether it's helping his family, supporting friends, or lending a hand to someone in need, Darryl never hesitates to show up. His kindness and willingness to help others are a big part of what makes him so special.

At home, Darryl is an amazing son, who takes care of his Parents by providing them with shelter. As a Father, he has a close and loving bond with his 14-year-old son Naveid Wells, and his presence means everything to each and every one of us. He teaches by example — showing his son the importance of hard work, and respect. Me and his family depend on him deeply, not just for what he does, but for who he is.

This situation has been incredibly difficult for Darryl and for all of us who love him. Before this incident nearly 8 years ago, Darryl had never been in any kind of trouble throughout his adult life. This situation is completely out of character for him and does not reflect his true being. He has expressed deep remorse and regret, and I can see the weight this has placed on his heart. This has been heavy for all of us. I have seen firsthand how much this has impacted him and how determined he is to make things right. I truly believe that this was an isolated mistake in judgment and not a reflection of the man he is.

Your Honor, Darryl is a good person — one with strong values, a caring spirit, and a deep sense of responsibility to his family. Darryl is a man of integrity, responsibility, and compassion. He is someone who learns from his mistakes and strives every day to be better. I beseech and respectfully ask that you take into consideration his history of good character, his devotion to his family, and the positive role he plays in our lives as you make your decision.

Thank you for taking the time to read my letter. I hope my words help you see the loving individual, devoted father, son, uncle, brother, and genuinely good-hearted man that Darryl truly is.

With my deepest respect and sincerity,

Tamar S. Brown

# EXHIBIT H: LETTER FROM STACEI WOODS

Dear Honorable Judge,

My name is Stacei Woods, and I am the Director of Evolving Minds Learning Academy. I am writing this letter on behalf of Mr. Darryl Wells, whom I have had the pleasure of knowing for over ten years.

Throughout our friendship, Darryl has consistently shown himself to be a kind, dependable, and community-oriented individual. Over the years, he has been an active participant in my childcare business, volunteering his time and resources to support our programs. He has assisted with toy drives, turkey giveaways, and numerous youth-focused events, always eager to lend a helping hand and make a positive impact.

While I am aware that Darryl has made a mistake in the past, I have also witnessed firsthand the growth and accountability he has shown since then. He has faced the consequences of his actions, learned from them, and redirected his energy toward being a positive role model in the community. The work he continues to do for the youth and those in need is a true reflection of his character and his commitment to change.

I sincerely believe Darryl Wells is a changed man who adds great value to those around him. He has demonstrated responsibility, humility, and a genuine desire to make amends and give back. I respectfully ask that you take his personal growth and community contributions into consideration.

Thank you for your time and understanding.


Respectfully,

Stacei Woods

Director, Evolving Minds Learning Academy

609-424-6167

# EXHIBIT I: LETTER FROM SHANIECE HAYES

To Whom It May Concern,

My name is Shaniece Hayes, and I am writing this letter on behalf of my dear friend and coworker, Darryl Wells. I have had the privilege of knowing Wells for over ten years, both personally and professionally, and in that time he has become like a brother to me.

Darryl is one of the most trustworthy and dependable people I have ever met. Whether at work or in his personal life, he always carries himself with honesty, humility, and kindness. He is the type of person you can count on no matter what, someone who will show up when you need him most and do so without hesitation.

Beyond being a reliable coworker and loyal friend, Darryl is an incredible father. His love and dedication to his son are evident in everything he does. He works hard to provide for him and to set a positive example of what it means to be a good man. I've seen firsthand the patience, compassion, and strength he brings to every challenge, and it's something I truly admire about him.

Darryl has a good heart and a gentle spirit. He treats people with respect, listens without judgment, and is always willing to lend a hand. In all the years I've known him, I've only ever seen him act with integrity and genuine care for others.

It's not often you meet someone as steady, selfless, and an all around great man as Darryl. I am proud to call him my friend, and I have complete faith in his character. I hope this letter helps show the kind of man he truly is a kind, honest, and dependable person who makes a positive difference in the lives of those around him.

With sincerity and respect,

Shaniece Hayes

# EXHIBIT J: LETTER FROM ASHLEY WELLS

The Honorable Judge Joel H. Slomsky,

I am writing this statement to share what an incredible person my brother Darryl Wells is. He has always been a constant source of love, strength, and support in my life. As a single mother, having a solid support system is everything, and my brother has truly been my right hand. Whenever I need him, he shows up without hesitation. Whether it's helping with my child, offering advice, or simply being present, I can always count on him.

Although he's younger than me, I deeply look up to him. He's a wonderful father, an amazing uncle, a devoted son, and a loyal friend. He believes in standing by the people he loves, no matter what. His resilience, determination, and reliability are qualities I admire most.

My brother is the kind of person who leads by example. He works hard, treats others with respect, and always carries himself with integrity. He's not just a great brother, he's my best friend and one of the most dependable people I know.

In every way, Darryl is a standup man and a true blessing to our family. I am proud to call him my brother and even prouder of the man he continues to be.


Sincerely,
Ashley

# EXHIBIT K: LETTER FROM JASON JONES

To Whom It May Concern,

My name is Jason Jones and I have had the privilege of knowing Darryl Wells for over twenty years. During this time, I have come to know him as one of the most hardworking, honest, and dependable people I have ever met.

Darryl has always been the type of person who takes pride in doing the right thing, even when it's not easy. He has shown a strong sense of responsibility in his work and in his personal life, and he's someone people can truly rely on. Whenever anyone around him needs help or support, Darryl is there without hesitation. His kindness and sincerity are qualities that stand out in every situation.

Over the years, I've seen Darryl overcome challenges with determination and a positive attitude. He takes accountability for his actions and continues to grow as a person. I truly believe he has a good heart and strong character, and that he strives to make a positive difference in the lives of those around him.

In all the time I've known him, I have never doubted his integrity or work ethic. I respectfully ask that you take this into consideration when reviewing his case. I am confident that Darryl is an honest man who continues to learn, improve, and contribute positively to his community.

Thank you for your time and understanding. Please feel free to contact me if you need any further information.

Sincerely,
Jason Jones

# EXHIBIT L: PAY STATEMENT
## 9/15/2025-9/28/2025

# American Airlines

**American Airlines, Inc.**
PHX-RWE-PAY
1 Skyview Drive, Fort Worth, TX 76155
1-800-447-2000

## Pay Statement

| Darryl Wells (544478) | | Pay Frequency: | US Bi-Weekly | Status/Allowance/Percent. | | | Available | |
|---|---|---|---|---|---|---|---|---|
| 6805 Jackson St | | Employee Type: | Regular | FED | Head House | 0 | Vacation | 0.00 |
| Philadelphia PA 19135 | | Payment Date: | 10/03/2025 | PA | Single | 0 | Sick | 0.00 |
| | | Hours Worked: | 80.00 | | | | | |
| Location: PHL AIRPORT GROUP 2 | | Pay Period: | 09/15/2025 - 09/28/2025 | | | | | |
| Company FEIN: 13-1502798 | | Basis of Pay: | Hourly | | | | | |

| Summary | Gross Earnings | Pre-Tax Deduction | Taxes | After-Tax Deduction | Net Pay |
|---|---|---|---|---|---|
| **Current** | 3,536.82 | 260.56 | 503.86 | 192.13 | 2,580.27 |
| **Year to Date** | 89,682.81 | 6,058.97 | 12,882.01 | 1,243.88 | 69,497.95 |

### EARNINGS

| Earnings | Period End | Rate | Hours | Current | Year to Date |
|---|---|---|---|---|---|
| Regular Pay | | 39.14 | 72.00 | 2,818.08 | 45,057.07 |
| Shift 2 | | 0.51 | 77.20 | 39.37 | 765.70 |
| Overtime | | 58.71 | 8.00 | 469.68 | 18,643.53 |
| Shift 2 - OT | | 0.77 | 8.00 | 6.16 | 267.57 |
| Sick Pay | | 39.14 | 5.20 | 203.53 | 3,043.91 |
| Voluntary Trade Worked | | 0.00 | 0.00 | 0.00 | 2,172.27 |
| Additional Hours | | 0.00 | 0.00 | 0.00 | 19.57 |
| Holiday Premium | | 0.00 | 0.00 | 0.00 | 2,281.52 |
| Hol Worked OT 1.5 | | 0.00 | 0.00 | 0.00 | 1,358.88 |
| Doubletime | | 0.00 | 0.00 | 0.00 | 7,948.65 |
| Shift 2 - DT | | 0.00 | 0.00 | 0.00 | 105.32 |
| Vacation Pay | | 0.00 | 0.00 | 0.00 | 5,714.43 |
| Comp Time Used | | 0.00 | 0.00 | 0.00 | 313.12 |
| AAG Profit Sharing | | 0.00 | 0.00 | 0.00 | 1,940.24 |
| EE Recognition GUp Tax | | 0.00 | 0.00 | 0.00 | 51.03 |
| **Total Earnings** | | | 170.40 | 3,536.82 | 89,682.81 |

### DEDUCTIONS

| Pre-Tax Deductions | Current | Year to Date |
|---|---|---|
| Medical Coverage | 77.92 | 1,558.40 |
| Dental Coverage | 2.78 | 55.60 |
| Vision Coverage | 3.02 | 60.40 |
| 401k | 176.84 | 4,384.57 |
| **Total Pre-Tax Deductions** | **260.56** | **6,058.97** |

| Taxes | Current | Year to Date |
|---|---|---|
| **Federal Taxes** | | |
| EE Social Security Tax | 214.14 | 5,476.04 |
| EE Medicare Tax | 50.08 | 1,280.69 |
| **State Taxes PA** | | |
| Withholding Tax | 106.01 | 2,711.08 |
| EE Unemployment Tax | 2.48 | 62.99 |
| **City PBKX** | | |
| Withholding Tax | 129.15 | 3,311.21 |
| **City PC0V** | | |
| Local Services Tax | 2.00 | 40.00 |
| **Total Taxes** | **503.86** | **12,882.01** |

| After-Tax Deductions | Current | Year to Date |
|---|---|---|
| LTD-TWU-IAM | 4.70 | 93.82 |
| 401k Loan #1 | 141.83 | 283.66 |
| Union Dues - IAM FS | 45.60 | 866.40 |
| **Total After-Tax Deductions** | **192.13** | **1,243.88** |

| Overpayments | Moved to A/R | Original Balance | Current Recovery | Total Recovery | Overpayment Balance |
|---|---|---|---|---|---|
| | | | | | |

| Taxable Earnings | Current | Year To Date |
|---|---|---|
| **Federal Taxes** | | |
| Withholding Tax | 3,277.00 | 83,938.64 |
| EE Social Security Tax | 3,453.84 | 88,323.21 |
| EE Medicare Tax | 3,453.84 | 88,323.21 |
| **State Taxes PA** | | |
| Withholding Tax | 3,453.10 | 88,308.41 |
| **City PBKX** | | |
| Withholding Tax | 3,453.10 | 88,308.41 |

| Additional Information | Current | Year To Date |
|---|---|---|
| 401k Company Match | 141.47 | 3,585.27 |
| **Imputed Income** | **Current** | **Year to Date** |
| Group Term Life | 0.74 | 14.80 |
| EE Recognition Gross-Up | 0.00 | 300.00 |

### NET EARNINGS DISTRIBUTION

| Account Type | Bank Name | Account Number | Date | Deposit Amount | Currency |
|---|---|---|---|---|---|
| Saving Account | PHILA POLICE & FIRE FED CU | ****5401 | 10/03/2025 | 2,580.27 | USD |

# EXHIBIT M: PAY STATEMENT
## 9/29/2025-10/12/2025

# American Airlines

## Pay Statement

American Airlines, Inc.
PHX-RWE-PAY
1 Skyview Drive, Fort Worth, TX 76155
1-800-447-2000

**Darryl Wells (544478)**
6805 Jackson St
Philadelphia PA  19135

**Location:** PHL AIRPORT GROUP 2
**Company FEIN:** 13-1502798

| | |
|---|---|
| **Pay Frequency:** | US Bi-Weekly |
| **Employee Type:** | Regular |
| **Payment Date:** | 10/17/2025 |
| **Hours Worked:** | 70.67 |
| **Pay Period:** | 09/29/2025 - 10/12/2025 |
| **Basis of Pay:** | Hourly |

| Status/Allowance/Percent. | | | |
|---|---|---|---|
| FED | Head House | 0 | |
| PA | Single | 0 | |

| Available | |
|---|---|
| Vacation | 0.00 |
| Sick | 2.36 |

| Summary | Gross Earnings | Pre-Tax Deduction | Taxes | After-Tax Deduction | Net Pay |
|---|---|---|---|---|---|
| **Current** | 2,802.06 | 223.82 | 397.08 | 192.13 | 1,989.03 |
| **Year to Date** | 92,484.87 | 6,282.79 | 13,279.09 | 1,436.01 | 71,486.98 |

### EARNINGS

| Earnings | Period End | Rate | Hours | Current | Year to Date |
|---|---|---|---|---|---|
| Regular Pay | | 39.14 | 70.67 | 2,766.02 | 47,823.09 |
| Shift 2 | | 0.51 | 70.67 | 36.04 | 801.74 |
| Voluntary Trade Worked | | 0.00 | 0.00 | 0.00 | 2,172.27 |
| Overtime | | 0.00 | 0.00 | 0.00 | 18,643.53 |
| Shift 2 - OT | | 0.00 | 0.00 | 0.00 | 267.57 |
| Additional Hours | | 0.00 | 0.00 | 0.00 | 19.57 |
| Holiday Premium | | 0.00 | 0.00 | 0.00 | 2,281.52 |
| Hol Worked OT 1.5 | | 0.00 | 0.00 | 0.00 | 1,358.88 |
| Doubletime | | 0.00 | 0.00 | 0.00 | 7,948.65 |
| Shift 2 - DT | | 0.00 | 0.00 | 0.00 | 105.32 |
| Vacation Pay | | 0.00 | 0.00 | 0.00 | 5,714.43 |
| Sick Pay | | 0.00 | 0.00 | 0.00 | 3,043.91 |
| Comp Time Used | | 0.00 | 0.00 | 0.00 | 313.12 |
| AAG Profit Sharing | | 0.00 | 0.00 | 0.00 | 1,940.24 |
| EE Recognition GUp Tax | | 0.00 | 0.00 | 0.00 | 51.03 |
| **Total Earnings** | | | 141.34 | 2,802.06 | 92,484.87 |

### DEDUCTIONS

| Pre-Tax Deductions | Current | Year to Date |
|---|---|---|
| Medical Coverage | 77.92 | 1,636.32 |
| Dental Coverage | 2.78 | 58.38 |
| Vision Coverage | 3.02 | 63.42 |
| 401k | 140.10 | 4,524.67 |
| **Total Pre-Tax Deductions** | **223.82** | **6,282.79** |

| Taxes | Current | Year to Date |
|---|---|---|
| **Federal Taxes** | | |
| EE Social Security Tax | 168.58 | 5,644.62 |
| EE Medicare Tax | 39.42 | 1,320.11 |
| **State Taxes PA** | | |
| Withholding Tax | 83.45 | 2,794.53 |
| EE Unemployment Tax | 1.96 | 64.95 |
| **City PBKX** | | |
| Withholding Tax | 101.67 | 3,412.88 |
| **City PC0V** | | |
| Local Services Tax | 2.00 | 42.00 |
| **Total Taxes** | **397.08** | **13,279.09** |

| After-Tax Deductions | Current | Year to Date |
|---|---|---|
| LTD-TWU-IAM | 4.70 | 98.52 |
| 401k Loan #1 | 141.83 | 425.49 |
| Union Dues - IAM FS | 45.60 | 912.00 |
| **Total After-Tax Deductions** | **192.13** | **1,436.01** |

| Overpayments | Moved to A/R | Original Balance | Current Recovery | Total Recovery | Overpayment Balance |
|---|---|---|---|---|---|
| | | | | | |

| Taxable Earnings | Current | Year To Date |
|---|---|---|
| **Federal Taxes** | | |
| Withholding Tax | 2,578.98 | 86,517.62 |
| EE Social Security Tax | 2,719.08 | 91,042.29 |
| EE Medicare Tax | 2,719.08 | 91,042.29 |
| **State Taxes PA** | | |
| Withholding Tax | 2,718.34 | 91,026.75 |
| **City PBKX** | | |
| Withholding Tax | 2,718.34 | 91,026.75 |

| Additional Information | Current | Year To Date |
|---|---|---|
| 401k Company Match | 112.08 | 3,697.35 |
| **Imputed Income** | **Current** | **Year to Date** |
| Group Term Life | 0.74 | 15.54 |
| EE Recognition Gross-Up | 0.00 | 300.00 |

### NET EARNINGS DISTRIBUTION

| Account Type | Bank Name | Account Number | Date | Deposit Amount | Currency |
|---|---|---|---|---|---|
| Saving Account | PHILA POLICE & FIRE FED CU | ****5401 | 10/17/2025 | 1,989.03 | USD |

# EXHIBIT N: PAY STATEMENT
## 10/13/2025-10/26/2025

# American Airlines

## Pay Statement

American Airlines, Inc.
PHX-RWE-PAY
1 Skyview Drive, Fort Worth, TX 76155
1-800-447-2000

| **Darryl Wells (544478)** | **Pay Frequency:** | US Bi-Weekly | **Status/Allowance/Percent.** | | | **Available** | |
|---|---|---|---|---|---|---|---|
| 6805 Jackson St | **Employee Type:** | Regular | FED | Head House | 0 | **Vacation** | 0.00 |
| Philadelphia PA  19135 | **Payment Date:** | 10/31/2025 | PA | Single | 0 | **Sick** | 4.22 |
| | **Hours Worked:** | 86.00 | | | | | |
| **Location:** PHL AIRPORT GROUP 2 | **Pay Period:** | 10/13/2025 - 10/26/2025 | | | | | |
| **Company FEIN:** 13-1502798 | **Basis of Pay:** | Hourly | | | | | |

| Summary | Gross Earnings | Pre-Tax Deduction | Taxes | After-Tax Deduction | Net Pay |
|---|---|---|---|---|---|
| **Current** | 3,727.17 | 270.08 | 531.51 | 146.53 | 2,779.05 |
| **Year to Date** | 96,212.04 | 6,552.87 | 13,810.60 | 1,582.54 | 74,266.03 |

| EARNINGS | | | | | | DEDUCTIONS | | |
|---|---|---|---|---|---|---|---|---|
| **Earnings** | **Period End** | **Rate** | **Hours** | **Current** | **Year to Date** | **Pre-Tax Deductions** | **Current** | **Year to Date** |
| Regular Pay | | 39.14 | 71.00 | 2,778.94 | 50,602.03 | Medical Coverage | 77.92 | 1,714.24 |
| Shift 2 | | 0.51 | 73.00 | 37.23 | 838.97 | Dental Coverage | 2.78 | 61.16 |
| Overtime | | 58.71 | 14.00 | 821.94 | 19,465.47 | Vision Coverage | 3.02 | 66.44 |
| Shift 2 - OT | | 0.77 | 14.00 | 10.78 | 278.35 | 401k | 186.36 | 4,711.03 |
| Additional Hours | | 39.14 | 1.00 | 39.14 | 58.71 | **Total Pre-Tax Deductions** | **270.08** | **6,552.87** |
| Sick Pay | | 39.14 | 1.00 | 39.14 | 3,083.05 | **Taxes** | **Current** | **Year to Date** |
| Voluntary Trade Worked | | 0.00 | 0.00 | 0.00 | 2,172.27 | **Federal Taxes** | | |
| Holiday Premium | | 0.00 | 0.00 | 0.00 | 2,281.52 | EE Social Security Tax | 225.94 | 5,870.56 |
| Hol Worked OT 1.5 | | 0.00 | 0.00 | 0.00 | 1,358.88 | EE Medicare Tax | 52.84 | 1,372.95 |
| Doubletime | | 0.00 | 0.00 | 0.00 | 7,948.65 | **State Taxes PA** | | |
| Shift 2 - DT | | 0.00 | 0.00 | 0.00 | 105.32 | Withholding Tax | 111.85 | 2,906.38 |
| Vacation Pay | | 0.00 | 0.00 | 0.00 | 5,714.43 | EE Unemployment Tax | 2.61 | 67.56 |
| Comp Time Used | | 0.00 | 0.00 | 0.00 | 313.12 | **City PBKX** | | |
| AAG Profit Sharing | | 0.00 | 0.00 | 0.00 | 1,940.24 | Withholding Tax | 136.27 | 3,549.15 |
| EE Recognition GUp Tax | | 0.00 | 0.00 | 0.00 | 51.03 | **City PC0V** | | |
| **Total Earnings** | | | **174.00** | **3,727.17** | **96,212.04** | Local Services Tax | 2.00 | 44.00 |
| | | | | | | **Total Taxes** | **531.51** | **13,810.60** |
| | | | | | | **After-Tax Deductions** | **Current** | **Year to Date** |
| | | | | | | LTD-TWU-IAM | 4.70 | 103.22 |
| | | | | | | 401k Loan #1 | 141.83 | 567.32 |
| | | | | | | Union Dues - IAM FS | 0.00 | 912.00 |
| | | | | | | **Total After-Tax Deductions** | **146.53** | **1,582.54** |

| Overpayments | Moved to A/R | Original Balance | Current Recovery | Total Recovery | Overpayment Balance |
|---|---|---|---|---|---|
| | | | | | |

| Taxable Earnings | Current | Year To Date | Additional Information | Current | Year To Date |
|---|---|---|---|---|---|
| **Federal Taxes** | | | 401k Company Match | 149.09 | 3,846.44 |
| Withholding Tax | 3,457.83 | 89,975.45 | **Imputed Income** | **Current** | **Year to Date** |
| EE Social Security Tax | 3,644.19 | 94,686.48 | Group Term Life | 0.74 | 16.28 |
| EE Medicare Tax | 3,644.19 | 94,686.48 | EE Recognition Gross-Up | 0.00 | 300.00 |
| **State Taxes PA** | | | | | |
| Withholding Tax | 3,643.45 | 94,670.20 | | | |
| **City PBKX** | | | | | |
| Withholding Tax | 3,643.45 | 94,670.20 | | | |

## NET EARNINGS DISTRIBUTION

| Account Type | Bank Name | Account Number | Date | Deposit Amount | Currency |
|---|---|---|---|---|---|
| Saving Account | PHILA POLICE & FIRE FED CU | ****5401 | 10/31/2025 | 2,779.05 | USD |

# EXHIBIT O: PAY STATEMENT
## 10/27/2025-11/09/2025

# American Airlines

## Pay Statement

**Darryl Wells (544478)**
6805 Jackson St
Philadelphia PA  19135

| | |
|---|---|
| **Pay Frequency:** | US Bi-Weekly |
| **Employee Type:** | Regular |
| **Payment Date:** | 11/14/2025 |
| **Hours Worked:** | 75.25 |

**Location:** PHL AIRPORT GROUP 2

**Company FEIN:** 13-1502798

| | |
|---|---|
| **Pay Period:** | 10/27/2025 - 11/09/2025 |
| **Basis of Pay:** | Hourly |

| Status/Allowance/Percent. | | | |
|---|---|---|---|
| FED | Head House | 0 | |
| PA | Single | 0 | |

| Available | |
|---|---|
| **Vacation** | 0.00 |
| **Sick** | 3.75 |

| Summary | Gross Earnings | Pre-Tax Deduction | Taxes | After-Tax Deduction | Net Pay |
|---|---|---|---|---|---|
| **Current** | 3,608.22 | 264.13 | 514.23 | 192.13 | 2,637.73 |
| **Year to Date** | 99,820.26 | 6,817.00 | 14,324.83 | 1,774.67 | 76,903.76 |

### EARNINGS

| Earnings | Period End | Rate | Hours | Current | Year to Date |
|---|---|---|---|---|---|
| Regular Pay | | 39.14 | 62.75 | 2,456.04 | 53,058.07 |
| Shift 2 | | 0.51 | 72.00 | 36.72 | 875.69 |
| Overtime | | 58.71 | 12.00 | 704.52 | 20,169.99 |
| Shift 2 - OT | | 0.77 | 12.00 | 9.24 | 287.59 |
| Doubletime | | 78.28 | 0.50 | 39.14 | 7,987.79 |
| Shift 2 - DT | | 1.02 | 0.50 | 0.51 | 105.83 |
| Sick Pay | | 39.14 | 1.25 | 48.93 | 3,131.98 |
| Comp Time Used | | 39.14 | 8.00 | 313.12 | 626.24 |
| Voluntary Trade Worked | | 0.00 | 0.00 | 0.00 | 2,172.27 |
| Additional Hours | | 0.00 | 0.00 | 0.00 | 58.71 |
| Holiday Premium | | 0.00 | 0.00 | 0.00 | 2,281.52 |
| Hol Worked OT 1.5 | | 0.00 | 0.00 | 0.00 | 1,358.88 |
| Vacation Pay | | 0.00 | 0.00 | 0.00 | 5,714.43 |
| AAG Profit Sharing | | 0.00 | 0.00 | 0.00 | 1,940.24 |
| EE Recognition GUp Tax | | 0.00 | 0.00 | 0.00 | 51.03 |
| **Total Earnings** | | | **169.00** | **3,608.22** | **99,820.26** |

### DEDUCTIONS

| Pre-Tax Deductions | Current | Year to Date |
|---|---|---|
| Medical Coverage | 77.92 | 1,792.16 |
| Dental Coverage | 2.78 | 63.94 |
| Vision Coverage | 3.02 | 69.46 |
| 401k | 180.41 | 4,891.44 |
| **Total Pre-Tax Deductions** | **264.13** | **6,817.00** |

| Taxes | Current | Year to Date |
|---|---|---|
| **Federal Taxes** | | |
|   EE Social Security Tax | 218.57 | 6,089.13 |
|   EE Medicare Tax | 51.12 | 1,424.07 |
| **State Taxes PA** | | |
|   Withholding Tax | 108.20 | 3,014.58 |
|   EE Unemployment Tax | 2.52 | 70.08 |
| **City PBKX** | | |
|   Withholding Tax | 131.82 | 3,680.97 |
| **City PC0V** | | |
|   Local Services Tax | 2.00 | 46.00 |
| **Total Taxes** | **514.23** | **14,324.83** |

| After-Tax Deductions | Current | Year to Date |
|---|---|---|
| LTD-TWU-IAM | 4.70 | 107.92 |
| 401k Loan #1 | 141.83 | 709.15 |
| Union Dues - IAM FS | 45.60 | 957.60 |
| **Total After-Tax Deductions** | **192.13** | **1,774.67** |

| Overpayments | Moved to A/R | Original Balance | Current Recovery | Total Recovery | Overpayment Balance |
|---|---|---|---|---|---|
| | | | | | |

| Taxable Earnings | Current | Year To Date |
|---|---|---|
| **Federal Taxes** | | |
|   Withholding Tax | 3,344.83 | 93,320.28 |
|   EE Social Security Tax | 3,525.24 | 98,211.72 |
|   EE Medicare Tax | 3,525.24 | 98,211.72 |
| **State Taxes PA** | | |
|   Withholding Tax | 3,524.50 | 98,194.70 |
| **City PBKX** | | |
|   Withholding Tax | 3,524.50 | 98,194.70 |

| Additional Information | Current | Year To Date |
|---|---|---|
| 401k Company Match | 144.33 | 3,990.77 |
| **Imputed Income** | **Current** | **Year to Date** |
| Group Term Life | 0.74 | 17.02 |
| EE Recognition Gross-Up | 0.00 | 300.00 |

### NET EARNINGS DISTRIBUTION

| Account Type | Bank Name | Account Number | Date | Deposit Amount | Currency |
|---|---|---|---|---|---|
| Saving Account | PHILA POLICE & FIRE FED CU | ****5401 | 11/14/2025 | 2,637.73 | USD |

# EXHIBIT P: PAY STATEMENT
## 11/10/2025-11/23/2025

# American Airlines — Pay Statement

American Airlines, Inc.
PHX-RWE-PAY
1 Skyview Drive, Fort Worth, TX 76155
1-800-447-2000

**Darryl Wells (544478)**
6805 Jackson St
Philadelphia PA  19135

**Location:** PHL AIRPORT GROUP 2
**Company FEIN:** 13-1502798

| Pay Frequency: | US Bi-Weekly |
|---|---|
| Employee Type: | Regular |
| Payment Date: | 11/28/2025 |
| Hours Worked: | 76.00 |
| Pay Period: | 11/10/2025 - 11/23/2025 |
| Basis of Pay: | Hourly |

| Status/Allowance/Percent. | | | |
|---|---|---|---|
| FED | Head House | 0 | |
| PA | Single | 0 | |

| Available | |
|---|---|
| Vacation | 0.00 |
| Sick | 0.00 |

| Summary | Gross Earnings | Pre-Tax Deduction | Taxes | After-Tax Deduction | Net Pay |
|---|---|---|---|---|---|
| Current | 3,598.65 | 263.65 | 512.84 | 192.13 | 2,630.03 |
| Year to Date | 103,418.91 | 7,080.65 | 14,837.67 | 1,966.80 | 79,533.79 |

## EARNINGS

| Earnings | Period End | Rate | Hours | Current | Year to Date |
|---|---|---|---|---|---|
| Regular Pay | | 39.14 | 72.00 | 2,818.08 | 55,876.15 |
| Shift 2 | | 0.51 | 84.75 | 43.22 | 918.91 |
| Overtime | | 58.71 | 4.00 | 234.84 | 20,404.83 |
| Shift 2 - OT | | 0.77 | 4.00 | 3.08 | 290.67 |
| Holiday Premium | | 39.14 | 8.00 | 313.12 | 2,594.64 |
| Sick Pay | | 39.14 | 4.76 | 186.31 | 3,318.29 |
| Voluntary Trade Worked | | 0.00 | 0.00 | 0.00 | 2,172.27 |
| Additional Hours | | 0.00 | 0.00 | 0.00 | 58.71 |
| Hol Worked OT 1.5 | | 0.00 | 0.00 | 0.00 | 1,358.88 |
| Doubletime | | 0.00 | 0.00 | 0.00 | 7,987.79 |
| Shift 2 - DT | | 0.00 | 0.00 | 0.00 | 105.83 |
| Vacation Pay | | 0.00 | 0.00 | 0.00 | 5,714.43 |
| Comp Time Used | | 0.00 | 0.00 | 0.00 | 626.24 |
| AAG Profit Sharing | | 0.00 | 0.00 | 0.00 | 1,940.24 |
| EE Recognition GUp Tax | | 0.00 | 0.00 | 0.00 | 51.03 |
| **Total Earnings** | | | 177.51 | 3,598.65 | 103,418.91 |

## DEDUCTIONS

| Pre-Tax Deductions | Current | Year to Date |
|---|---|---|
| Medical Coverage | 77.92 | 1,870.08 |
| Dental Coverage | 2.78 | 66.72 |
| Vision Coverage | 3.02 | 72.48 |
| 401k | 179.93 | 5,071.37 |
| **Total Pre-Tax Deductions** | **263.65** | **7,080.65** |

| Taxes | Current | Year to Date |
|---|---|---|
| **Federal Taxes** | | |
| EE Social Security Tax | 217.97 | 6,307.10 |
| EE Medicare Tax | 50.98 | 1,475.05 |
| **State Taxes PA** | | |
| Withholding Tax | 107.91 | 3,122.49 |
| EE Unemployment Tax | 2.52 | 72.60 |
| **City PBKX** | | |
| Withholding Tax | 131.46 | 3,812.43 |
| **City PC0V** | | |
| Local Services Tax | 2.00 | 48.00 |
| **Total Taxes** | **512.84** | **14,837.67** |

| After-Tax Deductions | Current | Year to Date |
|---|---|---|
| LTD-TWU-IAM | 4.70 | 112.62 |
| 401k Loan #1 | 141.83 | 850.98 |
| Union Dues - IAM FS | 45.60 | 1,003.20 |
| **Total After-Tax Deductions** | **192.13** | **1,966.80** |

| Overpayments | Moved to A/R | Original Balance | Current Recovery | Total Recovery | Overpayment Balance |
|---|---|---|---|---|---|
| | | | | | |

| Taxable Earnings | Current | Year To Date |
|---|---|---|
| **Federal Taxes** | | |
| Withholding Tax | 3,335.74 | 96,656.02 |
| EE Social Security Tax | 3,515.67 | 101,727.39 |
| EE Medicare Tax | 3,515.67 | 101,727.39 |
| **State Taxes PA** | | |
| Withholding Tax | 3,514.93 | 101,709.63 |
| **City PBKX** | | |
| Withholding Tax | 3,514.93 | 101,709.63 |

| Additional Information | Current | Year To Date |
|---|---|---|
| 401k Company Match | 143.95 | 4,134.72 |
| **Imputed Income** | **Current** | **Year to Date** |
| Group Term Life | 0.74 | 17.76 |
| EE Recognition Gross-Up | 0.00 | 300.00 |

## NET EARNINGS DISTRIBUTION

| Account Type | Bank Name | Account Number | Date | Deposit Amount | Currency |
|---|---|---|---|---|---|
| Saving Account | PHILA POLICE & FIRE FED CU | ****5401 | 11/28/2025 | 2,630.03 | USD |

# EXHIBIT Q: PAY STATEMENT
## 11/24/2025-12/07/2025

# American Airlines — Pay Statement

**Darryl Wells (544478)**
6805 Jackson St
Philadelphia PA 19135

| | |
|---|---|
| **Pay Frequency:** | US Bi-Weekly |
| **Employee Type:** | Regular |
| **Payment Date:** | 12/12/2025 |
| **Hours Worked:** | 84.00 |
| **Pay Period:** | 11/24/2025 - 12/07/2025 |
| **Basis of Pay:** | Hourly |

| Status/Allowance/Percent. | | | |
|---|---|---|---|
| FED | Head House | 0 | |
| PA | Single | 0 | |

| Available | |
|---|---|
| Vacation | 0.00 |
| Sick | 0.00 |

**Location:** PHL AIRPORT GROUP 2
**Company FEIN:** 13-1502798

| Summary | Gross Earnings | Pre-Tax Deduction | Taxes | After-Tax Deduction | Net Pay |
|---|---|---|---|---|---|
| **Current** | 4,361.61 | 301.80 | 623.69 | 192.13 | 3,243.99 |
| **Year to Date** | 107,780.52 | 7,382.45 | 15,461.36 | 2,158.93 | 82,777.78 |

## EARNINGS

| Earnings | Period End Rate | Hours | Current | Year to Date |
|---|---|---|---|---|
| Regular Pay | 39.14 | 56.00 | 2,191.84 | 58,067.99 |
| Voluntary Trade Worked | 39.14 | 8.00 | 313.12 | 2,485.39 |
| Shift 2 | 0.51 | 80.00 | 40.80 | 959.71 |
| Overtime | 58.71 | 12.00 | 704.52 | 21,109.35 |
| Shift 2 - OT | 0.77 | 20.00 | 15.41 | 306.08 |
| Holiday Premium | 39.14 | 16.00 | 626.24 | 3,220.88 |
| Hol Worked OT 1.5 | 58.71 | 8.00 | 469.68 | 1,828.56 |
| Additional Hours | 0.00 | 0.00 | 0.00 | 58.71 |
| Doubletime | 0.00 | 0.00 | 0.00 | 7,987.79 |
| Shift 2 - DT | 0.00 | 0.00 | 0.00 | 105.83 |
| Vacation Pay | 0.00 | 0.00 | 0.00 | 5,714.43 |
| Sick Pay | 0.00 | 0.00 | 0.00 | 3,318.29 |
| Comp Time Used | 0.00 | 0.00 | 0.00 | 626.24 |
| AAG Profit Sharing | 0.00 | 0.00 | 0.00 | 1,940.24 |
| EE Recognition GUp Tax | 0.00 | 0.00 | 0.00 | 51.03 |
| **Total Earnings** | | **200.00** | **4,361.61** | **107,780.52** |

## DEDUCTIONS

| Pre-Tax Deductions | Current | Year to Date |
|---|---|---|
| Medical Coverage | 77.92 | 1,948.00 |
| Dental Coverage | 2.78 | 69.50 |
| Vision Coverage | 3.02 | 75.50 |
| 401k | 218.08 | 5,289.45 |
| **Total Pre-Tax Deductions** | **301.80** | **7,382.45** |

| Taxes | Current | Year to Date |
|---|---|---|
| **Federal Taxes** | | |
| EE Social Security Tax | 265.27 | 6,572.37 |
| EE Medicare Tax | 62.04 | 1,537.09 |
| **State Taxes PA** | | |
| Withholding Tax | 131.33 | 3,253.82 |
| EE Unemployment Tax | 3.06 | 75.66 |
| **City PBKX** | | |
| Withholding Tax | 159.99 | 3,972.42 |
| **City PC0V** | | |
| Local Services Tax | 2.00 | 50.00 |
| **Total Taxes** | **623.69** | **15,461.36** |

| After-Tax Deductions | Current | Year to Date |
|---|---|---|
| LTD-TWU-IAM | 4.70 | 117.32 |
| 401k Loan #1 | 141.83 | 992.81 |
| Union Dues - IAM FS | 45.60 | 1,048.80 |
| **Total After-Tax Deductions** | **192.13** | **2,158.93** |

| Overpayments | Moved to A/R | Original Balance | Current Recovery | Total Recovery | Overpayment Balance |
|---|---|---|---|---|---|
| | | | | | |

| Taxable Earnings | Current | Year To Date |
|---|---|---|
| **Federal Taxes** | | |
| Withholding Tax | 4,060.55 | 100,716.57 |
| EE Social Security Tax | 4,278.63 | 106,006.02 |
| EE Medicare Tax | 4,278.63 | 106,006.02 |
| **State Taxes PA** | | |
| Withholding Tax | 4,277.89 | 105,987.52 |
| **City PBKX** | | |
| Withholding Tax | 4,277.89 | 105,987.52 |

| Additional Information | Current | Year To Date |
|---|---|---|
| 401k Company Match | 174.46 | 4,309.18 |
| **Imputed Income** | **Current** | **Year to Date** |
| Group Term Life | 0.74 | 18.50 |
| EE Recognition Gross-Up | 0.00 | 300.00 |

## NET EARNINGS DISTRIBUTION

| Account Type | Bank Name | Account Number | Date | Deposit Amount | Currency |
|---|---|---|---|---|---|
| Saving Account | PHILA POLICE & FIRE FED CU | ****5401 | 12/12/2025 | 3,243.99 | USD |

# EXHIBIT R: PAY STATEMENT
## 12/08/2025-21/21/2025

# American Airlines — Pay Statement

**Darryl Wells (544478)**
6805 Jackson St
Philadelphia PA 19135

**Location:** PHL AIRPORT GROUP 2
**Company FEIN:** 13-1502798

| | |
|---|---|
| **Pay Frequency:** | US Bi-Weekly |
| **Employee Type:** | Regular |
| **Payment Date:** | 12/26/2025 |
| **Hours Worked:** | 103.00 |
| **Pay Period:** | 12/08/2025 - 12/21/2025 |
| **Basis of Pay:** | Hourly |

| Status/Allowance/Percent. | | | | Available | |
|---|---|---|---|---|---|
| FED | Head House | 0 | | **Vacation** | 0.00 |
| PA | Single | 0 | | **Sick** | 0.00 |

| Summary | Gross Earnings | Pre-Tax Deduction | Taxes | After-Tax Deduction | Net Pay |
|---|---|---|---|---|---|
| **Current** | 4,599.50 | 313.70 | 658.26 | 192.13 | 3,435.41 |
| **Year to Date** | 112,380.02 | 7,696.15 | 16,119.62 | 2,351.06 | 86,213.19 |

## EARNINGS

| Earnings | Period End Rate | Hours | Current | Year to Date |
|---|---|---|---|---|
| Regular Pay | 39.14 | 64.00 | 2,504.96 | 60,572.95 |
| Voluntary Trade Worked | 39.14 | 8.00 | 313.12 | 2,798.51 |
| Shift 2 | 0.51 | 80.00 | 40.80 | 1,000.51 |
| Overtime | 58.71 | 20.00 | 1,174.20 | 22,283.55 |
| Shift 2 - OT | 0.77 | 20.00 | 15.40 | 321.48 |
| Additional Hours | 39.14 | 8.00 | 313.12 | 371.83 |
| Doubletime | 78.28 | 3.00 | 234.84 | 8,222.63 |
| Shift 2 - DT | 1.02 | 3.00 | 3.06 | 108.89 |
| Holiday Premium | 0.00 | 0.00 | 0.00 | 3,220.88 |
| Hol Worked OT 1.5 | 0.00 | 0.00 | 0.00 | 1,828.56 |
| Vacation Pay | 0.00 | 0.00 | 0.00 | 5,714.43 |
| Sick Pay | 0.00 | 0.00 | 0.00 | 3,318.29 |
| Comp Time Used | 0.00 | 0.00 | 0.00 | 626.24 |
| AAG Profit Sharing | 0.00 | 0.00 | 0.00 | 1,940.24 |
| EE Recognition GUp Tax | 0.00 | 0.00 | 0.00 | 51.03 |
| **Total Earnings** | | 206.00 | 4,599.50 | 112,380.02 |

## DEDUCTIONS

| Pre-Tax Deductions | Current | Year to Date |
|---|---|---|
| Medical Coverage | 77.92 | 2,025.92 |
| Dental Coverage | 2.78 | 72.28 |
| Vision Coverage | 3.02 | 78.52 |
| 401k | 229.98 | 5,519.43 |
| **Total Pre-Tax Deductions** | **313.70** | **7,696.15** |

| Taxes | Current | Year to Date |
|---|---|---|
| **Federal Taxes** | | |
| EE Social Security Tax | 280.03 | 6,852.40 |
| EE Medicare Tax | 65.49 | 1,602.58 |
| **State Taxes PA** | | |
| Withholding Tax | 138.63 | 3,392.45 |
| EE Unemployment Tax | 3.22 | 78.88 |
| **City PBKX** | | |
| Withholding Tax | 168.89 | 4,141.31 |
| **City PC0V** | | |
| Local Services Tax | 2.00 | 52.00 |
| **Total Taxes** | **658.26** | **16,119.62** |

| After-Tax Deductions | Current | Year to Date |
|---|---|---|
| LTD-TWU-IAM | 4.70 | 122.02 |
| 401k Loan #1 | 141.83 | 1,134.64 |
| Union Dues - IAM FS | 45.60 | 1,094.40 |
| **Total After-Tax Deductions** | **192.13** | **2,351.06** |

| Overpayments | Moved to A/R | Original Balance | Current Recovery | Total Recovery | Overpayment Balance |
|---|---|---|---|---|---|
| | | | | | |

| Taxable Earnings | Current | Year To Date |
|---|---|---|
| **Federal Taxes** | | |
| Withholding Tax | 4,286.54 | 105,003.11 |
| EE Social Security Tax | 4,516.52 | 110,522.54 |
| EE Medicare Tax | 4,516.52 | 110,522.54 |
| **State Taxes PA** | | |
| Withholding Tax | 4,515.78 | 110,503.30 |
| **City PBKX** | | |
| Withholding Tax | 4,515.78 | 110,503.30 |

| Additional Information | Current | Year To Date |
|---|---|---|
| 401k Company Match | 183.98 | 4,493.16 |
| **Imputed Income** | **Current** | **Year to Date** |
| Group Term Life | 0.74 | 19.24 |
| EE Recognition Gross-Up | 0.00 | 300.00 |

## NET EARNINGS DISTRIBUTION

| Account Type | Bank Name | Account Number | Date | Deposit Amount | Currency |
|---|---|---|---|---|---|
| Saving Account | PHILA POLICE & FIRE FED CU | ****5401 | 12/26/2025 | 3,435.41 | USD |

# EXHIBIT S: GAMBLING DISORDER IN THE AGE OF MOBILE SPORTS BETTING

[Skip to main content](#)



An official website of the United States government

Here's how you know

Here's how you know



[en español](#)

Search Component                                    Search

Mega Menu

- [Home](#)
- [Research Topics](#)
- [Research & Training](#)
- [Clinical Resources](#)
- [Grants & Funding](#)
- [News & Events](#)
- [About NIDA](#)

Breadcrumb

1. [Home](#)
2. [About NIDA](#)
3. [Nora's Blog](#)
4. Gambling disorder in the age of mobile sports betting

# [Director's Page](#)

- [Nora's Blog](#)
- [Biography of Dr. Nora Volkow](#)
- [NIDA in the News](#)
- [Director's Remarks and Interviews (YouTube)](#)
- [Testimony to Congress](#)

[Nora's Blog](#)

# Gambling disorder in the age of mobile sports betting

November 14, 2025
By Dr. Nora Volkow
Image



A closeup photo of a man holding a cell phone.

©Pexels/Porapak Apichodilok

*This blog was also published in the [American Society of Addiction Medicine (ASAM) Weekly](#) on October 21, 2025.*

Online gambling is a rapidly growing industry all over the world, affecting both adults and youth.[1] Sports betting is now legal in 38 US states and the District of Columbia, and in 26 states, a person can now make a sports wager on the same device they use to text their therapist or check their social media feeds.

Early data from problem-gambling helplines and state prevalence surveys suggest an increase in both gambling participation and help-seeking, with a disproportionate rise in jurisdictions that permit online betting.[2,3] This circumstance presents a challenge—and opportunity—for health care in general and addiction treatment in particular. By providing evidence-supported interventions for prevention and treatment, practitioners can help ensure that the rapid growth of mobile betting is matched by an equally rapid, equally sophisticated public-health response.

# A Changing Landscape

Gambling disorder (GD) was added to the Diagnostic and Statistical Manual of Mental Disorders (DSM) category Substance-Related and Addictive Disorders in 2013 after growing scientific literature revealed that GD shared clinical features as well as underlying neurobiological mechanisms with substance use disorders (SUDs), and it is still the only behavioral addiction recognized in the DSM-5.[4] The International Classification of Diseases, 11th Revision (ICD-11) classifies gambling disorder under "disorders due to addictive behaviors," alongside gaming disorder.[5]

Top risk factors for developing/maintaining GD are being male; being young and single or married for less than 5 years; living alone; having a low level of education; and struggling financially.[6] Like people with drug addiction, people with GD experience cravings and withdrawal symptoms and develop tolerance—needing to gamble with increasing amounts of money in order to achieve the desired excitement. Generally, a person with GD cannot control their gambling and experiences significant negative consequences, typically financial and relationship problems, because of it. The indebtedness and shame experienced by people who gamble can lead to self-harm and suicide or suicide attempts.[7]

People with GD often also have comorbid SUDs, other mental disorders,[8] and/or compulsive behaviors like problematic shopping and gaming.[9] GD is the model behavioral addiction: gambling is a classic experimental tool to measure risk-taking and bias in behavioral economics (ie, the gambling task),[10] and it shares neurobiological substrates with SUDs, including dysregulation of mesocorticolimbic dopamine pathways, altered reward processing, and impaired cognitive control.[11] People with Parkinson's disease treated with L-dopa or with dopamine agonist medications with high affinity for D3 receptors are at risk of developing compulsive gambling.[12]

Mobile technologies have transformed gambling over the past two decades in a manner analogous to how synthetic drugs have transformed the drug landscape over the same period of time. Just as new, cheap, high-potency synthetic opioids like fentanyl have created conditions for faster progression from initiation to disordered opioid use, gambling on high-speed, 24/7 mobile platforms exposes vulnerable people to a potent combination of continuous betting opportunities, data-driven promotions, and real-time micro-rewards. New markets are exposed to gambling, and compulsive use of these platforms is a predictable result.

The legalization of online gambling is associated with larger increases in irresponsible or risky gambling, particularly among those with lower incomes who can least absorb losses. Adolescents, who may be exposed to online gambling influencers and "risk-free" promotions in sports media and social media feeds, are likely to be especially susceptible due to their heightened reward sensitivity and immature executive control and impulsivity. Prevalence estimates for problem gambling in teens vary across studies but there are clear associations with other risk behaviors like alcohol and illicit drug use.[13]

# Recognizing and Treating Gambling Disorder

Health care providers must become cognizant of this new gambling landscape, if they aren't already, and be prepared to provide or refer adults and youth with gambling problems to appropriate, evidence-based treatment.

Cognitive behavioral therapy (CBT) is generally the treatment of choice for problem gambling. Randomized controlled trials consistently show CBT to be effective at reducing gambling frequency, symptom severity, and financial loss, with gains often sustained for months after treatment.[14,15] Self-guided, online CBT-based interventions have shown some promise,[16] and they may be augmented with human support.[17]

Motivational interviewing (MI) has also been shown to be effective, particularly as an engagement strategy and as a brief intervention in primary care, emergency departments, and telehealth settings.[18] Adjunctive approaches— mindfulness-based relapse prevention, acceptance and commitment therapy (ACT), and structured self-help—are supported by less evidence but may be useful in stepped-care models or in contexts where high-intensity therapy is not immediately available. Couples therapy and support groups may positively affect treatment retention and adherence.

A recent 2-year longitudinal study in France found that gambling medium (physical vs online) did not influence middle- and long-term recovery prospects in a cohort of gamblers receiving regular counseling for their gambling (with an option of group CBT), but online gamblers had an earlier and shorter course of GD prior to treatment.[19] A large majority of participants recovered after 1–2 years of treatment.

While youth-specific GD treatment research is limited, adaptations of CBT (with family involvement) and MI show promise.[20] Pediatricians working with transitional-age youth should include gambling when they talk to their patients about substance use and other risk behaviors and collaborate with families, school counselors, and addiction treatment specialists to intervene early.

No medications are FDA approved for GD, but opioid antagonists—particularly naltrexone and nalmafene—have the strongest evidence among pharmacological options, reducing gambling urges and behavior in some patients.[21] In clinical practice, naltrexone may be most helpful for individuals with high craving intensity, those with alcohol or opioid use disorder, or when rapid reduction in urge is needed to stabilize finances or relationships. An area of needed research is GLP-1 agonists, which have been reported anecdotally (eg, on social media platforms like Reddit) to help people curb their gambling and other problem behaviors, not just substance use and overeating.[22] If medications are used, they should be embedded in a broader psychosocial treatment plan that addresses comorbid mental disorders.

Currently, there is a lack of strong evidence supporting the diagnostic accuracy of available screening tools for problem gambling, especially brief tools used in general medical settings.[23] Thus, creating and validating such measures is another area where research is needed.

# Closing the Treatment Gap

Mobile access has transformed the temporal, spatial, and psychological dynamics of gambling, compressing the cycle of urge, opportunity, and action into seconds and thereby amplifying risk for rapid escalation and in some instances catastrophic outcomes. Physicians have a unique role in recognizing and responding to this transformed landscape through more routine delivery of evidence-based care or referral to appropriate treatment by specialists.

Unfortunately, despite our available tools to treat problem gambling, they currently only reach a fraction of those who could benefit. Just 7–12% of people with GD seek help from treatment or even support groups,[24] and treatment infrastructure remains underdeveloped. Dedicated GD services are sparse in most states, and insurance coverage for GD treatment is inconsistent. State funding for addressing problem gambling through prevention and treatment is generally a small or even miniscule fraction of gambling-related revenues.[25,26]

People seeking help can call or text 1-800-GAMBLER (the National Problem Gambling Helpline), and since 2022 that number routes nationally—a crucial modernization.[27] But the effectiveness of call centers and referral networks depends on there being professionals in a caller's area who are trained in addressing GD, and this may not be the case. Physician training in GD is minimal even in most psychiatry residencies, and many treatment programs lack staff trained in gambling-specific CBT. Professional medical associations like ASAM and other behavioral health organizations could help by facilitating training in addressing GD through continuing medical education and other means.

As with other addictions, prevention is also crucial. At least among adolescents and young people, prevention programs delivered in school settings and tailored to developmental stage have been shown to meaningfully reduce gambling behaviors.[28] More robust age verification is needed to prevent youth from gambling online. Other strategies that need study include AI-based algorithms that would identify problem play and intervene in some way.[29] Regulatory, technological, and policy levers will need to complement more targeted education and intervention to reduce gambling and its harms. People increasingly inhabit a world where sports books and casinos are right in their pocket—perhaps even alongside their own telepsychiatry app. In such a world, gambling addiction can be expected to become more and more prevalent. Attention from clinicians, researchers, and professional societies is needed to better understand, prevent, and treat this and other emerging addictions facilitated by digital technologies.

[References](#)

1. Wardle H, Degenhardt L, Marionneau V, et al. The Lancet Public Health Commission on gambling. *Lancet Public Health*. 2024;9(11):e950–e994. doi:10.1016/s2468-2667(24)00167-1.
2. Taylor WJ, McCarthy DM, Wilbur KC. *Online Gambling Policy Effects on Tax Revenue and Irresponsible Gambling*. New York, NY: Marketing Science Institute; 2024. Working Paper Series Report No. 24–128.
3. Ukhova D, Volberg R. Gambling harms in the era of legal gambling expansion—a growing health problem. *JAMA Intern Med*. 2025;185(4):389–390. doi:10.1001/jamainternmed.2024.8189.
4. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders*. 5th ed. Washington, DC: American Psychiatric Association; 2013.
5. Brand M, Rumpf HJ, Demetrovics Z, et al. Which conditions should be considered as disorders in the International Classification of Diseases (ICD-11) designation of "other specified disorders due to addictive behaviors"? *J Behav Addict*. 2020;11(2):150–159. doi:10.1556/2006.2020.00035.
6. Moreira D, Azeredo A, Dias P. Risk factors for gambling disorder: a systematic review. *J Gambl Stud*. 2023;39(2):483–511. doi:10.1007/s10899-023-10195-1.
7. Marionneau V, Nikkinen J. Gambling-related suicides and suicidality: a systematic review of qualitative evidence. *Front Psychiatry*. 2022;13:980303. doi:10.3389/fpsyt.2022.980303.
8. Lorains FK, Cowlishaw S, Thomas SA. Prevalence of comorbid disorders in problem and pathological gambling: systematic review and meta-analysis of population surveys. *Addiction*. 2011;106(3):490–498. doi:10.1111/j.1360-0443.2010.03300.x.
9. Ford M, Håkansson A. Problem gambling, associations with comorbid health conditions, substance use, and behavioural addictions: opportunities for pathways to treatment. *PLoS One*. 2020;15(1):e0227644. doi:10.1371/journal.pone.0227644.
10. Bechara A, Damasio H. Decision-making and addiction (part I): impaired activation of somatic states in substance dependent individuals when pondering decisions with negative future consequences. *Neuropsychologia*. 2002;40(10):1675–1689. doi:10.1016/s0028-3932(02)00015—5.
11. Murch WS, Clark L. Games in the brain: neural substrates of gambling addiction. *Neuroscientist*.

2015;22(5):534–545. doi:10.1177/1073858415591474.

12. Wong SH, Steiger MJ. Pathological gambling in Parkinson's disease. *BMJ*. 2007;334(7598):810–811. doi:10.1136/bmj.39176.363958.80.

13. Calado F, Alexandre J, Griffiths MD. Prevalence of adolescent problem gambling: a systematic review of recent research. *J Gambl Stud*. 2017;33(2):397–424. doi:10.1007/s10899-016-9627-5.

14. Free BL, Halle Smith E, Ginley MK, Whelan JP, Pfund RA. Does cognitive-behavioral treatment affect putative mechanisms of change among individuals with problem gambling? A systematic review and exploratory meta-analysis. *Addict Behav*. 2024;158:108110. doi:10.1016/j.addbeh.2024.108110.

15. Pfund RA, Ginley MK, Kim HS, Boness CL, Horn TL, Whelan JP. Cognitive-behavioral treatment for gambling harm: umbrella review and meta-analysis. *Clin Psychol Rev*. 2023;105:102336. doi:10.1016/j.cpr.2023.102336.

16. Rolvien L, Buddeberg L, Gehlenborg J, Borsutzky S, Moritz S. A self-guided internet-based intervention for the reduction of gambling symptoms: a randomized clinical trial. *JAMA Netw Open*. 2024;7(6):e2417282. doi:10.1001/jamanetworkopen.2024.17282.

17. Diaz-Sanahuja L, Suso-Ribera C, Lucas I, et al. A self-applied psychological treatment for gambling-related problems via the internet: a pilot, feasibility study. *J Gambl Stud*. 2024;40(3):1623–1651. doi:10.1007/s10899-024-10318-2.

18. Bodor D, Ricijaš N, Filipčić I. Treatment of gambling disorder: review of evidence-based aspects for best practice. *Curr Opin Psychiatry*. 2021;34(5):508–513. doi:10.1097/YCO.0000000000000728.

19. Challet-Bouju G, Caillon J, Leboucher J, et al. Impact of gambling on the internet on middle-term and long-term recovery from gambling disorder: a 2-year longitudinal study. *J Gambl Stud*. 2025;41:567–592. doi:10.1007/s10899-024-10328-0.

20. Park JJ, Stryjewski A, Chen B, Potenza MN. Treatment of gaming disorder in children and adolescents: a systematic review. *J Korean Acad Child Adolesc Psychiatry*. 2025;36(3):106–121. doi:10.5765/jkacap.250014.

21. Grant JE, Odlaug BL, Schreiber LR. Pharmacological treatments in pathological gambling. *Br J Clin Pharmacol*. 2014;77(2):375–381. doi:10.1111/j.1365-2125.2012.04457.x.

22. Ali, YS. Could Ozempic treat gambling addictions? *MDLinx*. August 15, 2024.

23. Otto JL, Smolenski DJ, Garvey Wilson AL, et al. A systematic review evaluating screening instruments for gambling disorder finds lack of adequate evidence. *J Clin Epidemiol*. 2020;120:86–93. doi:10.1016/j.jclinepi.2019.12.022.

24. Slutske WS. Natural recovery and treatment-seeking in pathological gambling: results of two US national surveys. *Am J Psychiatry*. 2006;163(2):297–302. doi:10.1176/appi.ajp.163.2.297.

25. Devor N. America's sports betting boom is about to backfire. *Barron's*. May 23, 2025. https://www.barrons.com/articles/sports-betting-gambling-addiction-horse-racing-f51b151b?

26. Epstein R. The big business of sports betting: states are bringing in the big bucks, but how many of them are prepared for a potential boom in gambling addictions? *Men's Health*. August 22, 2023. https://www.menshealth.com/trending-news/a44674774/problem-gambling-resource-allocation-state-guide/. Accessed March 15, 2024.

27. National Council on Problem Gambling. National Problem Gambling Helpline Modernization Project. Published September 23, 2024. https://www.ncpgambling.org/problem-gambling/helpline-modernization/.

28. Talebi F, Bazrafshan F. Effectiveness of preventive gambling interventions in adolescents: a systematic review and meta-analysis. *Addict Behav*. 2025;170:108436. doi:10.1016/j.addbeh.2025.108436.

29. Marionneau V, Ruohio H, Karlsson N. Gambling harm prevention and harm reduction in online environments: a call for action. *Harm Reduct J*. 2023;20(92). doi:10.1186/s12954-023-00828-4.

Image

# EXHIBIT T: PARENTAL INCARCERATION, DEVELOPMENT, AND WELL-BEING: A DEVELOPMENTAL SYSTEMATIC REVIEW



International Journal of
*Environmental Research
and Public Health*



*Systematic Review*

# Parental Incarceration, Development, and Well-Being: A Developmental Systematic Review

**Alicia Herreros-Fraile** [1], **Rodrigo J. Carcedo** [1,2,*], **Antonio Viedma** [3], **Victoria Ramos-Barbero** [4], **Noelia Fernández-Rouco** [1,5], **Pilar Gomiz-Pascual** [3] and **Consuelo del Val** [3]

1   HIPRIFAM, Psychological Assistance for Children of Incarcerated Parents and their Families Unit, Faculty of Psychology, University of Salamanca, Avda. de la Merced 109-131, 37005 Salamanca, Spain
2   Department of Developmental and Educational Psychology, Faculty of Psychology, University of Salamanca, Avda. de la Merced 109-131, 37005 Salamanca, Spain
3   Department of Sociology I, Faculty of Political Sciences and Sociology, National Distance Education University (UNED), C/Obispo Trejo, 2, 28040 Madrid, Spain
4   Health Sciences Department, Faculty of Health Sciences, University of Burgos, Paseo de los Comendadores, s/n (H. Militar), 09001 Burgos, Spain
5   Department of Education, School of Education, University of Cantabria, Avda. de los Castros 50, 39005 Santander, Spain
*   Correspondence: rcarcedo@usal.es

**Abstract:** Despite an increasing number of studies examining the impact of parental incarceration on children's well-being, there are few comprehensive reviews that collect this information, and even fewer from a developmental perspective. This study aims to clarify the effects of parental incarceration on children's well-being and development, as well as the moderating and mediating factors from a developmental perspective. A systematic review was conducted according to PRISMA guidelines, selecting 61 studies of children from early childhood to adolescence. The results show differences in the current evidence regarding the effects of parental incarceration on children depending on the developmental stage, with the most evidence in the 7–11-year-old stage. Being male appears as a risk moderator factor while the mental health of the caregiver and their relationship with the child appears as a mediating variable, especially from 7 to 18 years old. These results reveal the impact of parental incarceration based on children's age, providing a basis for developing protective and intervention measures.

**Keywords:** parental incarceration; development; well-being; children; adolescents; effects; moderators; mediators; systematic review

**Citation:** Herreros-Fraile, A.; Carcedo, R.J.; Viedma, A.; Ramos-Barbero, V.; Fernández-Rouco, N.; Gomiz-Pascual, P.; del Val, C. Parental Incarceration, Development, and Well-Being: A Developmental Systematic Review. *Int. J. Environ. Res. Public Health* **2023**, *20*, 3143. https://doi.org/10.3390/ijerph20043143

Academic Editors: Matt DeLisi and Scott D. Rozelle

Received: 24 November 2022
Revised: 31 January 2023
Accepted: 6 February 2023
Published: 10 February 2023



**Copyright:** © 2023 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (https://creativecommons.org/licenses/by/4.0/).

## 1. Introduction

Imprisonment has a range of negative consequences on an individual's personal life, and also on the families who are separated from the incarcerated people. This is especially relevant for the children of incarcerated parents. Having a parent in prison is a more common phenomenon than it may seem. Although there are no data or worldwide estimates, there are estimates that, in Europe, 723,000 children and adolescents are in this situation [1], and 2.6 million in the United States [2], the country with the highest incarceration rate in the world.

Over the past decade, several studies have been conducted, mainly in the United States [3], that have found significant associations between parental incarceration and different difficulties in the development of children of incarcerated parents, e.g., [4]. In this sense, children and adolescents have shown greater difficulties in their physical [5], cognitive [6] and socioemotional development [7–9], as well as in their school life [10], living conditions [11], and a greater number of psychosocial risks (e.g., substance abuse [12], delinquency [13], and violent behavior [9]). However, some studies have not found a relationship between parental incarceration and some of these variables, e.g., [14–18].

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

2 of 44

On the other hand, the target population differs depending on the research, with different studies focusing on the effects of parental imprisonment on children in early childhood [8], middle childhood [6], or adolescence [12]. It is essential to consider the child's developmental stage as, depending on the child's age, parental imprisonment may impact differently on the child's well-being [19]. For example, parental incarceration may have a different impact on children's academic performance depending on the stage of education. Parental incarceration has been more strongly associated with some developmental outcomes at one stage than others, e.g., [20]. Moreover, parental imprisonment may not only directly affect children's well-being but may also affect children indirectly through mediating variables [10]. In addition, the consequences of imprisonment may also be modified through moderating variables [8]. Some characteristics of the family, the children themselves, the school, or the neighborhood where they live could be determinants of the relationship, modifying the effects of parental imprisonment or eliminating them [21]. For example, financial hardship and family circumstances are important mediators. In contrast, Child's gender appears to be a significant moderator [22].

To date, several reviews and meta-analyses have explored the effects of parental imprisonment on physical health [21,23], mental health [23], and various other outcomes such as substance use, offending behavior, and educational performance [24–26]. However, these reviews do not present the results according to the developmental stage of the children, so it is not possible to observe whether the impact of imprisonment varies according to the age of the children. Nevertheless, the existence of different effects of parental imprisonment depending on the age of the children suggests the need to adopt a developmental perspective and consider life course patterns [27]. Implementing a developmental perspective when studying the impact of parental imprisonment on children is one of the lines of research that are still pending [19].

It has only been possible to locate two reviews that have analyzed the impact of parental imprisonment by separating children according to age [22,28]. On the one hand, Luk et al. [28] divide the included studies into children and adolescents. However, the group of "children" comprised ages ranging from birth to 11–12 years, a very long period in which the child undergoes many changes. Therefore, this review explores a further developmental stage by dividing the children group into early childhood and middle childhood. On the other hand, Poehlmann-Tynan and Turney [22] used these three developmental stages. Nevertheless, they do not set an inclusion criterion in the review to select only studies with a comparison group, as was the case with Luk's review [28]. To observe the different effects of parental imprisonment on children, it is essential to compare these outcomes with those of other children who have not been exposed to parental imprisonment. It is the only way to determine whether parental imprisonment impacts children's well-being and development. For this reason, this review not only explores in detail the effects of parental imprisonment in early childhood, middle childhood, and adolescence but carries out this analysis only through studies with a group of children with an imprisoned parent and a comparison group, unlike other reviews.

Furthermore, another problem identified with the analysis of this phenomenon lies in the methodological differences between studies on the effects of parental imprisonment. To make the results as comparable as possible, only quantitative articles have been selected. In addition, to show even more significant results, only those studies that include control variables have been considered. Control variables relate to characteristics before parental imprisonment likely to cause part of the effects to be studied. For example, children exposed to parental incarceration are three times more likely to suffer adverse childhood experiences than other children [29]. For this reason, it is essential to include only studies that controlled for a range of variables (socio-demographic, socio-economic, health, interpersonal, cognitive, and emotional) to ensure that the different outcomes observed in children were not solely dependent on other characteristics of children's lives.

Finally, this review also addresses another of the lines of research pending to date, the in-depth analysis of the mediating and moderating variables of the relationship between

parental imprisonment and different outcomes in children at different developmental stages [19]. These variables have yet to be rigorously analyzed in reviews with an evolutionary perspective, despite having been studied in some empirical research. In this sense, both Luk's and Poelhmann-Tynan and Eddy's reviews mention some mediators and moderators [22,28], but without examining them according to the age of the children not allowing us to observe the differences. This paper is the first review to analyze all the moderators and mediators analyzed in the included articles. The aim is to detect possible risk and protective factors as well as mechanisms that, depending on the age of the children, mediate or moderate the impact of parental imprisonment.

In summary, this fact leads us to propose the following research questions:

(1)  Are there differences in the impact of parental imprisonment on children's well-being and development depending on children's developmental stage when a comparison group is included?
(2)  What are the mediating and moderating variables in the relationship between parental imprisonment and the different outcomes related to children's well-being and development at each developmental stage?

## 2. Materials and Methods: Search Strategy, Inclusion Criteria, and Research Article Selection

Databases related to this topic and of great relevance and prestige were used. Therefore, the databases PsycINFO, MEDLINE, ERIC, Web of Science, Scopus, and the Cochrane Library were used. The search was limited to the period 2000–2022 with the following search strategy: (incarcerated parents OR parental incarceration OR incarcerated mother* OR incarcerated father) AND ((impact on child* OR effect on child*) OR (child* socio-emotional development OR child* well-being OR child* wellbeing OR infant* socio-emotional development OR infant* well-being OR infant* wellbeing OR infant* health OR infant* quality of life)).

Regarding the criteria for selecting studies for inclusion in the review, the following were used:

- Participants' age was between 0 and 18 years (except for studies that included older participants, provided the mean age of the sample was less than 18 years);
- The studies needed to assess the impact of parental incarceration on children and/or adolescents;
- One or both parents had to be or had been in prison;
- They needed to be quantitative studies and include groups of children with an incarcerated parent and a comparison group (without a parent in prison), in addition to control variables;
- The design could be cross-sectional or longitudinal;
- The studies had to be published in prestigious international journals (e.g., catalogued and/or indexed in PsycINFO, ERIC, Medline, Scopus, or Web of Science);
- The studies needed to be published in English or Spanish.

As an exclusion criterion, children could not live in the same prison as occurs in Mother Units. This profile is very different from children who live outside of prison with a caregiver.

Article selection was performed following the procedure outlined in the PRISMA guidelines [30]. Below, we present the search flow diagram, Figure 1.



**Figure 1.** PRISMA flowchart detailing study selection process.

The initial search was performed with the previously mentioned search strategy in distinct databases: APA PsycInfo (n = 523), Medline (n = 188), ERIC (n = 80), Web of Science (n = 777), Scopus (n = 416), and Cochrane (n = 30) for a total of 2014 studies. Duplicate studies were eliminated manually and automatically by importing articles into the Mendeley platform, reducing the sample to 1128. Accordingly, from the resulting studies, those that did not meet the inclusion criteria on reading the abstracts or the full-length articles were eliminated. Firstly, studies that did not investigate the effects of parental incarceration in children and/or adolescents, or those that did not do so empirically were excluded (n = 768). Secondly, articles based on systematic reviews and meta-analyses (n = 16) and intervention programs (n = 97) were also not included. Thirdly, empirical studies with the following characteristics were also dropped from the final selection: samples older than 18 (n = 59), qualitative research (n = 66), quantitative research without a comparison group (n = 47), without control variables (n = 6), or theses or dissertations that were not published in a scientific journal (n = 8). After exclusion, 61 studies met all the inclusion criteria and were selected.

To perform data extraction and synthesis, the most important information was determined based on the research questions. In addition to the authors and the publication date, we extracted the age and size of the included sample, the variables or criterion variables of each study, the incarcerated parent (father, mother, or both), the type of study, the number of controlled variables (in intervals, with these being "between 1 and 5", "between 5 and 10", "between 10 and 15", "between 15 and 20" and "more than 20") and the results obtained. All this information was collected in four tables based on the age of the sample. Therefore, the sample was divided into four groups: children between 0 and 6 years old, children between 7 and 11 years old, adolescents between 12 and 18 years old, and a last group of those studies that did not differentiate developmental stages and that included boys and girls between 0 and 18 years. In the second stage, variables with a moderator or mediator effect in the relationship between parental incarceration and different outcomes related to the well-being and development of children were collected. These variables were included in this review if there was an appropriate statistical analysis of moderation or mediation. However, it is true that in the case of moderation indicated in the corresponding table, those studies that ran their analyses with separate groups but without using a moderation test were also considered.

## 3. Results

In this section, the direct effects of parental imprisonment on different outcomes, as well as the effects of moderators and mediators are presented in Tables 1 and 2. Additionally, the results of each study included in this review may be consulted in Appendix A (Tables A1–A4).

### 3.1. Children 0 to 6 Years

Several studies have investigated the association of parental incarceration with physical health, cognitive skills and school performance, social–emotional skills, externalizing and internalizing symptoms, and material hardship in the early childhood stage.

#### 3.1.1. Physical Health

Four articles were included in this category, of which two differentiated between paternal and maternal incarceration [31,32]. Three of these studies found that parental incarceration was associated with greater sleep and eating behaviors problems [31], food insecurity [33], and infant mortality [32]. By contrast, one study did not find any significant relationship between parental incarceration and physical health, although this research used only one global health measure [8].

Regarding moderators, domestic violence by the father before incarceration moderated the relationship between the father's incarceration and the child's physical health ($p < 0.10$). Parents in prison who were not involved in domestic violence before imprisonment were associated with poorer physical health of their children [32]. On the other hand, although a

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

6 of 44

formal analysis was not performed, paternal and maternal incarceration, analyzed separately, was associated with most physical health measures. While paternal incarceration was significantly associated with more sleep problems and starch consumption, maternal incarceration was associated with fast food consumption [31].

### 3.1.2. Cognitive Skills and Academic Performance

A total of five studies were categorized within this section, three of which referred to paternal incarceration [8,10,34] and two which did not differentiate the gender of the parent in prison [16,35]. Parental incarceration was associated with lower cognitive skills and/or academic performance in four of these studies [8,10,34,35]. Those children with a parent in prison presented a greater number of attentional difficulties [8], were less prepared for school [34,35], and had a greater probability of repeating a grade [10]. In contrast, there was no association between parental incarceration and worse academic functioning [16]. Likewise, no significant results were found when studying the differences in children's verbal ability [8].

Among the moderating and mediating variables considered, child's gender appeared as a moderator, and the perception of teachers was a mediator. In this sense, paternal incarceration was significantly associated with a worse non-cognitive preparation for boys entering school but not girls [34]. Additionally, paternal incarceration was related to a more negative perception of teachers toward children, resulting in a deterioration in cognitive skills and school performance [10].

### 3.1.3. Socioemotional Skills

Only one study examined how paternal incarceration affects socioemotional skills, specifically emotion recognition. The relationship was not significant [19].

### 3.1.4. Externalizing Symptoms

Three studies analyzed the relationship between externalizing symptoms and parental incarceration, two of which referred to paternal incarceration [8,36] and one which did not differentiate the gender of the incarcerated parent [16]. Two of these studies found that children exposed to paternal incarceration were more likely to present more externalizing problems [8] and physical aggression behaviors [36]. On the other hand, another study found no significant results for externalizing symptoms [16].

Multiple moderators were also observed. In this sense, boys with an imprisoned father were more likely to present externalizing problems than girls. In addition, children who lived with their father before incarceration, who had been victims of domestic violence, or whose fathers had not been convicted of a violent crime also showed more externalizing behaviors [8,36].

### 3.1.5. Internalizing Symptoms

The relationship between parental incarceration and internalizing symptoms in small children was only examined in two studies. One of these studies analyzed paternal incarceration [8], and the other did not differentiate the gender of the incarcerated parent [16]. Only the latter study showed a significant relationship. Concretely, children who experienced parental incarceration had more internalizing symptoms than children who did not [16].

### 3.1.6. Material Hardship

Two studies were included in this category, one of which focused on paternal incarceration [37], and another which did not differentiate the gender of the parent in prison [11]. Both studies revealed significant results. Parental incarceration was significantly associated with a higher risk of children being homeless [11], and paternal incarceration was related to the lack of material resources [37].

Diverse variables acted as moderators and mediators in the relationship between parental incarceration and material hardship. African American children with a parent

in prison had a greater association ($p < 0.10$) with material hardship than other ethnic groups [11]. It was also found that the fact that the father lived with the family before imprisonment was associated with a higher degree of material hardship once the parent was in prison [37]. Finally, an indirect effect of parental imprisonment on material hardship was found through increased economic hardship and reduced institutional support [11].

### 3.2. Children 7 to 11 Years

In this stage, various studies focused on analyzing the association between parental incarceration and physical health, cognitive skills and academic performance, socioemotional skills, delinquent behavior, externalizing and internalizing symptoms, and material hardship.

#### 3.2.1. Physical Health

Four studies were selected for this category, with only two of them distinguishing the gender of the parent in prison [38,39]. Three of these studies found a significant relationship between parental imprisonment and a higher likelihood of presenting health problems. Specifically, a significant relationship was found between paternal incarceration and sleep problems [38], parental incarceration (or just maternal incarceration) and obesity [39], and parental incarceration and higher levels of food insecurity [40]. By contrast, a fourth study showed that parental incarceration did not influence body mass index [41].

Regarding mediating variables, bedtime inconsistency partly mediated the association between paternal incarceration and less sleep duration [38].

#### 3.2.2. Cognitive Skills and Academic Performance

Eight studies were included in this section: seven articles focused on paternal incarceration [6,10,17,34,42–44] and only one was on maternal incarceration [18]. A total of four studies found a significant relationship between paternal incarceration and a worse non-cognitive preparation for school entry and a greater possibility of special education attendance in boys [33], worse math problem solving skills, and a greater number of attention and memory problems [6], and, finally, a greater probability of repeating the grade [10], and school suspension [44].

Although four studies did not find a direct association between parental incarceration and cognitive skills and academic performance, some of them found significant moderating and indirect effects [17,42].

Regarding moderating effects, child's gender seems to play a relevant role. In this respect, girls with a father in prison scored significantly lower in reading comprehension and math problem solving skills than girls who did not have an imprisoned father. In the case of boys, lower levels of memory/attention skills were only found in boys with a parent in prison compared to boys whose father was not incarcerated [6]. Furthermore, paternal incarceration was associated with a greater probability of attending special education in boys, although this effect was not tested in girls [34]. Finally, children with a father in prison and at a low risk level of experiencing parental incarceration were associated with lower reading comprehension, math comprehension, and verbal ability. However, these significant relationships were not found in the group of children with an incarcerated father and a high risk of experiencing parental incarceration [17].

Other variables acted as mediators, such as being less prepared for school in boys (outcome: special education placement [34]), behavior problems and weakened social bonds (outcome: suspension/expulsion from elementary school [44]), supportive maternal caregiving (outcome: reading achievement [42]) and negative perception by teachers (outcome: repeat the grade [10]).

#### 3.2.3. Socioemotional Skills

Only one study entered this category. Paternal incarceration was significantly associated with lower levels of socioemotional skills. This relationship was stronger for those children with a violent father [7].

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

8 of 44

### 3.2.4. Delinquent Behavior

It was possible to include four studies in this category. Three of these studies focused on paternal incarceration [17,43,45], and the other one on maternal incarceration [18]. Three of the studies showed a significant relationship between parental incarceration and a greater probability of presenting early juvenile delinquency [18,43,45].

The probability of parental incarceration, categorized in three strata (low, medium, and high), acted as a moderator in two studies, but in different ways. On the one hand, a significant relationship was found between paternal incarceration and a greater probability of presenting early juvenile delinquency in the medium and highest strata but not in the lowest stratum [17]. On the other hand, a significant relationship was observed between maternal incarceration and a greater presence of early juvenile delinquency in the lowest and medium risk strata but not in the highest risk stratum [18]. In addition, having a poor relationship with siblings increased the association between maternal incarceration and greater children's delinquent involvement [45]. Finally, the association between parental incarceration and a greater presence of early delinquent behavior was significant in boys but not girls [43].

### 3.2.5. Externalizing Symptoms

Eight studies were incorporated into this category, five of which studied paternal incarceration [17,43,46–48], one of which studied maternal incarceration [18], and two which did not distinguish between either type of imprisonment [41,49]. The results of seven of these studies showed a direct, significant, and positive relationship between parental incarceration and these symptoms [17,41,43,46–49].

Regarding the study that did not find a significant relationship between maternal incarceration and externalizing symptoms [18], it did find a significant association between both variables in those children with a lower probability of experiencing maternal incarceration.

Other variables that also appeared as moderators were empathy and gender. In this sense, the relationship between parental incarceration and aggression problems was no longer significant in children with high empathy levels [49]. On the other hand, the association between paternal incarceration and externalizing symptoms was only significant for boys but not girls [43].

Some mechanisms or mediators were also observed in these studies. Paternal incarceration was associated with higher levels of maternal and child depression, a greater frequency of spanking the child, and less parental involvement, which in turn was associated with a greater presence of externalizing symptoms [46,47].

### 3.2.6. Internalizing Symptoms

Eight studies were found related to this category. Five of them focused on paternal incarceration [17,43,46–48], one on maternal incarceration [18], and two included both types of imprisonment [41,50]. The only study that addressed maternal incarceration did not show a significant relationship with internalizing symptoms [18], while four of the five studies that focused on parental incarceration found a positive association [17,43,47,48].

The risk of suffering paternal and maternal incarceration and gender acted as possible moderators. On the other hand, paternal and maternal incarceration was associated with higher levels of internalizing symptoms in children who had an a priori risk of suffering incarceration of their mother, while this association was not significant in children with a middle or high risk [17,18]. Likewise, paternal incarceration was associated with internalizing problems in boys but not girls [43].

Different mechanisms by which parental incarceration increased internalizing symptoms were also observed. First, maternal incarceration increased maternal depression and stress (mediators), which were associated with higher internalizing symptoms [46]. Second, paternal incarceration was associated with more problems contacting the father in prison, generating more internalizing symptoms in children [50].

### 3.2.7. Material Hardship

Among the two studies that covered this category, there was a significant association between paternal incarceration and children receiving less financial support from their fathers [51,52]. This relationship was mediated by a decrease in the father's earnings and the fact that the father in prison and the mother do not live together anymore [51].

### 3.3. *Adolescents (12 to 18 Years Old)*

Different studies investigated the association between parental incarceration and cognitive skills and school performance, socioemotional skills, risk behaviors, delinquent behaviors, and externalizing and internalizing symptoms during this developmental stage.

### 3.3.1. Cognitive Skills and Academic Performance

Eight studies were found related to this category. One of these eight studies addressed both paternal and maternal incarceration separately [53], two of them paternal incarceration [15,54], one maternal incarceration [55], and the last three did not discriminate the gender of the parent in prison [56–59]. The vast majority of these investigations only included variables related to academic performance. Only two studies referred to cognitive skills, specifically attention [15,54].

Five out of eight studies found a significant association between parental incarceration and cognitive skills and academic performance. Having a parent in prison has been associated with poorer school performance (grades), lower educational achievement, higher absenteeism and dropout rates, and more attention problems [53–55,57,59]. In contrast with these results, three studies did not find a significant relationship between parental incarceration and academic performance [52,53] and paternal incarceration and attention problems [15].

Significant moderators and mediators were also observed. First, paternal incarceration only during children's early childhood was significantly associated with more attention problems [54]. Furthermore, parental imprisonment was only related to poor school outcomes among children enrolled in public schools [59].

An indirect relationship was also found between incarceration and poorer school performance and cognitive abilities, through poor quality of the father–child relationship, poorer health, a more negative type of residence and parenting style, and lower economic well-being [54].

### 3.3.2. Socioemotional Skills

Three studies were included in this category, one regarding paternal incarceration [60] and two that did not differentiate the gender of the parent in prison [61,62]. Only two studies found a significant association between parental incarceration and this category [60,62]. Parental imprisonment was associated with a greater probability of establishing peripheral friendships and maintaining relationships with more conflictive people. However, no significant association was found between parental incarceration and the number of the child's friends [60,62] or prosocial behavior [61].

It was also found that parental incarceration generated higher levels of caregiving depression which, in turn, generated a worse relationship between the caregiver and the adolescent, concluding in a deterioration of the adolescents' socioemotional skills (sequential mediation) [61].

### 3.3.3. Risk Behaviors

Six studies were included in this section, two about the incarceration of the father [63,64] and the rest without differentiating the gender of the parent in prison [14,56,65,66]. The relationship between incarceration and risk behaviors was significant in four studies [12,14,64,65]. Having a father or mother in prison was significantly associated with greater consumption and abuse of substances (alcohol, tobacco, drugs, marijuana, etc.) in two of the four articles that studied this variable [65,66]. Paternal incarceration was also associated with early

Int. J. Environ. Res. Public Health **2023**, 20, 3143

10 of 44

sexual initiation [64]. Regarding sexual risk, it was only related to parental incarceration in African American children [65]. Likewise, paternal detention, but not incarceration, predicted adolescent alcohol abuse [63].

### 3.3.4. Delinquent Behavior

Four articles were incorporated into this category, two of which studied paternal incarceration [54,67], and two which did not differentiate the gender of the parent in prison [56,68]. Two of these studies showed a significant relationship between parental imprisonment and delinquent behavior [58,60]. Specifically, an association was found between parental incarceration and increased youth theft [56] and between the incarceration of the father and delinquent behavior [54].

Regarding moderators, paternal incarceration was significantly associated with more delinquent behavior during early childhood only [54]. Concerning mediators, an indirect relationship was also observed between parental incarceration and serious criminal acts through high levels of social disadvantage, poor parental mental health, lower effectiveness in parenting, and a decrease in attachment to fathers [67,68].

### 3.3.5. Externalizing Symptoms

Ten studies were included in this section. Four of these analyzed the incarceration of the father [15,47,54,63], and the other six the imprisonment of the father or mother without differentiating them [9,12,14,61,68,69]. Six of these studies found that adolescents with an incarcerated parent showed more externalizing symptoms [12,14,47,54,68,69].

To refine these results, moderating and mediating effects were also analyzed. Parental incarceration was a significant predictor of externalizing symptoms in only one of the problematic trajectory groups named "mid-increasing trajectory" (i.e., lower levels of externalizing problems at the age of 10, but with levels gradually increasing to clinically high levels at the age of 16) [9]. The moment of incarceration also moderated the level of externalizing problems. This association was maintained when incarceration occurred during early childhood [54]. Furthermore, children's closeness with their parents acted as a protective factor against the appearance of these externalizing symptoms [12].

An indirect relationship was also found between parental incarceration and externalizing symptoms mediated by a poor quality father–child and parental relationship, poor health, a more negative type of residence and parenting style, and lower economic well-being [47,54,61].

### 3.3.6. Internalizing Symptoms

Eleven studies were included in this category. Six of these did not differentiate whether the parent in prison was the father or the mother [12,14,56,69–71] while the other five only studied paternal incarceration [15,47,54,63,72]. Five out of the eleven studies revealed a significant relationship between parental incarceration and a greater presence of internalizing symptoms in adolescents [12,14,47,69,72]. These studies included measures of internalizing symptoms such as anxiety, depression, ADHD, suicidal ideation or suicidal or self-injurious behaviors, post-traumatic stress, mental health, and internalizing problems in general.

Several variables were found in this category that exerted a moderating effect as protective variables. Among these were resilience, extracurricular activities, physical activity, quality of sleep [14], and closeness with the father [12]. Screen time also appeared as a risk factor, increasing the likelihood of presenting internalizing symptoms in adolescents with an incarcerated parent. Additionally, there was an indirect effect of parental incarceration on the development of internalizing symptoms in adolescents through caregivers' depression [71].

*3.4. Studies That Do Not Differentiate According to Developmental Stage (Children and Adolescents)*

Finally, a subsection was created to present the results of all the studies that do not make differences according to age, and that include children and adolescents without distinguishing. These studies introduce measures of both physical and mental health.

### 3.4.1. Physical Health

Five studies were included in this category, none of which differentiated the gender of the incarcerated parent. Four of them found a significant relationship between parental incarceration and poor physical health [17,73–75], while the other one did not find these results [4]. These investigations highlighted parental incarceration as a predictor of various measures related to respiratory, cardiac, bone, muscle, dental, and visual problems, chronic ailments, increased mortality, and unmet needs for medical resources.

Regarding the moderating variables, having health insurance acted as a protective factor in the relationship between parental incarceration and children's poorer physical health. At the same time, material hardship led to more physical health problems in children and adolescents [73]. Gender also acted as a moderator, with the relationship between parental incarceration and mortality in girls not being significant [74].

### 3.4.2. Internalizing Symptoms

The relationship between parental incarceration, without differentiating the gender of the parent in prison, and internalizing symptoms in children was studied in three articles. All of them found a significant relationship between parental incarceration and internalizing symptoms [4,5,75]. These studies covered mental health problems, such as Tourette's syndrome, intellectual disability, learning disabilities, language problems, ASD, developmental delay, anxiety, depression, and ADHD.

A summary of the direct effects of parental imprisonment on different outcomes, as well as the effects of moderators and mediators are included in Tables 1 and 2. Additionally, the results of each study included in this review may be consulted in Appendix A (Tables A1–A4).

**Table 1.** Summary of significant direct effects of parental incarceration on the different outcomes.

| | Children 0 to 6 Years | Children 7 to 11 Years | Adolescents (12 to 18 Years) | Developmental Stage Is Not Determined |
|---|---|---|---|---|
| Physical health | 3/4 (75%) | 3*/4 (75%) | - | 4/5 (80%) |
| Cognitive skills and academic performance | 4/5 (80%) | 4/8 (50%) | 5/8 (62.5%) | - |
| Socioemotional skills | 0/1 (0%) | 1/1 (100%) | 2/3 (66.6%) | - |
| Risk behaviors | - | - | 4/6 (66.6%) | - |
| Delinquent behaviors | - | 3/4 (75%) | 2/4 (50%) | - |
| Externalizing symptoms | 2/3 (66.6%) | 7/8 (87.5%) | 6/10 (60%) | - |
| Internalizing symptoms | 1/2 (50%) | 6/8 (75%) | 5/11 (45.5%) | 3/3 (100%) |
| Materials hardship | 2/2 (100%) | 2/2 (100%) | - | - |

* Note: The direction of the relationship of one of these studies [39] is contrary to the rest of the evidence (maternal incarceration–higher physical health).

*Int. J. Environ. Res. Public Health* **2023**, *20*, 3143

12 of 44

**Table 2.** Summary of moderators and mediators in the relationship between parental incarceration and different outcomes.

| | Children 0 to 6 Years | | Children 7 to 11 Years | | Adolescents (12–18 Years) | | Developmental Stage Is Not Determined | |
|---|---|---|---|---|---|---|---|---|
| | Moderation | Mediation | Moderation | Mediation | Moderation | Mediation | Moderation | Mediation |
| Physical health | Father in prison who exerts domestic violence ($p < 0.10$) | - | - | Bedtime consistency | - | - | Child's gender, household material hardship, child does not have medical insurance. | - |
| Cognitive skills and academic performance | Child's gender | Teacher's perceptions | Child's gender, risk of parental incarceration | School readiness, maternal care, behavioral problems, weak social relationships and teacher´s perceptions | Moment of incarceration, school setting | Quality of the parent–child relationship, health, type of residence, parenting style, economic well-being | - | - |
| Socioemotional skills | - | - | - | Father in prison who exerts violence | - | Caregiver depression, quality of the caregiver–child relationship | - | - |
| Risk behaviors | - | - | - | - | Child's gender, children's sleep quality, father in prison lived with the child before incarceration. | Externalizing problems | - | - |

*Int. J. Environ. Res. Public Health* **2023**, *20*, 3143

13 of 44

Table 2. *Cont.*

| | Children 0 to 6 Years | | Children 7 to 11 Years | | Adolescents (12–18 Years) | | Developmental Stage Is Not Determined | |
|---|---|---|---|---|---|---|---|---|
| Delinquent behaviors | - | - | Child's gender, risk of parental incarceration, negative sibling relationship quality | - | Moment of incarceration | Social disadvantages, parents´ mental health, parenting effectiveness, the reduction of attachment to fathers | - | - |
| Externalizing symptoms | Child's gender, father in prison lived with the child before incarceration, father in prison exerted domestic violence, crime for which the parent was arrested | - | Child's gender, empathy, risk of parental incarceration | Maternal depression, frequency of spankings, parental implication, child depression | Closeness to father, moment of incarceration, previous externalizing problems, resilience, extracurricular activity | Caregiver depression, caregiver–child relationship, adolescent depressive symptoms, perceived social support, parenting style, change of residence, economic well-being | - | - |
| Internalizing symptoms | - | - | Child's gender, risk of parental incarceration | Maternal depression and stress, problems experienced trying to contact the parent in prison | Resilience, extracurricular activity, physical activity, sleep quality, screen time, closeness to incarcerated parent | Caregiver depression | - | - |
| Material hardship | Ethnic group ($p <$ 0.10), cohabitation of the father with the family prior to incarceration | Family economic difficulties and reduced institutional support | - | Decrease in father's earnings, incarcerated father and mother do not live together | - | - | - | - |

Int. J. Environ. Res. Public Health **2023**, 20, 3143

14 of 44

## 4. Discussion

During childhood and adolescence, a significant percentage of children are exposed to parental incarceration. This phenomenon may have a negative impact on the well-being and development of children and adolescents [4]. This systematic review has focused on studies examining the differences in the effect of parental incarceration on the well-being and development of children across three different developmental stages: children aged 0 to 6 years, children aged 7 to 11 years, and adolescents aged 12 to 18 years. A fourth group of studies that did not differentiate the age of the children was also included. To this end, studies were selected following a series of inclusion and exclusion criteria, highlighting the presence of a comparison group, control variables, and a quantitative approach, and were categorized based on the developmental stage of the children. This distinction allowed us to observe if there were variations in the results depending on the children's stage of development. The second goal of this systematic review was to address the analysis of moderating and mediating variables in the relationship between parental incarceration and the children's development and well-being also considering the above-mentioned three different developmental stages.

### 4.1. Parental Incarceration and Children's Development and Well-Being

There is strong evidence to show that parental incarceration has a significant impact on the well-being and development of children and adolescents. This has been observed across all relevant outcomes related to children's well-being and development, except for socioemotional skills in children from 0 to 6 years old (only one study was found for this outcome, which does not represent sufficient empirical evidence). These results are consistent with findings in previous systematic reviews that have also found a general negative effect of parental incarceration on the well-being and development of these children [21,22,28].

However, this present review finds a more specific and unique pattern of significant associations between parental incarceration and a worse state of children's well-being and development in different developmental stages. This is determined by selecting outcomes with higher significance (categories of outcomes with at least four studies, and 75% of them showed significant negative effects of parental incarceration). In this regard, in children aged 0 to 6 years, parental incarceration had adverse effects on cognitive skills and academic performance (80%) and physical health (75%). In children aged 7 to 11 years, it had adverse effects on externalizing symptoms (87.5%) internalizing symptoms (87.5%), and delinquent behaviors (75%). In adolescence, the adverse effects of parental incarceration were less pronounced and only appeared on risk behaviors (66.6%), cognitive skills in academic performance (62.5%), and externalizing symptoms (60%) when 60% was selected as the cut-off point. It is worth noting that some outcomes, such as material hardship or socioemotional skills were not included in the analysis due to a lack of sufficient studies.

In general, we can observe that from 0 to 6 years there was a particularly important effect on cognitive and educational aspects. More attentional problems [8], worse preparation for school [34,35], and a greater probability of repeating grades [10] were found in children with an incarcerated parent. This stage is especially important for cognitive development, especially for the start of the development of the attentional filter [76], and all this influences better academic adaptation to preschool and kindergarten [77].

Considering that the first years of a child's life are key for the acquisition of literacy and initial math skills, it is especially relevant that most problems occur in this stage as this can mean difficulties that can be carried over throughout children's education.

While the review by Poehlmann-Tynan and Turney [22] places attentional problems between 3 and 5 years and between 9 and 16 years, and school difficulties between 6 and 17 years, and the review by Luk et al. [28] does not clearly specify the age (0 to 17 years), our review highlights these problems which appear in the studies with a higher percentage from 0 to 6 years. However, these difficulties appear in all the stages studied to varying degrees.

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

15 of 44

On the other hand, worse physical health also appears as one of the most relevant results in the 0 to 6 years stage, more so than in later stages. Previous reviews have also found a relationship between parental incarceration and physical health [26,78–80], even though only some of them break their results down by the developmental stage [21,22]. In this sense, Poehlmann-Tynan and Turney [22] place adverse health effects at birth from 9 to 16 years old, and Austin et al. [21] in infants (11 out of 10 studies) and from early childhood to late adolescence (7 out of 10 studies). Although our review also finds an important effect between parental incarceration and physical health in the block of studies which did not determine the developmental stage, the most apparent evidence of adverse effects appears in the 0 to 6 years stage. This result partially coincides with Austin et al. [21], since these authors also observed a higher incidence at birth. However, they include a too-broad developmental stage from early childhood to adolescence.

There is no evidence of whether such manifestations express their emotional distress, either because of how children express themselves during this developmental stage or because adults do not often identify forms of emotional expression that do not follow the usual adult rules.

Regarding the 7–11 years old stage, the highest percentage of studies with a significant association was found in children exhibiting externalizing symptoms, followed by delinquent behavior and internalizing symptoms. In this developmental stage, the children's behavior seems to play a crucial role, as parental incarceration negatively affects externalizing and delinquent behavior. At this life stage, children are expected to have gained self-control [81] to regulate their behavior, but it seems that the absence of a parent at home may disrupt this process. Additionally, cognitive development at this life stage makes these children and their peers more aware of the parent's situation than in early childhood, which may increase feelings of stigma and internalizing symptoms.

Again, some previous reviews have found an association between parental incarceration and experiencing externalizing and internalizing behavior problems at various points across childhood, but without specifying the specific stages [78]. While there is a general agreement on the presence of externalizing behavior problems [25], there are conflicting results regarding the significant association between mental health problems and/or internalizing behavior symptoms. Some studies affirm this association [22,28,78,79], while others do not [25]. According to Poehlmann-Tynan and Turney's [22] and Wildeman et al.'s [80] reviews, the consequences of parental incarceration appear in earlier developmental stages in the case of externalizing behavioral problems and later for internalizing behavioral problems. In particular, Poehlmann-Tynan and Turney's [22] review states that whereas more attention problems and aggression appear between 3 and 5 years old, externalizing and internalizing problems, as well as antisocial behaviors and delinquency, appear in middle childhood. The current review is consistent with the findings of Poehlmann-Tynan and Turney [22], as it also found that children exhibit externalizing, internalizing, and early delinquent behavior problems in middle childhood. However, this review makes a novel contribution by finding that a larger number of studies have identified children experiencing externalizing and internalizing behavior problems at 7 to 11 years old than in other developmental stages.

Additionally, when analyzing each developmental stage individually, we find that the most robust results correspond to children 7 to 11 years of age. This original contribution of the current review could be explained because the transition to adolescence is included in this developmental stage (the mean age of most of these studies is around 9 years old, and this transition is a challenging moment in a child's life [82]). In other words, we speculate that the effect of parental incarceration on children's development and well-being might be more pronounced at this developmental stage.

Although few studies have investigated the material hardship experienced by these families, it is important to note that parental incarceration has been significantly associated with higher levels of this variable in all studies conducted, both in early and middle childhood.

Regarding adolescents, when reducing to 60% significant studies (with a minimum of four studies for each outcome), risk behaviors, cognitive skills, academic performance, and externalizing symptoms were found to be the most relevant adverse effects of parental incarceration.

Health risk behaviors mainly comprised substance abuse and sexual behavior. With regard to adolescent sexual behavior, previous studies have also shown a link to the early onset of sexual relationships and sexual risks [28,79]. In addition, previous reviews have also found a significant association between parental incarceration and substance abuse (alcohol, tobacco, drugs, marijuana, etc.) [26,28,78–80], although one review did not find a significant association specifically with illicit drugs [25]. These two types of risk behaviors are typically observed from adolescence onwards [83,84], and their association with parental incarceration during this developmental stage was found to be statistically significant in three out of four (75%) studies included in this category.

As was the case in the 7 to 11 years old stage, parental incarceration was also associated with externalizing symptoms in adolescence. As previously mentioned, different reviews have found this significant association, although most of them have not specified a concrete age group. At this developmental stage, Poehlmann-Tynan and Turney's [22] and Luk et al.'s reviews [28] make references to the association between parental incarceration and externalizing symptoms. However, as also described above, more studies have found a significant relationship between these two variables in middle childhood than in adolescence. At this developmental stage, human beings progressively gain autonomy and the ability to elaborate and express what is happening to them cognitively, so children's discomfort and disruptive behaviors become more visible than in the previous stage. At the same time, these behaviors, such as early delinquent behaviors, are not usually attended to or considered especially problematic by adults until adolescence. Unfortunately, this consideration often hides the need for early and preventive intervention that may be more effective.

Finally, having an incarcerated parent has also been associated with lower grades and achievement, higher absenteeism and dropout rates, and more attention problems [61–63,65,67] in adolescence. Previous reviews have also found a relationship between parental incarceration and different school-related problems without clearly specifying the age group [25,78,80], or placing this relationship in different developmental stages [22,28]. This current review finds evidence of this relationship in all developmental groups, but the number of studies that found this relationship in adolescence and early childhood is lower compared to middle childhood.

In general, this review has found a lower percentage of studies with significant results in adolescence. This fact may be due to adolescents' responses being more likely to come from the adolescents themselves rather than from their primary caregiver, as is the case in earlier developmental stages. Future studies should control the effect of the respondent on the association between parental incarceration and different outcomes.

### 4.2. Moderating and Mediating Factors Depending on Children's Developmental

Furthermore, the second research question addressed the possible influence of moderating and mediating variables on the relationship between parental incarceration and the measures related to the development and well-being of children. Previous reviews have also attempted to examine the impact other factors have on children with an incarcerated parent, but either they did not specifically study the mediating or moderating role [28] or were not comprehensive in describing all possible moderating or mediating effects [22,56]. Our results identify some moderating and mediating effect patterns within each age group. However, finding a clear pattern is challenging due to the limited number of studies addressing these issues.

Among the moderating variables, gender stands out for its importance. Boys often reported more significant problems compared to girls in different categories, such as physical health, cognitive abilities and academic performance, externalizing problems, juvenile delinquency, or risk behaviors, e.g., [8,34,36,43,64]. The relationship is also moderated

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

17 of 44

by the children's risk of parental incarceration [17], the timing of the incarceration in the child's life [54], and whether the father lived with the child before being incarcerated [8]. In addition, some characteristics of these children, such as empathy or resilience, act as protective factors, reducing the impact of incarceration in children with higher levels of these abilities, e.g., [14,49]. Some variables such as gender, exposure to incarceration-related events, or timing of incarceration also showed this effect in other reviews [28,56].

Gender socialization could influence this issue. Gender stereotypes emphasize different characteristics for boys and girls: initiative, emotional and physical strength, limited emotional expression of fragility or vulnerability in boys, and tenderness, care, and the expression of emotional discomfort and fragility in girls.

Regarding mediating variables, the mental health of both child and caregiver [47,61], the quality of the child–caregiver relationship [61], the level of parental involvement, and the type of parenting model employed by the parents [68] are of particular importance. In this sense, parental incarceration is associated with worse children's mental health, a weaker child–caregiver relationship, reduced parental involvement, and a more negligent parenting style. These factors, in turn, are associated with lower levels of variables that describe the children's well-being and development. Consistent with our results, previous reviews also highlighted various family aspects as key mediators between parental incarceration and different outcomes [28].

Concerning developmental differences, it is not easy to make a synthesis. As mentioned, each author decided to study certain variables as moderators and mediators, and the same variables may not have been studied for each stage.

Despite this, it has been possible to observe that, in the case of moderators, most of them are common across the three developmental stages. In this sense, the child's gender, whether the father lived with the child before incarceration, and the timing of the incarceration, act as moderators regardless of the child's age. Other moderators only appear in adolescence, such as the relationship with the father and different variables related to the adolescent's extracurricular activities.

The effects of mediating variables have hardly been studied for the youngest children, so it is not possible to compare them with the other two developmental stages. In the case of middle childhood and adolescence, it is observed that the effect of caregiver's health is the most important, and is present in both stages. Caring for the caregiver promotes the development and well-being of children and adolescents. Similarly, the child's health and behavioral problems, as well as socio-economic characteristics, also stand out as mediators in both stages. On the other hand, in the case of adolescents, the quality of family relationships (between parents and the child) and the parenting style are highly important as mediating variables, not appearing in other stages. Moreover, the perception of teachers appears during early childhood and middle childhood, probably as a result of the stigma that accompanies these children for having a parent in prison.

### 4.3. Practical and Theoretical and Practical Implications

This review brings up important practical and theoretical implications. The evidence suggests that parental incarceration adversely affects children's development and well-being. These results highlight the need for intervention with these children and their families at a medical, psychological, social, political, and academic level. Policies and strategies for prevention and correction should be also taken into consideration.

From a developmental perspective, although all the outcomes studied in this review indeed deserve attention at all developmental stages, the results obtained highlight greater evidence that certain stages should be considered for any type of intervention. In this sense, work on physical health, cognitive skills, and academic performance is especially important in early childhood. Interventions should explore how these aspects may also express the child's distress. Working with caregivers on identifying the child's actual mood and improving effective communication will help prevent future problems in the child. In addition, internalizing and externalizing symptoms and the early delinquent

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

18 of 44

behaviors appear in middle childhood, while risk behaviors (66.6%), cognitive skills and academic performance (62.5%), and externalizing symptoms (60%) appear in adolescence. Although there are few studies on the material hardship suffered by these families, it is also important to palliate the effects that this has since in all the studies it is associated with parental incarceration.

On the other hand, it seems important to place special emphasis on middle childhood, as this is the stage in which most studies show significant negative effects of parental incarceration. Interventions at this stage can help compensate for problems stemming from early childhood and prevent future problems in adolescence.

As far as psychological intervention is concerned, several programs have been implemented so far with both parents and children to support them in the situation of having an incarcerated parent [85–87]. However, thanks to the analysis by developmental stages, it is possible to determine beforehand the areas in which they may face more difficulties, allowing for more directed interventions.

Additionally, the analysis of mediating and moderating variables based on the developmental stage offers useful information for intervention. For example, being a male child was a frequently observed risk factor, so this group should be a reference for intervention. Moreover, it has been observed that the caregiver's health, as well as the relationship between the caregiver and the child, is crucial in the impact on the well-being and development of the child, especially in middle childhood and adolescence. For this reason, programs should not only be oriented towards working with minors but also with the caregiver figure, focusing on enhancing their well-being and creating a good relationship between the caregiver and the minor [88]. In this sense, an appropriate intervention could be systemic family therapy, since much importance is given to the minor's interpersonal relationships with different agents who influence their development (mainly the primary caregiver and the parent in prison). This type of intervention has already been put into practice with children of prisoners, producing positive results [89].

In terms of theoretical contributions, the results of this review largely coincide with the theoretical model developed by Austin [21] to explain the physical health of these children. This model, which explains parental-incarceration-related intergenerational and chronic stress, integrates the most relevant theoretical models in this field of study [90–95]. This model mainly indicates that parental incarceration has an influence on physical health throughout the family (material resources, family relationships, etc.) and the child who is also in the family (e.g., stigma, internalizing/externalizing symptoms, etc.). Conversely, certain characteristics act as moderators (e.g., parent and child gender). On the other hand, racial and socioeconomic disadvantages reinforce the effect of all these factors. In view of our review, the application of this model to explain children's development and well-being would replace physical health with the different outcomes that we have reviewed in this work. Notably, the mental health of the caregiver and his relationship with the child would be within the family variables that act as mediators, and the child's gender would be a moderator variable. To these, the moderators and mediators included in Table 2 would be added. A clear contribution of our work would be to place this model on a chronological axis, as the Bronfenbrenner ecological model [90] does, considering the developmental stage in which the child is found, as that can determine different outcomes, mediators, and moderators.

### 4.4. Limitations and Future Lines of Research

The different number of studies regarding each developmental stage and each outcome may be a confounding factor in this review. The varying number of studies for each developmental stage and outcome may pose a challenge in this review. For instance, the number of studies for the 0-to-6-years-old developmental stage is considerably lower than for the rest of the stages, except in the categories of physical health and cognitive abilities, and academic performance. This may lead to less accurate results for this group than for other age groups and emphasizes the need for future research to provide more scientific

evidence. We have purposely focused on the outcomes with more empirical evidence, especially in the discussion. For this reason, some outcomes may be too underrepresented to achieve a better description of the findings with more empirical support.

Furthermore, the gender of the parent in prison has also been considered, noting that most studies only considered parental incarceration or did not distinguish between the gender of the parent in prison. It is probable that in the latter case, a greater number of men than women were included due to the higher ratio of men in prison [28]. Only two studies in this review analyzed exclusively maternal incarceration, with only one showing significant results [55]. The lack of evidence makes it impossible to determine whether maternal incarceration is less harmful than paternal incarceration. It is necessary to continue investigating the impact of maternal incarceration on children and adolescents.

Additionally, most of the studies included in this review have been carried out in the United States, which makes comparison with other countries difficult due to cultural differences in the characteristics of the population and the prison system. Cross-cultural studies would be necessary to obtain more representative and comparable results. Additionally, some of the studies used in this review were obtained from two specific databases: "The Fragile Families and Child Wellbeing Study" and "The National Longitudinal Study of Adolescent Health," which may bias the results obtained. These national databases work with many participants, whereas other studies have used short samples. Differences in the sample sizes also present a limitation in representativeness and statistical significance.

## 5. Conclusions

This work contributes to previous reviews in this field by offering a developmental view of the effects of parental incarceration and the moderating and mediating variables. In this sense, greater evidence of the association between parental incarceration and poorer physical health and cognitive skills and academic performance in early childhood (0–6 years old) has been found, with a higher presence of externalizing and internalizing symptoms and early delinquent behaviors in middle childhood (7–11 years old), and finally, a higher presence of risk behaviors, externalizing symptoms, and lower cognitive skills and academic performance in adolescence (12–18). Additionally, middle childhood presents a greater number of studies in which the association between parental incarceration and different outcomes is significant. Finally, being a male child appears as the moderating risk factor with the most evidence, especially in the three developmental stages analyzed, although with a greater presence in middle childhood, while the mental health of the primary caregiver and the quality of their relationship with the child are the main mediating variables that appear both in middle childhood and adolescence.

To conclude, there is a need for further evidence on the impact of parental incarceration and the mediating and moderating factors from a developmental perspective, emphasizing cultural differences [3,28]. The importance of working on the design, implementation, and evaluation of interventions with a systemic approach aimed at this population group must not be forgotten.

**Author Contributions:** Conceptualization, A.H.-F., R.J.C. and A.V.; methodology, A.H.-F., R.J.C., A.V., V.R.-B., N.F.-R.; software, A.H.-F., R.J.C.; validation, A.H.-F., R.J.C.; formal analysis, A.H.-F., R.J.C.; investigation, A.H.-F., R.J.C.; resources, A.H.-F., R.J.C.; data curation, A.H.-F., R.J.C.; writing—original draft preparation, A.H.-F., R.J.C., A.V., V.R.-B., N.F.-R., P.G.-P., and C.d.V.; writing—review and editing, A.H.-F., R.J.C., A.V., V.R.-B., N.F.-R., P.G.-P., and C.d.V.; visualization, A.H.-F., R.J.C., A.V., V.R.-B. and N.F.-R.; supervision, A.H.-F., R.J.C., A.V., V.R.-B. and N.F.-R.; project administration, A.H.-F., R.J.C.; funding acquisition, A.V., and R.J.C. All authors have read and agreed to the published version of the manuscript.

**Funding:** This article is part of a research project funded by the Spanish State Research Agency of the Ministry of Science and Innovation (reference PID2019-110006RB-I00/AEI/10.13039/501100011033).

58.  Burton R, Henn C, Lavoie D, O'Connor R, Perkins C, Sweeney K, et al. A rapid evidence review of the effectiveness and cost-effectiveness of alcohol control policies: an English perspective. Lancet. 2017;389:10078.
59.  Smith R, Kelly B, Yeatman H, Boyland E. Food marketing influences children's attitudes, preferences and consumption: a systematic critical review. Nutrients. 2019;11:4.

**Publisher's Note**

Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Ready to submit your research?  Choose BMC and benefit from:**

- fast, convenient online submission
- thorough peer review by experienced researchers in your field
- rapid publication on acceptance
- support for research data, including large and complex data types
- gold Open Access which fosters wider collaboration and increased citations
- maximum visibility for your research: over 100M website views per year

**At BMC, research is always in progress.**

**Learn more** biomedcentral.com/submissions



**Institutional Review Board Statement:** This article is part of a research project conducted according to the guidelines of the Declaration of Helsinki and approved by the National University of Education at Distance-UNED Ethics Committee.

**Informed Consent Statement:** Not applicable.

**Data Availability Statement:** Not applicable.

**Conflicts of Interest:** The authors declare no conflict of interest.

## Appendix A

**Table A1.** Summary of studies included in the systematic review. Children aged 0 to 6 years old (early childhood).

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | **(a) Size (b) Mean Age (c) Parent in Prison** | **(d) Type of Study (e) Control Variables** | |
| Physical health: General health assessment | Geller et al. (2012) [a] [8] | (a) N = ~3000 (b) M = 5 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Parental incarceration was not related to child health measures. |
| Physical health: Sleep and eating behaviors | Jackson and Vaughn (2017) [31] | (a) N = 2100–2388 (b) M = 5 years [b] (c) PP = B | (d) TS = Long. (e) CV = 5–10 | - Parental incarceration was significantly associated with eating and sleeping problems. Single-parent incarceration predicted all measures except fast food consumption. Similarly, when both parents were incarcerated, the relationship was significant for all measures except fast food and starch consumption. <br> - When differentiating between maternal and paternal incarceration, it was found that the relationship between maternal incarceration and sleep-related problems and starch consumption ceased to be significant. This is also the case for the relationship between paternal incarceration and the consumption of junk food. |
| Physical health: Food insecurity | Turney (2015) [33] | (a) N = 3004 (b) M = 5 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - For those children living with their fathers prior to incarceration, paternal imprisonment was significantly associated with an increased risk of current food insecurity and an increased risk of developing food insecurity in the future. The results were not significant for children who did not live with their fathers prior to incarceration. |
| Physical health: Infant mortality | Wildeman (2012) [32] | (a) N = 42,544 (b) M = 0–19 months (c) PP = B | (d) TS = Cross. (e) CV ≥ 20 | - Parental incarceration predicted an increase in infant mortality. <br> - Moderation: The findings show a statistical trend ($p < 0.10$) that this association is concentrated mostly in children whose fathers did not report domestic violence. |

*Int. J. Environ. Res. Public Health* **2023**, *20*, 3143

21 of 44

**Table A1.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | **(a) Size** **(b) Mean Age** **(c) Parent in Prison** | **(d) Type of Study** **(e) Control Variables** | |
| Cognitive skills and academic performance: Academic performance | Casey et al. (2015)[a] [16] | (a) N = 138 (b) M = 5.75 years (c) PP = B | (d) TS = Cross. (e) CV ≤ 5 | - No significant relationship was found between having experienced parental incarceration and poorer academic performance. |
| Cognitive skills and academic performance: Attention difficulties and verbal skills | Geller et al. (2012) [a] [8] | (a) N = ~3000 (b) M = 5 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Recent incarceration of fathers was significantly associated with increased attention problems in children, but a within-individual change in attention problems is not significant. |
| Cognitive skills and academic performance: School readiness (cognitive and non-cognitive) | Haskins (2014) [a] [34] | (a) N = 4311 (b) M = 5 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Moderation (separation of groups without a proper moderation test): Parental incarceration was significantly associated with poorer non-cognitive readiness for school entry in boys but not in girls. The differences were not significant for cognitive readiness. |
| Cognitive skills and academic performance: School readiness | Testa and Jackson (2021) [35] | (a) N = 15,402 (b) M = 3.99 years (c) PP = B | (d) TS = Cross. (e) CV = 20 | - Concerning the four categories that reflect school readiness (early learning skills, self-regulation, social-emotional development, physical health, and motor development), children exposed to parental incarceration are at much higher risk of not achieving "on-track" status. |
| Cognitive skills and academic performance: Early grade retention | Turney and Haskins (2014) [a] [10] | (a) N = 947 (b) M = 9 years [b] (asked about their 0–6-years-old) (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Children who experienced paternal incarceration for the first time between the ages of 0 and 5 were more likely to repeat a grade in early childhood education. - There is no evidence of variation regarding gender, ethnicity, or whether or not the father had resided with the children prior to incarceration. - Mediation: When controlling for the different mechanisms through which parental incarceration might influence children's likelihood of repeating a grade, most of the relationship was due to the teachers' perceptions, which is a mediating variable. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

22 of 44

**Table A1.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | **(a) Size** **(b) Mean Age** **(c) Parent in Prison** | **(d) Type of Study** **(e) Control Variables** | |
| Socioemotional skills: Emotion recognition | Hindt et al. (2016) [20] | (a) N = 128 (b) M = 5.23 years (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | - Although children with incarcerated parents showed significantly fewer positive emotions than the comparison group, the relationship between parental incarceration and poorer emotion recognition was not significant. On the other hand, children with incarcerated parents showed negative biases (a tendency to interpret the neutral/positive more negatively) compared to those without incarcerated parents. |
| Externalizing symptoms: Externalizing symptoms | Casey et al. (2015) [a] [16] | (a) N = 138 (b) M = 5.75 years (c) PP = B | (d) TS = Cross. (e) CV ≤ 5 | - No significant relationship was observed between parental incarceration and exhibiting more externalizing symptoms. |
| Externalizing symptoms: Externalizing symptoms | Geller et al. (2012) [a] [8] | (a) N = ~3000 (b) M = 5 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Children of incarcerated parents displayed more aggressive behaviors than their peers without imprisoned parents. These results held, and even increased slightly, when considering whether the incarceration was recent. <br> - Moderation: Several moderating variables were observed, such as having lived with the father before incarceration, with these children presenting more problems than those who had not lived with the father. In addition, having suffered domestic violence was associated with a reduction of externalizing problems. Gender also moderated the relationship, as girls' results were no longer significant. |
| Externalizing symptoms: Physical, aggressive behaviors | Wildeman (2010) [36] | (a) N = 2275 (b) M = 5 years [b] (c) PP = F | (d) TS = Long. (e) CV = 15–20 | - The results showed a significant relationship between parental incarceration and higher levels of physical aggression in boys with incarcerated fathers. <br> - Moderation (separation of groups without a proper test of moderation): Gender acted as a moderator of the relationship, observing that, in girls, paternal imprisonment did not increase physical aggression, and it could even be a protective factor, although the results are not robust. <br> - Moderation: The association of paternal incarceration with physical aggression of children focused on those whose fathers had not been arrested for violent crimes or had not been abusive to the children's mother. |

**Table A1.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | **(a) Size (b) Mean Age (c) Parent in Prison** | **(d) Type of Study (e) Control Variables** | |
| Internalizing symptoms: Internalizing symptoms | Casey et al. (2015) [a] [16] | (a) N = 138 (b) M = 5.75 years (c) PP = B | (d) TS = Cross. (e) CV ≤ 5 | - Children who experienced parental incarceration had more internalizing symptoms than children without an incarcerated parent. |
| Internalizing symptoms: Internalizing symptoms | Geller et al. (2012) [a] [8] | (a) N = ~3000 (b) M = 5 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Parental incarceration did not significantly predict internalizing symptoms in children of prisoners, compared with other children who had not experienced parental incarceration. |
| Material hardship: Material hardship | Schwartz-Soicher et al. (2011) [37] | (a) N = 3834 (b) M = 5 years [b] (c) PP = B | (d) TS = Long. (e) CV ≥ 20 | - The results showed a relationship between paternal incarceration and family material hardship (increased financial and other family strains). <br> - Moderation: The hardship's effect of paternal incarceration was more pronounced for families that cohabited with the father prior to his incarceration. |
| Material hardship: Child homelessness | Wildeman (2014) [11] | (a) N = 3774 (b) M = 5 years [b] (c) PP = B | (d) TS = Long. (e) CV ≥ 20 | - Recent paternal but not maternal incarceration substantially increased the risk of child homelessness. <br> - After selecting an appropriate comparison group, the risk of child homelessness increased by 2–4% in the group with an incarcerated father. <br> - Moderation: A statistical trend ($p < 0.10$) pointed out that these effects intensified among African American children. <br> - Mediation: Part of the relationship was mediated by increased family economic difficulties and decreased access to institutional support. |

N = Size; M = Mean Age; PP = Parent in Prison; TS = Type of Study; CV = Number of Control Variables; F = Father; M = Mother; B = Both. Cross. = Cross Sectional; Long. = Longitudinal; [a] Studies that include different types of criterion variables or focus on more than one developmental stage.; [b] Mean age is not shown, only the age of the children at the time of the assessment.

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

24 of 44

**Table A2.** Summary of studies included in the systematic review. Children aged 7 to 11 years old (middle childhood).

| Criterion Variable | Study | Characteristics of the Study: (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | Results |
|---|---|---|---|---|
| Physical health: Sleep schedules and sleep regulation | Branigan and Meyer (2020) [38] | (a) N = 3246 (b) M = 9 years [b] (c) PP = B | (d) TS = Long. (e) CV = 10–15 | - Paternal, but not maternal, incarceration was significantly associated with less effective sleep regulation, including less consistent bedtime. There was also a difference in mean daily sleep time compared to children who had not experienced parental incarceration. <br> - Mediation: Bedtime consistency partly mediated the association between paternal incarceration and total sleep duration. |
| Physical health: Overweight | Branigan and Wildeman (2019) [39] | (a) N = 2141 (b) M = 9 years [b] (c) PP = B | (d) TS = Long. (e) CV = 15–20 | - Maternal, or parental, incarceration was associated with being overweight or obesity in children. In the case of paternal incarceration, the results were not significant. |
| Physical health: Food insecurity | Cox and Wallace (2016) [40] | (a) N = 2849 (b) M = 9 years [b] (c) PP = B | (d) TS = Long. (e) CV ≥ 20 | - Parental incarceration increased the likelihood of food insecurity by about 4%. |
| Physical health: Body mass index | Haskins and McCauley (2019) [a] [41] | (a) N = 1664 (b) M = 9 years [b] (c) PP = B | (d) TS = Long. (e) CV = 5–10 | - No significant relationship was found between parental incarceration and body mass index. |
| Cognitive skills and academic performance: Reading skills | Bridgewater and Yates (2021) [42] | (a) N = 180 (b) M = 10 years [b] (c) PP = F | (d) TS = Long. (e) CV = 5–10 | - This study did not show a significant negative effect of parental incarceration on children's reading skills. <br> - Mediation: A significant indirect relationship was observed through the mediation of the mother's care. <br> - Moderator: This relationship was moderated by gender and was no longer significant for girls when gender was included. |
| Cognitive skills and academic performance: Special education attendance | Haskins (2014) [a] [34] | (a) N = 4311 (b) M = 5 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Moderation: Paternal incarceration predicted a greater likelihood of children (boys) attending special education than children who had not been exposed to their father's incarceration. This effect was not found for girls. <br> - Mediation: School readiness measured four years earlier mediated the relationship between paternal incarceration and attending special education. |

**Table A2.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | Results |
|---|---|---|---|---|
| Cognitive skills and academic performance: Task completion | Haskins (2015) [a] [43] | (a) N = 2150 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Paternal incarceration did not influence task completion in children exposed to this phenomenon, compared to the comparison group. There was also no significant effect when dividing children according to gender. |
| Cognitive skills and academic performance: Reading and mathematical comprehension, vocabulary, and memory/attention | Haskins (2016) [6] | (a) N = 2192 (b) M = 9.29 years (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Father's incarceration was associated with deficits in the dimensions of mathematical resolution and children's memory and attention skills. However, the results of vocabulary skills and reading comprehension were not significant. <br> - Moderation: In the case of girls with a parent in prison, mathematical comprehension scores were significantly lower than those of their peers who had not experienced parental imprisonment. In the case of boys with a parent in prison, differences were only significant in memory/attention skills. |
| Cognitive skills and academic performance: School punishment/expulsion | Jacobsen (2019) [44] | (a) N = 3201 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Children whose fathers were incarcerated before first grade were more likely to be suspended or expelled by age nine than other children. A total of 16% of children whose fathers were in prison were suspended/expelled from school compared to 9% of other children. This result was limited to children who lived with their fathers prior to incarceration. <br> - Mediation: The association between paternal incarceration and suspension/expulsion from elementary school was partially explained by behavioral problems and weakened social bonds. |

*Int. J. Environ. Res. Public Health* **2023**, *20*, 3143

26 of 44

**Table A2.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | **(a) Size**<br>**(b) Mean Age**<br>**(c) Parent in Prison** | **(d) Type of Study**<br>**(e) Control**<br>**Variables** | |
| Cognitive skills and academic performance: Reading and mathematical comprehension, and verbal skills | Turney (2017) [a] [17] | (a) N = 3065<br>(b) M = 9 years [b]<br>(c) PP = F | (d) TS = Long.<br>(e) CV ≥ 20 | - No significant relationship was found between parental incarceration and the different measures of cognitive skills (using matched estimates based on propensity scores).<br>- Moderation (separation of groups without a proper test of moderation): When parents were divided into three groups with different probability of risk of entering prison (low, medium, and high), a significant relationship was observed between parental incarceration and lower reading comprehension in the lowest and medium strata, but not in the highest stratum. Additionally, a significant relationship was found between parental incarceration and lower mathematical comprehension and verbal skills in the lowest-risk stratum but not in the medium and highest-risk strata. |
| Cognitive skills and academic performance: Early grade retention | Turney and Haskins (2014) [a] [10] | (a) N = 947<br>(b) M = 9 years [b]<br>(c) PP = F | (d) TS = Long.<br>(e) CV ≥ 20 | - Children of parents who had been incarcerated for the first time when the child was between one and five years were more likely to repeat a grade in primary school.<br>- There was no evidence of variation concerning gender, ethnicity, or whether or not the father had previously resided with the children.<br>- Mediation: Most of the relationship was mediated by the teachers' perceptions. |
| Cognitive skills and academic performance: Verbal skills | Turney and Wildeman (2015) [a] [18] | (a) N = 3197<br>(b) M = 9 years [b]<br>(c) PP = M | (d) TS = Long.<br>(e) CV ≥ 20 | - No significant relationship was found between maternal incarceration and verbal aptitude scores in their children. |
| Socioemotional skills: Socioemotional skills | Washington (2018) [7] | (a) N = 3225 children<br>b) M = 9 years [b]<br>(c) PP = F | (d) TS = Long.<br>(e) CV = 10–15 | - A significant association between paternal incarceration and poorer socioemotional functioning in nine-year-old children was found.<br>- Moderation: Violent father behavior moderated the relationship between paternal incarceration and teacher-reported poorer socioemotional functioning. The children of more violent fathers showed more problems. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

27 of 44

**Table A2.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | **(a) Size (b) Mean Age (c) Parent in Prison** | **(d) Type of Study (e) Control Variables** | |
| Delinquent behaviors: Delinquent behaviors | Haskins (2015) [a] [43] | (a) N = 2150 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV $\geq$ 20 | - Paternal incarceration significantly predicted delinquent behavior in children exposed to it compared to children who had not experienced it. <br> - Moderation: Considering the gender of the children, the results remained significant for boys but not for girls. |
| Delinquent behaviors: Delinquent behaviors | Turney (2017) [a] [17] | (a) N = 3065 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV $\geq$ 20 | - There was a significant relationship between parental incarceration and more delinquent behaviors in children. <br> - Moderation (separation of groups without a proper test of moderation): When fathers were divided into three groups with different probability of risk of entering prison (low, medium, and high), a significant relationship was observed between paternal incarceration and a higher probability of presenting early juvenile delinquency in the medium and highest strata, but not in the lowest stratum. |
| Delinquent behaviors: Juvenile delinquency | Turney and Wildeman (2015) [a] [18] | (a) N = 3197 (b) M = 9 years [b] (c) PP = M | (d) TS = Long. (e) CV $\geq$ 20 | - Maternal incarceration was not significantly associated with children's delinquent behaviors <br> - Moderation (separation of groups without a proper test of moderation): When parents were divided into three groups with different probability of risk of entering prison (low, medium, and high), a significant relationship was observed between maternal incarceration and a higher presence of early juvenile delinquency in the lowest and medium risk strata but not in the highest risk stratum. |
| Delinquent behaviors: Delinquency | Woodard and Copp (2016) [45] | (a) N = 3391 (b) M = 9.28 years (c) PP = B | (d) TS = Long. (e) CV = 10–15 | - Maternal incarceration was significantly associated with higher delinquency levels at age nine. In addition, when considering the previous incarceration of the father, the results were also significant. <br> - Moderation: Regarding the child's gender, the results were higher for boys than for girls. The child's relationship with their siblings also moderated the effect of parental incarceration on the occurrence of risk behaviors. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

28 of 44

**Table A2.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | Results |
|---|---|---|---|---|
| Externalizing symptoms: Behavioral problems | Antle et al. (2019)[a] [46] | (a) N = 3188 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV = 15–20 | - Paternal incarceration was directly and significantly related to more significant behavior problems in boys and girls compared to the comparison group. <br> - Mediation: Incarceration also indirectly affected behavioral problems through the mediation of maternal depression, the frequency of spankings, and parental involvement. |
| Externalizing symptoms: Aggressive behavior with peers | Dallaire and Zeman (2013) [49] | (a) N = 210 (b) M = 7–11 years (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | - Parental incarceration was significantly associated with higher levels of aggressiveness in children's social relationships. <br> - Moderation: Considering the children's levels of empathy, the relationship was no longer significant for those with high empathy levels. Empathy acted as a moderator of the relationship. |
| Externalizing symptoms: Rule breaking behaviors | Del Toro et al. (2022) [a] [47] | (a) N = 4327 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV = 10 | - Children who had experienced paternal incarceration between the ages of five and nine showed higher rule-breaking behaviors at nine. <br> - Mediation: This relationship was partially mediated by children's depressive symptoms. |
| Externalizing symptoms: Externalizing symptoms | Haskins (2015)[a] [43] | (a) N = 2150 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Paternal incarceration significantly predicted externalizing problems in children compared with those who had not been exposed to this phenomenon. <br> - Moderation: When considering gender differences, a negative impact was observed for boys but not for girls. |
| Externalizing symptoms: Externalizing symptoms | Haskins and McCauley (2019)[a] [41] | (a) N = 1664 (b) M = 9 years (c) PP = B | (d) TS = Long. (e) CV = 5–10 | - Parental incarceration was significantly associated with greater child-reported and parent-reported externalizing problems. |
| Externalizing symptoms: Externalizing symptoms | Turney (2017)[a] [17] | (a) N = 3065 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - A significant relationship was observed between parental incarceration and externalizing symptoms in children. <br> - This result was also found within three groups with different probabilities of risk of entering prison (low, medium, and high). |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

29 of 44

**Table A2.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | |
| Externalizing symptoms: Externalizing symptoms | Turney and Wildeman (2015)[a] [18] | (a) N = 3197 (b) M = 9 years [b] (c) PP = M | (d) TS = Long. (e) CV ≥ 20 | - This study did not find a significant relationship between maternal incarceration and externalizing problems in their children, compared to the comparison group. <br> - Moderation (separation of groups without a proper test of moderation): When mothers were divided into three groups with a different probability of risk of entering prison (low, medium, and high), a significant relationship was observed between maternal incarceration and a greater presence of externalizing problem behaviors in the lowest risk stratum, but not in the medium and highest risk strata. |
| Externalizing symptoms: Externalizing symptoms | Wilbur et al. (2007) [a] [48] | (a) N = 102 (b) M = 9.5–11 years (c) PP = F | (d) TS = Long. (e) CV = 5–10 | - Paternal incarceration significantly predicted externalizing problems in children. |
| Internalizing symptoms: Internalizing symptoms | 25. Antle et al. (2019)[a] [46] | (a) N = 3188 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV = 15–20 | - The relationship between paternal incarceration and children presenting more internalizing symptoms was not directly significant. <br> - Mediation: Paternal incarceration was found to exert a small but significant positive indirect effect on internalizing symptoms through parental characteristics (maternal depression and stress). |
| Internalizing symptoms: Childhood trauma | Arditti and Savla (2013) [50] | (a) N = 45 (b) M = 10.52–10.61 years [b] (c) PP = B | (d) TS = Cross. (e) CV = 10–15 | - Parental incarceration was significantly associated with childhood trauma symptoms. <br> - Mediation: In addition, the relationship between incarceration and parents' perceptions of childhood trauma was mediated by problems during visits to the parents in prison. |
| Internalizing symptoms: Depressive symptoms | Del Toro et al. (2022)[a] [47] | (a) N = 4327 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV = 10 | - Children who experienced parental imprisonment between the ages of five and nine had more depressive symptoms at age nine than children who had not been exposed to parental imprisonment. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

30 of 44

**Table A2.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | Results |
|---|---|---|---|---|
| Internalizing symptoms: Internalizing symptoms | Haskins (2015)[a] [43] | (a) N = 2150 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - Paternal incarceration significantly predicted internalizing problems in children. <br> - Moderation: When considering differences in terms of gender, this effect was only maintained for boys. |
| Internalizing symptoms: Internalizing problems | Haskins and McCauley (2019)[a] [41] | (a) N = 1664 (b) M = 9 years [b] (c) PP = B | (d) TS = Long. (e) CV = 5–10 | - Parental incarceration was significantly associated with children reporting more internalizing problems. |
| Internalizing symptoms: Internalizing symptoms | Turney (2017)[a] [17] | (a) N = 3065 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - A significant relationship was observed between parental incarceration and internalizing symptoms in children. <br> - When fathers were divided into three groups with different probabilities of risk of entering prison (low, medium, and high), a significant relationship between paternal incarceration and a higher probability of presenting internalizing behaviors in the lowest and medium strata, but not in the highest stratum, was observed. |
| Internalizing symptoms:: Internalizing symptoms | Turney and Wildeman (2015)[a] [18] | (a) N = 3197 (b) M = 9 years [b] (c) PP = M | (d) TS = Long. (e) CV ≥ 20 | - Maternal incarceration was not a predictor of children's internalizing symptoms. <br> - Moderation (separation of groups without a proper test of moderation): When mothers were divided into three groups with a different probability of risk of entering prison (low, medium, and high), a significant relationship between maternal incarceration and a greater presence of externalizing problem behaviors in the lowest risk stratum, but not in the medium and highest risk strata was observed. |
| Internalizing symptoms: Depression | Wilbur et al. (2007) [a] [48] | (a) N = 102 (b) M = 9.5–11 years (c) PP = F | (d) TS = Long. (e) CV = 5–10 | - A significant relationship was found between paternal incarceration and children's depressive symptoms (when children reported these symptoms, but not when parents did). |

**Table A2.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
| --- | --- | --- | --- | --- |
| | | **(a) Size (b) Mean Age (c) Parent in Prison** | **(d) Type of Study (e) Control Variables** | |
| Material hardship: Economic risks | Geller et al. (2011) [51] | (a) N = 3469 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV = 15–20 | - A statistically significant relationship was observed between paternal incarceration and higher economic risks for their children. <br> - Mediation: The indirect mechanisms through which this phenomenon occurred were the relationship between parents, the labor market performance, and the fact that the father did not reside with the family prior to incarceration. |
| Material hardship: Father's financial contributions | Washington et al. (2018) [52] | (a) N = 1185 (b) M = 9 years [b] (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | - A significant relationship was observed between paternal incarceration and a lower economic contribution to child support. |

N = Size; M = Mean Age; PP = Parent in Prison; TS = Type of Study; CV = Number of Control Variables; F = Father; M = Mother; B = Both; Cross. = Cross Sectional; Long. = Longitudinal; [a] Studies that include different types of criterion variables or focus on more than one developmental stage.; [b] Mean age is not shown, only the age of the children at the time of the assessment.

**Table A3.** Summary of studies included in the systematic review. Adolescents aged 12 to 18 years old.

| Criterion Variable | Study | Characteristics of the Study: | | Results |
| --- | --- | --- | --- | --- |
| | | **(a) Size (b) Mean Age (c) Parent in Prison** | **(d) Type of Study (e) Control Variables** | |
| Cognitive skills and academic performance: Attentional difficulties | Boch et al. (2019) [15] | (a) N = 613 (b) M = 14.5 years [c] (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | The relationship between paternal incarceration and attention difficulties in adolescents was not significant when considering possible adverse childhood experiences. |
| Cognitive skills and academic performance: Educational attainment and school absenteeism | Brown (2016) [55] | (a) N = 103,536 (b) M = 15.81 years [c] (c) PP = M | (d) TS = Cross. (e) CV = 15–20 | An association was found between maternal incarceration and academic outcomes. The moment of incarceration according to the child's age and the difference between compulsory and non-compulsory education (specifically, colleg(e) were important determinants of these variable effects. Maternal incarceration predicted compulsory educational achievement during adolescence more prominently when it occurred between birth and age four (increased grade repetition) and between ages five and ten (increased high school dropouts). In both cases, the effects were persistent and occurred years after incarceration. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

32 of 44

**Table A3.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | |
| Cognitive skills and academic performance: Academic performance, involvement in fights, school absenteeism, and membership | McCauley (2020) [53] | (a) N = 11,767 M = 15.77 years [d] (c) PP = B | (d) TS = Long. (e) CV = 5–10 | Participants who had suffered parental incarceration experienced lower rates of achieving B grades or better. There was a relationship between paternal (or maternal) incarceration and lower academic performance in English (not in mathematics). Paternal incarceration was significantly associated with higher odds of failing grades, being expelled, being involved in fights, school absenteeism, not participating in school activities, and not feeling part of the school. In addition, maternal incarceration was associated with a greater likelihood of getting into fights and school absenteeism. |
| Cognitive skills and academic performance: Academic performance | Murray et al. (2012) [a] [47] | (a) N = 1009 (b) M = 7–19 years (c) PP = B | (d) TS = Long. (e) CV = 10–15 | No significant relationship was found between parental incarceration and academic performance. |
| Cognitive skills and academic performance: Truancy, the highest level of education, and cumulative academic achievement | Nichols et al. (2016) [58] | N = 71,447 (truancy); 69,082 (highest level of education); 46,045 (cumulative academic achievement) (b) M = 15.9 years (c) PP = B | (d) TS = Cross. (e) CV = 10–15 | Parental incarceration was significantly associated with school absenteeism, academic performance, and higher educational attainment, with the strongest association being school absenteeism. Moderation (parental incarceration as moderator): The relationship between higher school connectedness and higher educational achievement in children disappeared in cases where the children had a parent in prison. |
| Cognitive skills and academic performance: Failure to complete secondary school and prolonged school absenteeism | Nichols and Loper (2012) [57] | (a) N = 3338 (b) M = 26.5 years, study date (asked about adolescence) (c) PP = HM | (d) TS = Long. (e) CV ≤ 5 | Adolescents who experienced the incarceration of an extended family member living in their household before the age of eighteen were more likely to report a prolonged absence from school (more than 30 days) and not to finish high school than those who did not report having a household member in prison. This relationship was not found when a parent was the one in prison, although a statistical trend was observed. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

33 of 44

**Table A3.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | |
| Cognitive skills and academic performance: Achievement, discipline, school connectedness, and engagement | Shlafer et al. (2017) [59] | (a) N = 114,828 (b) M = 14.90 years [c] (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | Parental incarceration was significantly associated with students' poor school-based outcomes. Moderation: Parental incarceration was associated with different school outcomes by school setting. Among youth in public school settings, parental incarceration was consistently associated with poor school outcomes (lower levels of achievement, less engagement and connectedness, and a greater likelihood of receiving disciplinary action than peers who never experienced parental incarceration). |
| Cognitive skills and academic performance: Attention problems | Turney (2022) [a] [54] | (a) N = 3416 (b) M = 15.59 years (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | Paternal incarceration was associated with more attentional difficulties (adjusted estimates). Moderation (separation of groups without a proper moderation test): Paternal incarceration in early childhood was associated with more attention problems but not in middle childhood and adolescence (adjusted estimates). Mediation: The relationship between early childhood paternal incarceration and attention problems was significantly mediated by parental relationship, economic well-being, parenting style, health, and type of residence (introduced all mechanisms together in the analysis). |
| Socioemotional skills: Prosocial behavior | Bradshaw et al. (2021)[a] [61] | (a) N = 8568 (b) M = 13 years [b] (c) PP = B | (d) TS = Long. (e) CV = 5 | No direct relationship was observed between parental incarceration and prosocial behavior at age 13. Mediation: The relationship between having a parent in prison at age nine and presenting worse prosocial behavior at age thirteen was mediated by higher levels of caregiver depression and poor caregiver–child relationship quality. |
| Socioemotional skills: Social network size and location | Bryan (2017) [60] | (a) N = 11,356 (b) M = 14.9 years (c) PP = F | (d) TS = Long. (e) CV = 10–15 | Adolescents with a father in prison showed more peripheral social relationships than their peers. Specifically, they showed lower centrality positions, smaller extensive networks, and their friends were less advantaged and academically successful in school and committed more delinquent acts. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

34 of 44

**Table A3.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | **(a) Size** **(b) Mean Age** **(c) Parent in Prison** | **(d) Type of Study** **(e) Control Variables** | |
| Socioemotional skills: Social networks size and location, participation in antisocial contexts | Cochran et al. (2018) [62] | (a) N = 11,681 (b) M = 14.99 years (c) PP = B | (d) TS = Long. (e) CV = 5–10 | Inconsistent results were found on the relationship between parental incarceration and adolescents' social relationships. Overall, no significant association was found, but specifically, parental incarceration negatively affected the youth's social network characteristics (friends with lower grades who lied more, missed more school, and got into fights). No relationship was found between parental incarceration and school integration. |
| Risk behaviors: Substance abuse | Bomysoad and Francis (2021)[a] [14] | (a) N = 29,617 (b) M = 12–17 years (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | Parental incarceration significantly predicted greater substance abuse problems in adolescents, Moderation: Resilience and sleep quality moderated this relationship. |
| Risk behaviors: Alcohol, tobacco, marihuana use, other drugs | Davis and Shlafer (2017)[a] [65] | (a) N = 122,180 (b) M = 14.87 years (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | Parents' past and present incarceration were significantly associated with alcohol, tobacco, and other substance use and abuse in adolescents. Across all outcomes, adolescents with incarcerated or released parents had higher rates of substance abuse than children without an incarcerated parent. In addition, youth with currently incarcerated parents performed worse than their peers with a history of parental incarceration on nearly every indicator. |
| Risk behaviors: AIDS/HIV-related drug use and sexual risk | Khan et al. (2018) [66] | (a) N = 11,884 (b) M = 15.9 years (c) PP = B | (d) TS = Long. (e) CV = 5–10 | Parental incarceration was associated with higher marijuana use by adolescents, especially in those who had experienced parental incarceration before the age of eight. On the other hand, parental incarceration only significantly predicted STD acquisition for black children. |
| Risk behaviors: Substance use (alcohol and tobacco) | Kinner et al. (2007) [a] [63] | (a) N = 2339 (b) M = 14 years (c) PP = F | (d) TS = Long. (e) CV = 5–10 | No association was observed between parental incarceration and externalizing problems as well as substance use in adolescence. For boys, paternal detention but not incarceration predicted alcohol abuse. |
| Risk behaviors: Marijuana use | Murray et al. (2012) [a] [47] | (a) N = 1009 (b) M = 7–19 years (c) PP = B | (d) TS = Long. (e) CV = 10–15 | There was no significant relationship between parental incarceration and marijuana use. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

35 of 44

**Table A3.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | |
| Risk behaviors: Early sexual onset | Turney and Goldberg (2019) [64] | (a) N = 3405 (b) M = 15.6 years (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | Paternal incarceration was positively associated with early sexual onset. Moderation: Consequences of paternal incarceration on early sexual onset were stronger among boys who lived with their fathers prior to incarceration compared to girls. Mediation: This relationship occurred directly and indirectly through externalizing problems as a mediator. |
| Delinquent behaviors: Serious youth delinquency | Kjellstrand and Eddy (2011) [68] | (a) N = 655 (b) No M: 5th, 8th, and 10th grade (c) PP = B | (d) TS = Long. (e) CV = 5–10 | No direct relationship was found between paternal incarceration and juvenile delinquency Mediation: This relationship did occur indirectly, mediated by other variables related to social disadvantages, the mental health of the parents, and the effectiveness of parenting. |
| Delinquent behaviors: Theft | Murray et al. (2012) [a] [47] | (a) N = 1009 (b) M = 7–19 years (c) PP = B | (d) TS = Long. (e) CV = 10–15 | An association was found between parental incarceration and a temporary increase in theft. This increase occurred when the children lived with their parents before the incarceration. |
| Delinquent behaviors: Material or monetary gain | Porter and King (2015) [67] | (a) N = 2283 (b) M = 15.56 years (c) PP = F | (d) TS = Long. (e) CV = 10–15 | No direct relationship was found between paternal incarceration and juvenile delinquency. Mediation: Paternal incarceration was significantly related to expressive delinquency (crimes resulting from anger or frustration) through the reduction of attachment to fathers. |
| Delinquent behaviors: Delinquent behaviors | Turney (2022)[a] [54] | (a) N = 3416 (b) M = 15.59 years (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | Paternal incarceration was significantly associated with juvenile delinquency. Moderation (separation of groups without a proper test of moderation): Paternal incarceration in early childhood was associated with more juvenile delinquency but not in middle childhood or adolescence (adjusted estimates). |
| Externalizing symptoms: Externalizing symptoms | Boch et al. (2019) [a] [15] | (a) N = 613 (b) M = 14.55 years [c] (c) PP = F | (d) TS = Cross. (e) CV = 5–10 | Parental incarceration did not significantly predict externalizing problems in adolescents when other adverse childhood experiences were included. |
| Externalizing symptoms: Behavioral problems | Bomysoad and Francis (2021) [a] [14] | (a) N = 29,617 (b) M = 12–17 years (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | Parental incarceration significantly predicted behavioral problems in adolescents. This relationship was moderated by the adolescents' resilience and engagement in extracurricular activities. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

36 of 44

**Table A3.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | |
| Externalizing symptoms: Behavioral problems | Bradshaw et al. (2021) [a] [61] | (a) N = 8568 (b) M = 13 years [b] (c) PP = B | (d) TS = Long. (e) CV = 5 | No significant direct relationship was found between parental incarceration at age nine and behavioral problems at age thirteen. Mediation: Having a father in prison at age nine predicted higher levels of depression in the caregiver, which in turn implied a worse relationship between the caregiver and the child and ultimately led to greater behavioral problems. |
| Externalizing symptoms: Rule-breaking behavior | Del Toro et al. (2022) [a] [47] | (a) N = 4327 (b) M = 15 years [b] (c) PP = F | (d) TS = Long. (e) CV = 10 | Children who experienced parental incarceration at age five or nine had higher norm noncompliance at age fifteen than children who had not been exposed to parental incarceration. Mediation: This relationship was partially mediated by children's depressive symptoms. |
| Externalizing symptoms: Behavioral problems | Davis and Shlafer (2016) [a] [12] | (a) N = 122,180 (b) M = 14.87 years (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | Having an incarcerated parent was significantly associated with greater behavioral problems in adolescents, twice as high as peers without an incarcerated parent. Moderation: The protective effect of parental closeness was strongest for children with no experience of parental incarceration compared to children with former and current experience. However, its protective effect was significant in the three groups. |
| Externalizing symptoms: Behavioral problems | 47. Kinner et al. (2007) [a] [63] | (a) N = 2399 (b) M = 14 years [b] (c) PP = F | (d) TS = Long. (e) CV = 5–10 | No association was found between parental incarceration and externalizing problems. |
| Externalizing symptoms: Externalizing symptoms | Kjellstrand; et al. (2018) [69] | (a) N = 361 (b) M = 10–16 years (c) PP = B | (d) TS = Long. (e) CV = 5–10 | Parental incarceration was significantly related to externalizing symptoms in adolescence. |
| Externalizing symptoms: Externalizing symptoms | Kjellstrand et al. (2019) [9] | (a) N = 655 (b) No M: 10, 12, 14, and 16 years (c) PP = B | (d) TS = Long. (e) CV = 5–10 | Parental incarceration was a significant predictor of externalizing symptoms in one of the problematic trajectory groups named "Mid-Increasing trajectory". This group is described by the following characteristics: low externalizing problems at age ten, but gradually increasing to clinically high levels at age sixteen. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

37 of 44

<b>Table A3.</b> <i>Cont.</i>

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | **(a) Size** <br> **(b) Mean Age** <br> **(c) Parent in Prison** | **(d) Type of Study** <br> **(e) Control Variables** | |
| Externalizing symptoms: Behavioral problems | Philips et al. (2002) [a] [70] | (a) N = 258 <br> (b) M = 13.7 years <br> (c) PP = B | (d) TS = Long. <br> (e) CV = 10–15 | Adolescents who experienced a parent's incarceration showed significantly more behavioral problems. |
| Externalizing symptoms: Externalizing symptoms | Turney (2022) [a] [54] | (a) N = 3416 <br> (b) M = 15.59 years <br> (c) PP = F | (d) TS = Long. <br> (e) CV ≥ 20 | Paternal incarceration was associated with more externalizing problems (adjusted estimates). <br> Moderation (separation of groups without a proper moderation test): Paternal incarceration in early childhood was associated with more externalizing problems, but not in middle childhood and adolescence (adjusted estimates). <br> Mediation: The relationship between early childhood paternal incarceration and externalizing problems was significantly mediated by parental relationship, economic well-being, parenting, health, and residence (introduced all mechanisms together in the analysis). |
| Internalizing symptoms: Internalizing symptoms | Boch et al. (2019) [15] | (a) N = 613 <br> (b) M = 14.55 years [c] <br> (c) PP = F | (d) TS = Cross. <br> (e) CV = 5–10 | No significant relationship was found between parental incarceration and internalizing symptoms. |
| Internalizing symptoms: Emotional distress | Bradshaw et al. (2021)[a] [61] | (a) N = 8568 <br> (b) M = 13 years [b] <br> (c) PP = B | (d) TS = Long. <br> (e) CV = 5 | No significant direct relationship was found between parental incarceration at age nine and experiencing emotional distress at age thirteen. <br> Mediation: There was an indirect relationship between parental incarceration and emotional distress through the caregiver's depression. |
| Internalizing symptoms: Depression, anxiety, ADHD | Bomysoad and Francis (2021) [a] [14] | (a) N = 29,617 <br> (b) M = 12–17 years <br> (c) PP = B | (d) TS = Cross. <br> (e) CV = 5–10 | Parental incarceration significantly predicted higher mental health problems in adolescents (anxiety, depression, ADHD, behavioral problems, and substance abus(e) than in adolescents without an incarcerated parent. <br> Moderation: Different moderating variables were found for the relationship between parental incarceration and internalizing symptoms, such as resilience, extracurricular activity, physical activity, sleep quality, or screen time. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

38 of 44

**Table A3.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | Results |
|---|---|---|---|---|
| Internalizing symptoms: Mental health and emotional problems | Davis and Shlafer (2016) [a] [12] | (a) N = 122,180 (b) M = 14.87 years (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | Children of incarcerated parents showed poorer mental health than the rest of the adolescents, with those of currently incarcerated parents at the highest risk. Adolescents who had been exposed to previous parental incarceration were approximately twice as likely to experience them, while those whose parent was currently in prison were between two and a half and four times as likely. Moderation: Parental closeness acted as a protective factor of the relationship between parental incarceration and mental health. This protective effect was strongest for children with no experience of parental incarceration compared to children with former and current experiences, although it was significant in the three groups. |
| Internalizing symptoms: Depressive symptoms | Del Toro et al. (2022) [a] [47] | (a) N = 4327 (b) M = 15 years [b] (c) PP = F | (d) TS = Long. (e) CV = 10 | Children who experienced parental imprisonment at age five or nine had more depressive symptoms at age fifteen than children who had not been exposed to parental imprisonment. |
| Internalizing symptoms: Internalizing symptoms | Kinner et al. (2007) [a] [63] | (a) N = 2339 (b) M = 14 years [b] (c) PP = F | (d) TS = Long. (e) CV = 5–10 | The relationship between parental incarceration and internalizing symptoms in children was not significant. |
| Internalizing symptoms: Internalizing symptoms | Kjellstrand et al. (2020) [71] | (a) N = 671 (b) M = 10–16 years (c) PP = B | (d) TS = Long. (e) CV = 5–10 | No significant relationship was found between parental incarceration and internalizing problems. |
| Internalizing symptoms: Depression | Murray et al. (2012) [a] [56] | (a) N = 1009 (b) M = 7–19 years (c) PP = B | (d) TS = Long. (e) CV = 10–15 | No association was found between parental incarceration and depression in adolescents. |
| Internalizing symptoms: Mental health | Philips et al. (2002) [a] [70] | (a) N = 258 (b) M = 13.7 years (c) PP = B | (d) TS = Long. (e) CV = 10–15 | Adolescents who experienced parental incarceration showed significantly more ADHD and lower levels of depression. |

**Table A3.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study: | | Results |
|---|---|---|---|---|
| | | (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | |
| Internalizing symptoms: Post-traumatic stress and general psychological problems | Shehadeh et al. (2015) [72] | (a) N = 314 (b) M = 13.4 years (c) PP = F | (d) TS = Cross. (e) CV = 5–10 | Paternal incarceration was significantly associated with greater mental health problems in their children, compared to the comparison group. Additionally, witnessing the father's arrest increased these mental health problems in this group of children. |
| Internalizing symptoms: Internalizing symptoms | Turney (2022) [a] [54] | (a) N = 3416 (b) M = 15.59 years (c) PP = F | (d) TS = Long. (e) CV ≥ 20 | Paternal incarceration was not associated with more internalizing problems (adjusted estimates). |

N = Size; M = Mean Age; PP = Parent in Prison; TS = Type of Study; CV = Number of Control Variables; F = Father; M = Mother; B = Both; HM = Household Member (Parent, Sibling, Extended Family)[;] Cross. = Cross Sectional; Long. = Longitudinal[;] [a] Studies that include different types of criterion variables or focus on more than one developmental stage. [b] Mean age is not shown, only the age of the children at the time of the assessment. [c] Mean age was calculated from the mean age of each subgroup, considering their sample size. [d] Mean age was calculated from the mean age of each subgroup without considering their sample size because it was not reported.

**Table A4.** Summary of studies included in the systematic review. Studies that do not differentiate according to children's and adolescents' developmental stage.

| Criterion Variable | Study | Characteristics of the Study | | Results |
|---|---|---|---|---|
| | | (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | |
| Physical health: General physical health and chronic physical conditions | Jackson et al. (2021) [a] [5] | (a) N = 102,341 (b) M = 0–17 years (c) PP = B | (d) TS = Cross. (e) CV = 10 | - Parental incarceration was significantly associated with worse physical health and chronic disease problems. |
| Physical health: Oral Health | Testa and Jackson (2020) [73] | (a) N = 99,962 (b) M = 9.65 years [c] (c) PP = B | (d) TS = Cross. (e) CV = 5–10 | - Children whose parents had ever been in prison had lower oral health, including weak or fair teeth, toothaches, gum bleeding, cavities, and tooth decay, and they were also more likely to have unmet dental care needs. <br> - Moderation: Attenuation analyses indicated that this relationship partially accounted for household material hardship and children's health insurance. |
| Physical Health: General and physical health, activity, and school absenteeism | Turney (2014) [a] [4] | (a) N = 95,677 (b) M = 0–17 years (c) PP = B | (d) TS = Cross. (e) CV = 20 | - No significant relationship was found between parental incarceration and physical health measures. |

*Int. J. Environ. Res. Public Health* **2023**, 20, 3143

40 of 44

**Table A4.** *Cont.*

| Criterion Variable | Study | Characteristics of the Study | | Results |
| --- | --- | --- | --- | --- |
| | | (a) Size (b) Mean Age (c) Parent in Prison | (d) Type of Study (e) Control Variables | |
| Physical Health: Unmet medical needs | Turney (2017) [a] [41] | (a) N = 95,531 (b) M = 0–17 years (c) PP = B | (d) TS = Cross. (e) CV ≥ 20 | - Children exposed to parental incarceration were 26% more likely to have unmet healthcare needs. <br> - When the different medical needs were studied separately, the difference was not significant for physical health measures. |
| Physical Health: Mortality | Wildeman et al. (2014) [74] | (a) N = 58,848 (b) M = 0–20 years (c) PP = B | (d) TS = Long. (e) CV = 15–20 | - Moderation (separation of groups without a proper moderation test): Paternal and maternal imprisonment were associated with higher male child mortality, whereas paternal imprisonment was associated with lower child mortality risks for girls. There was no clear association between maternal incarceration and female child mortality. |
| Internalizing symptoms: Mental health and developmental problems | Jackson et al. (2021) [a] [5] | (a) N = 102,341 (b) M = 0–17 years (c) PP = B | (d) TS = Cross. (e) CV = 10 | - Parental incarceration was significantly associated with children's general mental health problems. |
| Internalizing symptoms: Mental health | Turney (2014) [a] [4] | (a) N = 95,677 (b) M = 0–17 years (c) PP = B | (d) TS = Cross. (e) CV = 20 | - Parental incarceration was significantly associated with five child health variables: learning disabilities, ADD/ADHD, behavioral problems, developmental delays, and language disorders. |
| Internalizing symptoms: Mental health | Turney (2017) [a] [75] | (a) N = 95,531 (b) M = 0–17 years (c) PP = B | (d) TS = Cross. (e) CV ≥ 20 | - Children exposed to parental incarceration were 26% more likely to have unmet healthcare needs. Children with an incarcerated parent were 60% more likely to have a mental health problem than other children. |

N = Size; M = Mean Age; PP = Parent in Prison; TS = Type of Study; CV = Number of Control Variables; F = Father; M = Mother; B = Both; Cross. = Cross Sectional; Long. = Longitudinal; [a] Studies that include different types of criterion variables or focus on more than one developmental stage. [c] Mean age was calculated from the mean age of each subgroup, considering their sample size.

# References

1. Children of Prisoners Europe. Available online: https://childrenofprisoners.eu/the-issues/ (accessed on 17 September 2022).
2. Sykes, B.L.; Pettit, B. Mass incarceration, family complexity, and the reproduction of childhood disadvantage. *Ann. Am. Acad. Political Soc. Sci.* **2014**, *654*, 127–149. [CrossRef]
3. Eddy, J.M.; Poehlmann-Tynan, J. Interdisciplinary Perspectives on Research and Intervention with Children of Incarcerated Parents. In *Handbook on Children with Incarcerated Parents: Research, Policy, and Practice*, 2nd ed.; Eddy, J.M., Poehlmann-Tynan, J., Eds.; Springer Nature: Cham, Switzerland, 2019; Volume 1.
4. Turney, K. Stress proliferation across generations? Examining the relationship between parental incarceration and childhood health. *J. Health Soc. Behav.* **2014**, *55*, 302–319. [CrossRef]
5. Jackson, D.B.; Testa, A.; Semenza, D.C.; Vaughn, M.G. Parental incarceration, child adversity, and child health: A strategic comparison approach. *Int. J. Environ. Res. Public Health* **2021**, *18*, 3384. [CrossRef]

6.    Haskins, A.R. Beyond boys' bad behavior: Paternal incarceration and cognitive development in middle childhood. *Soc. Forces* **2016**, *95*, 861–892. [CrossRef]
7.    Washington, H.M. Paternal incarceration and children's social-emotional functioning at age nine: Why fathers' violence matters. *Sociol. Focus* **2018**, *51*, 318–334. [CrossRef]
8.    Geller, A.; Garfinkel, I.; Western, B. Paternal incarceration and support for children in fragile families. *Demography* **2011**, *48*, 25–47. [CrossRef]
9.    Kjellstrand, J.M.; Yu, G.; Eddy, J.M. Parental incarceration as a predictor of developmental trajectories of externalizing behaviors across adolescence. *Child. Youth Serv. Rev.* **2019**, *103*, 10–17. [CrossRef]
10.   Turney, K.; Haskins, A.R. Falling behind? Children's early grade retention after paternal incarceration. *Sociol. Educ.* **2014**, *87*, 241–258. [CrossRef]
11.   Wildeman, C. Parental incarceration, child homelessness, and the invisible consequences of mass imprisonment. *ANNALS Am. Acad. Political Soc. Sci.* **2014**, *651*, 74–96. [CrossRef]
12.   Davis, L.; Shlafer, R.J. Mental health of adolescents with currently and formerly incarcerated parents. *J. Adolesc.* **2016**, *54*, 120–134. [CrossRef]
13.   Besemer, S.; Farrington, D.P.; Bijleveld, C.C. Labeling and intergenerational transmission of crime: The interaction between criminal justice intervention and a convicted parent. *PLoS ONE* **2017**, *12*, e0172419. [CrossRef]
14.   Bomysoad, R.N.; Francis, L.A. Associations between parental incarceration and youth mental health conditions: The mitigating effects of adolescent resilience and positive coping strategies. *Curr. Psychol.* **2021**, *41*, 8746–8757. [CrossRef]
15.   Boch, S.J.; Warren, B.J.; Ford, J.L. Attention, externalizing, and internalizing problems of youth exposed to parental incarceration. *Issues Ment. Health Nurs.* **2019**, *40*, 466–475. [CrossRef]
16.   Casey, E.C.; Shlafer, R.J.; Masten, A.S. Parental incarceration as a risk factor for children in homeless families. *Fam. Relat.* **2015**, *64*, 490–504. [CrossRef]
17.   Turney, K. The unequal consequences of mass incarceration for children. *Demography* **2017**, *54*, 361–389. [CrossRef]
18.   Turney, K.; Wildeman, C. Detrimental for some? Heterogeneous effects of maternal incarceration on child wellbeing. *Criminol. Public Policy* **2015**, *14*, 125–156. [CrossRef]
19.   Poehlmann-Tynan, J.; Eddy, J.M. A Research and Intervention Agenda for Children with Incarcerated Parents and Their Families. In *Handbook on Children with Incarcerated Parents: Research, Policy, and Practice*, 2nd ed.; Eddy, J.M., Poehlmann-Tynan, J., Eds.; Springer Nature: Cham, Switzerland, 2019; Volume 1.
20.   Hindt, L.A.; Davis, L.; Schubert, E.C.; Poehlmann-Tynan, J.; Shlafer, R.J. Comparing emotion recognition skills among children with and without jailed parents. *Front. Psychol.* **2016**, *7*, 1095. [CrossRef]
21.   Austin, M.K.; White, I.I.; Kim, A.W. Parental incarceration and child physical health outcomes from infancy to adulthood: A critical review and multilevel model of potential pathways. *Am. J. Hum. Biol.* **2020**, *34*, e23691. [CrossRef]
22.   Poehlmann-Tynan, J.; Turney, K. A developmental perspective on children with incarcerated parents. *Child Dev. Perspect.* **2020**, *15*, 3–11. [CrossRef]
23.   Boch, S.J.; Ford, J.L. Health outcomes of youth in the United States exposed to parental incarceration: An integrative review. *J. Forensic Nurs.* **2018**, *14*, 61–71. [CrossRef]
24.   Besemer, S.; Ahmad, S.I.; Hinshaw, S.P.; Farrington, D.P. A systematic review and meta-analysis of the intergenerational transmission of criminal behavior. *Aggress. Violent Behav.* **2017**, *37*, 161–178. [CrossRef]
25.   Murray, J.; Farrington, D.P.; Sekol, I. Children's antisocial behavior, mental health, drug use, and educational performance after parental incarceration: A systematic review and meta-analysis. *Psychol. Bull.* **2012**, *138*, 175–210. [CrossRef]
26.   Whitten, T.; Burton, M.; Tzoumakis, S.; Dean, K. Parental offending and child physical health, mental health, and drug use outcomes: A systematic literature review. *J. Child Fam. Stud.* **2019**, *28*, 1155–1168. [CrossRef]
27.   Elder, G.H.; Johnson, M.K.; Crosnoe, R. The emergence and development of life course theory. In *Handbook of the Life Course*, 1st ed.; Mortimer, J.T., Shanahan, J.M., Eds.; Springer: Boston, MA, USA, 2003; pp. 3–19. [CrossRef]
28.   Luk, M.S.K.; Hui, C.; Tsang, S.K.M.; Fung, Y.L.; Chan, C.H.Y. Physical and Psychosocial Impacts of Parental Incarceration on Children and Adolescents: A Systematic Review Differentiating Age of Exposure. *Adolesc. Res. Rev.* **2022**, 1–20. [CrossRef]
29.   Murphey, D.; Cooper, P.M. Parents behind bars. What happens to their children? *Child Trends* **2015**, 1–20.
30.   Page, M.J.; McKenzie, J.E.; Bossuyt, P.M.; Boutron, I.; Hoffmann, T.C.; Mulrow, C.D.; Shamseer, L.; Tetzlaff, J.M.; Akl, E.A.; Brennan, S.E.; et al. Declaración PRISMA 2020: Una guía actualizada para la publicación de revisiones sistemáticas. *Rev. Española De Cardiol.* **2021**, *74*, 790–799. [CrossRef]
31.   Jackson, D.B.; Vaughn, M.G. Parental incarceration and child sleep and eating behaviors. *J. Pediatr.* **2017**, *185*, 211–217. [CrossRef]
32.   Wildeman, C. Imprisonment and infant mortality. *Soc. Probl.* **2012**, *59*, 228–257. [CrossRef]
33.   Turney, K. Paternal incarceration and children's food insecurity: A consideration of variation and mechanisms. *Soc. Serv. Rev.* **2015**, *89*, 335–367. [CrossRef]
34.   Haskins, A.R. Unintended consequences: Effects of paternal incarceration on child school readiness and later special education placement. *Sociol. Sci.* **2014**, *1*, 141–158. [CrossRef]
35.   Testa, A.; Jackson, D.B. Parental incarceration and school readiness: Findings from the 2016 to 2018 National Survey of Children's Health. *Acad. Pediatr.* **2021**, *21*, 534–541. [CrossRef]

36. Wildeman, C. Paternal incarceration and children's physically aggressive behaviors: Evidence from the Fragile Families and Child Wellbeing Study. *Soc. Forces* **2010**, *89*, 285–309. [CrossRef]
37. Schwartz-Soicher, O.; Geller, A.; Garfinkel, I. The effect of paternal incarceration on material hardship. *Soc. Serv. Rev.* **2011**, *85*, 447–473. [CrossRef]
38. Branigan, A.R.; Meyer, J.M. Bedtime Schedules and Sleep Regulation among Children of Incarcerated Parents. *J. Pediatr.* **2020**, *236*, 253–259. [CrossRef] [PubMed]
39. Branigan, A.R.; Wildeman, C. Parental incarceration and child overweight: Results from a sample of disadvantaged children in the United States. *Public Health Rep.* **2019**, *134*, 363–370. [CrossRef]
40. Cox, R.; Wallace, S. Identifying the link between food security and incarceration. *South. Econ. J.* **2016**, *82*, 1062–1077. [CrossRef]
41. Haskins, A.R.; McCauley, E.J. Casualties of context? Risk of cognitive, behavioral and physical health difficulties among children living in high-incarceration neighborhoods. *J. Public Health* **2019**, *27*, 175–183. [CrossRef]
42. Bridgewater, J.M.; Yates, T.M. Paternal incarceration and children's reading achievement: The role of maternal caregiving quality. *J. Marriage Fam.* **2021**, *84*, 791–813. [CrossRef]
43. Haskins, A.R. Paternal incarceration and child-reported behavioral functioning at age 9. *Soc. Sci. Res.* **2015**, *52*, 18–33. [CrossRef]
44. Jacobsen, W.C. The intergenerational stability of punishment: Paternal incarceration and suspension or expulsion in elementary school. *J. Res. Crime Delinq.* **2019**, *56*, 651–693. [CrossRef]
45. Woodard, T.; Copp, J.E. Maternal incarceration and children's delinquent involvement: The role of sibling relationships. *Child. Youth Serv. Rev.* **2016**, *70*, 340–348. [CrossRef]
46. Antle, K.; Gibson, C.L.; Krohn, M.D. The mediating role of family dynamics in the relationship between paternal incarceration and child behavior problems. *J. Crime Justice* **2019**, *43*, 16–35. [CrossRef]
47. Del Toro, J.; Fine, A.; Wang, M.T. The intergenerational effects of paternal incarceration on children's social and psychological well-being from early childhood to adolescence. *Dev. Psychopathol.* **2022**, 1–12. [CrossRef]
48. Wilbur, M.B.; Marani, J.E.; Appugliese, D.; Woods, R.; Siegel, J.A.; Cabral, H.J.; Frank, D.A. Socioemotional effects of fathers' incarceration on low-income, urban, school-aged children. *Pediatrics* **2007**, *120*, e678–e685. [CrossRef] [PubMed]
49. Dallaire, D.H.; Zeman, J.L. Empathy as a protective factor for children with incarcerated parents. *Monogr. Soc. Res. Child Dev.* **2013**, *78*, 7–25. [CrossRef]
50. Arditti, J.A.; Savla, J. Parental incarceration and child trauma symptoms in single caregiver homes. *J. Child Fam. Stud.* **2013**, *24*, 551–561. [CrossRef]
51. Geller, A.; Cooper, C.E.; Garfinkel, I.; Schwartz-Soicher, O.; Mincy, R.B. Beyond absenteeism: Father incarceration and child development. *Demography* **2012**, *49*, 49–76. [CrossRef]
52. Washington, H.M.; Juan, S.C.; Haskins, A.R. Incapacitated involvement: Incarceration and fatherhood in fragile families at age 9. *J. Fam. Issues* **2018**, *39*, 3463–3486. [CrossRef]
53. McCauley, E. Beyond the classroom: The intergenerational effect of incarceration on children's academic and nonacademic school-related outcomes in high school. *Socius* **2020**, *6*, 1–13. [CrossRef]
54. Turney, K. Chains of adversity: The time-varying consequences of paternal incarceration for adolescent behavior. *J. Quant. Criminol.* **2022**, *38*, 159–196. [CrossRef]
55. Brown, C. Maternal incarceration and children's education and labor market outcomes. *Labour* **2016**, *31*, 43–58. [CrossRef]
56. Murray, J.; Loeber, R.; Pardini, D. Parental involvement in the criminal justice system and the development of youth theft, marijuana use, depression, and poor academic performance. *Criminology* **2012**, *50*, 255–302. [CrossRef]
57. Nichols, E.B.; Loper, A.B. Incarceration in the household: Academic outcomes of adolescents with an incarcerated household member. *J. Youth Adolesc.* **2012**, *41*, 1455–1471. [CrossRef]
58. Nichols, E.B.; Loper, A.B.; Meyer, J.P. Promoting educational resiliency in youth with incarcerated parents: The impact of parental incarceration, school characteristics, and connectedness on school outcomes. *J. Youth Adolesc.* **2016**, *45*, 1090–1109. [CrossRef]
59. Shlafer, R.J.; Reedy, T.; Davis, L. School-based outcomes among youth with incarcerated parents: Differences by school setting. *J. Sch. Health* **2017**, *87*, 687–695. [CrossRef]
60. Bryan, B. Paternal incarceration and adolescent social network disadvantage. *Demography* **2017**, *54*, 1477–1501. [CrossRef] [PubMed]
61. Bradshaw, D.; Creaven, A.M.; Muldoon, O.T. Parental incarceration affects children's emotional and behavioral outcomes: A longitudinal cohort study of children aged 9 to 13 years. *Int. J. Behav. Dev.* **2021**, *45*, 310–316. [CrossRef]
62. Cochran, J.C.; Siennick, S.E.; Mears, D.P. Social exclusion and parental incarceration impacts on adolescents' networks and school engagement. *J. Marriage Fam.* **2017**, *80*, 478–498. [CrossRef]
63. Kinner, S.A.; Alati, R.; Najman, J.M.; Williams, G.M. Do paternal arrest and imprisonment lead to child behaviour problems and substance use? A longitudinal analysis. *J. Child Psychol. Psychiatry* **2007**, *48*, 1148–1156. [CrossRef] [PubMed]
64. Turney, K.; Goldberg, R.E. Paternal incarceration and early sexual onset among adolescents. *Popul. Res. Policy Rev.* **2019**, *38*, 95–123. [CrossRef]
65. Davis, L.; Shlafer, R.J. Substance use among youth with currently and formerly incarcerated parents. *Smith Coll. Stud. Soc. Work* **2017**, *87*, 43–58. [CrossRef] [PubMed]

*Int. J. Environ. Res. Public Health* **2023**, *20*, 3143

43 of 44

66. Khan, M.R.; Scheidell, J.D.; Rosen, D.L.; Geller, A.; Brotman, L.M. Early age at childhood parental incarceration and STI/HIV-related drug use and sex risk across the young adult lifecourse in the US: Heightened vulnerability of black and Hispanic youth. *Drug Alcohol Depend.* **2018**, *183*, 231–239. [CrossRef] [PubMed]
67. Porter, L.C.; King, R.D. Absent fathers or absent variables? A new look at paternal incarceration and delinquency. *J. Res. Crime Delinq.* **2015**, *52*, 414–443. [CrossRef]
68. Kjellstrand, J.M.; Eddy, J.M. Mediators of the effect of parental incarceration on adolescent externalizing behaviors. *J. Community Psychol.* **2011**, *39*, 551–565. [CrossRef] [PubMed]
69. Kjellstrand, J.M.; Reinke, W.M.; Eddy, J.M. Children of incarcerated parents: Development of externalizing behaviors across adolescence. *Child. Youth Serv. Rev.* **2018**, *94*, 628–635. [CrossRef]
70. Philips, S.D.; Burns, B.J.; Wagner, H.R.; Kramer, T.L.; Robbins, J.M. Parental incarceration among adolescents receiving mental health services. *J. Child Fam. Stud.* **2002**, *11*, 385–399. [CrossRef]
71. Shehadeh, A.; Loots, G.; Vanderfaeillie, J.; Derluyn, I. The impact of parental detention on the psychological wellbeing of Palestinian children. *PLoS ONE* **2015**, *10*, e0133347. [CrossRef]
72. Kjellstrand, J.M.; Yu, G.; Eddy, J.M.; Clark, M.; Jackson, A. The role of parental incarceration in predicting trajectories of child internalizing problems. *Child. Youth Serv. Rev.* **2020**, *115*, 105055. [CrossRef]
73. Testa, A.; Jackson, D.B. Parental incarceration and children's oral health in the United States: Findings from the 2016–2018 National Survey of Children's Health. *Community Dent. Oral Epidemiol.* **2020**, *49*, 166–175. [CrossRef]
74. Wildeman, C.; Andersen, S.H.; Lee, H.; Karlson, K.B. Parental incarceration and child mortality in Denmark. *Am. J. Public Health* **2014**, *104*, 428–433. [CrossRef]
75. Turney, K. Unmet health care needs among children exposed to parental incarceration. *Matern. Child Health J.* **2017**, *21*, 1194–1202. [CrossRef] [PubMed]
76. Klenberg, L.; Korkman, M.; Lahti-Nuuttila, P. Differential development of attention and executive functions in 3-to 12-year-old Finnish children. *Dev. Neuropsychol.* **2001**, *20*, 407–428. [CrossRef]
77. Haskins, A.R.; Amorim, M.; Mingo, M. Parental incarceration and child outcomes: Those at risk, evidence of impacts, methodological insights, and areas of future work. *Sociol. Compass* **2018**, *12*, e12562. [CrossRef]
78. McCabe, L.A.; Cunnington, M.; Brooks-Gunn, J. The development of self-regulation in young children: Individual characteristics and environmental contexts. In *Handbook of Self-Regulation: Research, Theory, and Applications*; Baumeister, R.F., Vohs, K.D., Eds.; The Guilford Press: New York, NY, USA, 2004; pp. 340–356.
79. Provencher, A.; Conway, J.M. Health effects of family member incarceration in the United States: A meta-analysis and cost study. *Child. Youth Serv. Rev.* **2019**, *103*, 87–99. [CrossRef]
80. Wildeman, C.; Goldman, A.W.; Turney, K. Parental incarceration and child health in the United States. *Epidemiol. Rev.* **2018**, *40*, 146–156. [CrossRef] [PubMed]
81. Duncan, G.J.; Dowsett, C.J.; Claessens, A.; Magnuson, K.; Huston, A.C.; Klebanov, P.; Pagani, L.S.; Feinstein, L.; Engel, M.; Brooks-Gunn, J.; et al. School readiness and later achievement. *Dev. Psychol.* **2007**, *43*, 1428–1446. [CrossRef]
82. Graber, J.A.; Brooks-Gunn, J. Transitions and turning points: Navigating the passage from childhood through adolescence. *Dev. Psychol.* **1996**, *32*, 768–776. [CrossRef]
83. Das, J.K.; Salam, R.A.; Arshad, A.; Finkelstein, Y.; Bhutta, Z.A. Interventions for Adolescent Substance Abuse: An Overview of Systematic Reviews. *J. Adolesc. Health* **2016**, *59*, 61–75. [CrossRef]
84. Diamond, L.M.; Bonner, S.B.; Dickenson, J. The development of sexuality. In *Handbook of Child Psychology and Developmental Science: Socioemotional Processes*; Lamb, M.E., Lerner, R.M., Eds.; John Wiley & Sons, Inc.: Hoboken, NJ, USA, 2015; pp. 888–931. [CrossRef]
85. Armstrong, E.; Eggins, E.; Reid, N.; Harnett, P.; Dawe, S. Parenting interventions for incarcerated parents to improve parenting knowledge and skills, parent well-being, and quality of the parent–child relationship: A systematic review and meta-analysis. *J. Exp. Criminol.* **2018**, *14*, 279–317. [CrossRef]
86. Dallaire, D.H.; Shlafer, R.J. Programs for currently and formerly incarcerated mothers. In *When Parents Are Incarcerated: Interdisciplinary Research and Interventions to Support Children*; Wildeman, C., Haskins, A.R., Poehlmann-Tynan, J., Eds.; American Psychological Association: Washington, DC, USA, 2018; pp. 83–107. [CrossRef]
87. Gordon, D.M.; Hunter, B.A.; Campbell, C.A. Children of incarcerated parents: Promising intervention programs and future recommendations. In *When Parents Are Incarcerated: Interdisciplinary Research and Interventions to Support Children*; Wildeman, C., Haskins, A.R., Poehlmann-Tynan, J., Eds.; American Psychological Association: Washington, DC, USA, 2018; pp. 133–150. [CrossRef]
88. Carretero-Trigo, M.; Carcedo, R.J.; Fernández-Rouco, N. Correlates of a positive parenting experience in prison. *Int. J. Environ. Res. Public Health* **2020**, *18*, 626. [CrossRef]
89. Tadros, E.; Morgan, A.A. The Tadros Theory: A Clinical Supervision Framework for Working with Incarcerated Individuals and Their Families. *Trends Psychol.* **2022**, *30*, 621–639. [CrossRef]
90. Arditti, J.A. Parental incarceration and the family. In *Parental Incarceration and the Family*; New York University Press: New York, NY, USA, 2012. [CrossRef]
91. Bronfenbrenner, U. Toward an experimental ecology of human development. *Am. Psychol.* **1977**, *32*, 513–531. [CrossRef]

*Int. J. Environ. Res. Public Health* **2023**, *20*, 3143

44 of 44

92. Foster, H.; Hagan, J. Maternal imprisonment, economic marginality, and unmet health needs in early adulthood. *Prev. Med.* **2017**, *99*, 43–48. [CrossRef] [PubMed]

93. Krieger, N. Epidemiology and the web of causation: Has anyone seen the spider? *Soc. Sci. Med.* **1994**, *39*, 887–903. [CrossRef] [PubMed]

94. Miller, G.E.; Chen, E.; Parker, K.J. Psychological stress in childhood and susceptibility to the chronic diseases of aging: Moving toward a model of behavioral and biological mechanisms. *Psychol. Bull.* **2011**, *137*, 959–997. [CrossRef] [PubMed]

95. Poehlmann, J.; Dallaire, D.; Loper, A.B.; Shear, L.D. Children's contact with their incarcerated parents: Research findings and recommendations. *Am. Psychol.* **2010**, *66*, 575–598. [CrossRef]

**Disclaimer/Publisher's Note:** The statements, opinions and data contained in all publications are solely those of the individual author(s) and contributor(s) and not of MDPI and/or the editor(s). MDPI and/or the editor(s) disclaim responsibility for any injury to people or property resulting from any ideas, methods, instructions or products referred to in the content.

# EXHIBIT U: YOUNG MEN'S PERCEPTIONS ABOUT THE RISKS ASSOCIATED WITH SPORTS BETTING: A CRITICAL QUALITATIVE INQUIRY

Nyemcsok *et al. BMC Public Health*     (2022) 22:867
https://doi.org/10.1186/s12889-022-13164-2

## RESEARCH

**Open Access**



# Young men's perceptions about the risks associated with sports betting: a critical qualitative inquiry

Christian Nyemcsok[1*], Hannah Pitt[1], Peter Kremer[2] and Samantha L. Thomas[1]

## Abstract

**Background:** Gambling is an inherently risky activity. New technologies have led to the development of new, online forms of gambling such as sports betting, with round the clock availability and accessibility. While young men have been identified as a group that may be particularly vulnerable to the harms associated with these new online products, few studies have qualitatively explored young men's perceptions of the risks associated with these products. Using concepts associated with the sociology of risk, this paper sought to explore the range of factors that may influence how 18–24 year old young Australian men conceptualise the risks associated with sports betting.

**Methods:** Using a critical qualitative inquiry approach, in-depth interviews were conducted with sixteen participants in Victoria, Australia, who engaged in sports betting at least monthly. The data interpreted for this study included questions relating to awareness of gambling, the contexts associated with early gambling experiences; the factors that influenced current gambling behaviours, and why they engaged in gambling. A reflexive approach to thematic analysis was used to interpreted themes from the data.

**Results:** Four key themes were constructed from the data relating to the factors that influenced risk perceptions. These included: 1) 'The role of early experiences', including exposure to gambling advertising in sport, and the gambling behaviours of social networks; 2) 'The influence of peer rivalry and competition', in which sports betting was used to form connections within and across peer groups; 3) 'The normalisation of gambling', including the embedding of gambling in everyday activities; and 4) 'The influence of perceptions of knowledge, skill, and control', including the belief that they could engage in responsible behaviours and stop gambling if they needed to.

**Conclusion:** This study indicated that a range of factors may influence how young men conceptualise the risks and benefits associated with sports betting. Current public health strategies for gambling that focus on individual determinants and responsibility paradigms must be broadened to target the social and commercial factors that influence young men's attitudes towards, and engagement in sports betting.

**Keywords:** Young men, Sports betting, Risk, Public health

## Background

There has been increased recognition that gambling related harm is distributed unevenly and is a significant burden on the health and wellbeing of individuals who gamble, their social networks, and the broader community [1]. The commercial growth and diversification of gambling in the past decade had led to increasing calls

*Correspondence: cnyemcso@deakin.edu.au
[1] Institute for Health Transformation, School of Health and Social Development, Faculty of Health, Deakin University, Gheringhap St, Geelong, Australia
Full list of author information is available at the end of the article



© The Author(s) 2022. **Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated in a credit line to the data.

Nyemcsok *et al. BMC Public Health*     (2022) 22:867

Page 2 of 13

from public health researchers and advocates for public health responses to prevent and reduce gambling related harm [2, 3]. Harms associated with gambling are unique to the individual, contributing to financial and interpersonal problems, as well as serious mental health illness and suicide [2, 4]. An evidence-based approach is important to understand the complex socio-cultural drivers of gambling engagement to develop robust public health interventions that prevent and reduce gambling related harm [5]. Researchers have identified that specific forms of gambling such as sports betting are associated with increased risk for gambling related harm [6]. While most studies have investigated a range of individual risk factors for harm associated with sports betting [7, 8], comparatively less research has qualitatively explored the range of socio-cultural and commercial factors for gambling that may influence risky patterns of engagement with sports betting.

Population-based surveys have indicated that young men are one demographic who may be at particular risk of harm associated with sports betting [9, 10]. A recent study found that young men were more at risk of the harms associated with sports betting products, because they were more likely to engage with these products, and place an increased number of bets as compared to women and older men [11]. Quantitative studies also indicate that there are a range of motivational factors for sports betting engagement that may increase young men's risk for harm, such as to make money, to reduce boredom, and to demonstrate perceived knowledge of sport [7, 12]. Public health researchers have also qualitatively explored young men's sports betting engagement and implications for risk and harm. Deans and colleagues [2016] conducted seminal research exploring the sports betting attitudes and behaviour of young men aged 20–35 years in Australia [13]. The researchers found that socio-cultural factors such as the embedded nature of sports betting in young men's social and peer environments, and commercial factors relating to young men's interaction with betting marketing, could increase young men's risk for harm associated with their sports betting engagement [14, 15]. McGee [2020] investigated the sports betting experiences of young men aged 18–35 years and recommended that more effective public health strategies were needed to address the influence of betting marketing, as well as independent risk assessments for betting products [16].

Rhodes [17] describes that examining the relationship between health, risk perceptions, and behaviour requires distinguishing between whether risk is the product of individual decisions and actions, or if risk is embedded in social contexts and processes [17]. Rhodes explains that risk perceptions are significantly shaped by social interactions and norms, and argues that a more comprehensive understanding of risk that moves beyond the influence of individual processes, requires capturing the way in which risk is socially organised. This is important for improving the effectiveness of strategies to address the harms associated with unhealthy products, in which they better recognise the role of social processes in shaping risk perceptions and behaviour [18]. For example, researchers in alcohol harm prevention argue that exploring risk through social processes is important given that alcohol consumption is largely a social activity and is bound by socially shared meanings such as social connection [19, 20]. Furthermore, the researchers argued for the same approach to be extended to other unhealthy products that are influenced by social processes such as gambling [18]. Social risk theorists argue that examining the social processes that shape risk beliefs may help us to understand why people engage in activities that may be potentially risky for their health [17]. For example, Zinn [2019] explains that young people are motivated to engage in risk behaviours as part of developing their social identity and position in their social realm relative to their peers [21]. As such, social contexts are an important factor in understanding people's motives for risk behaviour.

Individual motivations to engage in risky behaviours are complex and may be influenced by a range of everyday social contexts and experiences [17, 21]. These factors may influence whether a motive is driven by a desire to achieve material gain, or a response to a vulnerable situation [21]. For example, social contexts in people's everyday environments may motivate them to make choices that are more favourable, or congruent with the choices of wider society [22]. Studies that have investigated young men's sports betting attitudes and behaviours indicate that they perceive sports betting as a normalised practice for men who are engaged as 'fans' of sport, and this could also contribute to prompting their own betting participation [14, 16]. Another key dimension of risk that may explain why individuals engage in a risk behaviour relates to the control an individual perceives that they have over a behaviour [21]. Zinn [2019] describes that an individual with a high perception of control, may engage in risk to validate this self-perception, while an individual with a low perception of control may engage in risk to regain or enhance control [21]. Within these situations, social risk theorists explain that the degree of control is shaped through meanings that people interpret from their social environment [21]. This process involves reflexivity, whereby people attempt to makes sense of their control over a risk activity or behaviour through repeated interaction with their social environment [21, 23]. Put more simply, this means utilising the social environment to weigh up one's perceived level of control over a risk behaviour. Research shows that social

Nyemcsok *et al. BMC Public Health* (2022) 22:867

Page 3 of 13

environments, and gambling products and marketing are key processes that influence beliefs about gambling risk and perceived control over gambling interaction [15, 24]. However, there is still limited qualitative research which explores how social and commercial factors shape young men's perceptions of the risks and benefits of sports betting. Such research is important to broaden public health responses for gambling related harm to recognise the complex range of determinants that may influence how and why young men may engage in risky patterns of gambling.

Using concepts derived from theoretical considerations associated with the sociology of risk, this study sought to explore how socio-cultural and commercial factors associated with gambling shape young men's sports betting risk perceptions and how risk behaviours are reflected in their sports betting engagement. Three research questions were explored:

1. What factors influence how young men conceptualise and reflect upon the risks associated sport betting?
2. Do perceptions of knowledge, skill, control contribute to young men's motivations to gamble?
3. Do the findings highlight specific areas for intervention associated with young men's sports betting and risk conceptualisations?

## Methods
### Approach
The data presented in this paper was part of a broader qualitative study that explored the gambling attitudes and behaviours of young men. A previous paper from this data explored the social practices associated with the young men's gambling [25]. The study utilised a critical approach to qualitative inquiry. Charmaz [26] argues that critical inquiries:

> … include concerns about social justice …. Addresses power inequality and injustice … (and is) embedded in a transformative paradigm that seeks to expose, oppose, and redress forms of oppression, inequality, and injustice [p. 35].

As Charmaz highlights, critical inquiries are grounded in the researcher's value positions, and the positionalities that guide the development of the research. In terms of gambling, the researchers take a position that the risks associated with gambling products extend beyond individual behaviours and choices, and are influenced by a range of socio-cultural, environmental, and commercial determinants, including the marketing of gambling products. Critical inquiries are also consistent with public

health prevention paradigms which state that the implementation of effective public health interventions should collect and synthesise evidence that:

> … contextualizes the lived experiences of the individual gambler, within their wider social and cultural community, and alongside the commercial drivers and political contexts [27].

Constructivist Grounded Theory, which has strong pragmatist roots and complements critical inquiry through its commitment to social justice, guided the research process, including the study design and data interpretation [28]. This included a focus on co-constructing meaning with participants, and understanding how meanings and actions influence how they interpret different social phenomenon and the role of these phenomenon in their lives [29].

Ethical approval for the study was received from the University Human Research Ethics Committee (2019–402).

### Sampling and recruitment
The study sought to recruit young men aged 18–24 years from Victoria, Australia, who self-reported that they engaged regularly in sports betting (at least once a month). This age range was chosen based on evidence from gambling participation studies indicating higher levels of sports betting among young men aged 18–24 years when compared with other age demographics [9, 30]. Given that Australia legally permits gambling from age 18 years, the study provided an important opportunity to explore young men's earliest legal interactions with sports betting and the range of factors that shaped their risk perceptions towards sports betting. Participants were referred to as 'young men' as this aligns with the age range for 'young people' (aged 16–24 years) as defined by the World Health Organisation (WHO) [31].

Convenience and snowball sampling strategies were used to invite participation to the study [32]. The study did not specifically aim to recruit young men who may have experienced harm associated with online wagering, however these sampling strategies helped to ensure that individuals with a range of gambling attitudes and experiences were able to participate in the study. As the interviews and data analysis progressed, purposive sampling was used to recruit participants who primarily engaged in sports betting, but also had experiences with other forms of gambling. These sampling strategies help to build depth in understanding participants' gambling experiences. The researchers sought permission from a range of community organisations, including tertiary education providers, local councils and community sporting clubs,

Nyemcsok *et al. BMC Public Health*      (2022) 22:867

Page 4 of 13

and gambling advocacy and support groups to distribute study information to their networks. Participants were also invited to share information about the study to their peers. Participants were informed that their participation was voluntary and required them to feel comfortable with sharing and discussing their experiences of sports betting. Participants who expressed interest were provided information about the study both verbally and in a written format and were required to consent prior to participation. Each participant received a $70 petrol voucher for their time, which was approved by Deakin University Ethics Committee, and was commensurate with tokens of appreciation given in other interview studies related to young men and gambling [13, 33, 34].

### Data collection
Semi-structured, telephone interviews were conducted with each individual participant between February and November 2020. The majority of interviews were conducted during the COVID-19 lockdown period in Victoria, Australia. Interviews lasted for a duration of up to 45 min and were recorded with participant's permission.

Interviews collected socio-demographic information including age, postcode, employment status, occupation, relationship status, living arrangement, and highest level of schooling. After the first interview, The Problem Gambling Severity Index (PGSI) [35] was subsequently administered to each participant to provide a broad indication of risk of problem gambling. Interview questions were flexible to ensure that the data was co-created with participants. As the interviews progressed, and concurrent data analysis occurred, themes and lines of questioning were revisited. The open nature of questions and prompts, encouraged participants to reflect on their experiences with gambling, and elaborate on areas of discussion that were important to them [36]. This study focuses on questions that related to participant's awareness of gambling and the contexts associated with their first gambling experiences; the factors that influenced their current gambling behaviours, and their rationale for engaging in gambling.

As Varpio et al. [2017] argue, data saturation in qualitative studies is a 'thorny concept' (p. 46) [37]. Braun and Clarke [38] state that decisions about when to stop data collection are subjective and situated in a range of meanings and contextual factors relating to the data that is collected. Considerations about the sample size were constantly reflected upon throughout the data interpretation process. We utilised guidance from Malterud et al. [2016] regarding sample size whereby we reflected upon the study aims, the specific nature of the sample, the theoretical concepts of the study, and the quality of the data (dialogue) with the participants [39]. A decision to stop

collecting data was reached when the researchers determined that the interpretation provided enough 'information power' to address the study aims and research questions [39].

### Data analysis
Author one transcribed all the interviews, with sufficient space between the interviews to interpret and identify patterns in the data (which were explored in subsequent interviews). Data were interpreted using Braun and Clarke's reflexive thematic analysis [40, 41]. While the overall study was guided by theoretical concepts associated with social norms, the concept of risk was reviewed in the literature and utilised as a theoretical concept that could underpin the data. The coding process was open and data-driven. Initial coding focused on semantic (or surface) meanings in the data, followed by a process of in which latent (or underlying) meanings were considered, and refining these to construct overarching themes and sub-themes. The researchers maintained regular contact throughout the analysis process to discuss and reflect upon interpretations and patterns in the data and how these could be explained by key concepts of risk as well as to plan for the written analysis. Data extracts were selected that conveyed participant's meanings that were grounded in the data [42]. A model was then constructed to conceptualise young men's risk perceptions and behaviours associated with sports betting.

### Results
The full details of participant's socio-demographic and gambling characteristics have been presented elsewhere [25]. In brief, sixteen young men, aged 18–24 years ($M = 20.81$) participated in the study. The majority lived at home with a parent or guardian ($n = 14$). Most had completed high school education at Year 12 (the final year of Australian high school) ($n = 10$), just under a quarter completed Year 11 ($n = 3$), and just under a quarter completed education beyond high school ($n = 3$). Three quarters of participants were employed full time ($n = 12$). Scores on the PGSI indicated a range of gambling risk profiles among participants, including four 'non-problem' gambling, five 'low risk' gambling, three 'moderate risk' gambling, and four participants who indicated 'problem gambling'.

Four themes relating to risk were constructed from the data. These themes related to the influence of early gambling experiences, the role of peer rivalry in sports betting risk perceptions, the normalisation of gambling in everyday activities, and the influence of knowledge, skill, and control.

**Early gambling experiences in shaping gambling risk perceptions**

A range of experiences with gambling prior to the legal age of 18 years for gambling in Australia shaped participants' early risk perceptions. Most participants had an awareness of sports betting during their adolescence through seeing gambling advertising when watching professional sport or through their social experiences that were associated with gambling. These social experiences included participating in informal gambling during major sporting events with family members and or peer networks, and being present when family members or peer networks engaged in gambling. While a few participants also engaged with gambling products such as 'scratchies' (instant lottery cards – also known as 'scratchcards'). Scratchies were bought as a gift by a parent or relative and participants recalled that they did not perceive scratchcards to be a type of formal gambling. Participants discussed multiple social experiences with gambling during their adolescence:

> *"The Melbourne Cup (horse race) was the only time I ever bet on a horse when I was young. With scratchies, since about 10, I had my parents buy them for me and then scratch them and then win something. I have an older brother and he would go to the Returned and Services League of Australia (RSL) and bet with all his mates'" – Participant nine, 19 years old, problem gambling.*

Some participants' early risk perceptions about their capability with gambling appeared to be shaped through activities not related to gambling. This involved competing with peers. These activities related to making predictions about the outcome between two sporting teams, colloquially referred to as sports tipping, or creating virtual sporting teams based on the best performing sporting players, known as fantasy sporting leagues[1]. Participants stated that the competitive nature of these activities helped to enhance their engagement as a 'fan' of sport, and peer connections. In terms of risk, engaging in these activities created a sense of knowledge and understanding about sport and how to predict the outcomes of sporting matches. This contributed to shaping a perception of control relating to their future sports betting attitudes and behaviours. For example, the following participant recalled that his interest in sports betting was shaped through his prior engagement with fantasy sporting leagues.

---

[1] Some Australian and international fantasy sporting competitions require a subscription fee however they are not defined as gambling.

> *"I was big into the fantasy hockey, fantasy soccer, fantasy basketball, fantasy football. I guess technically we used to put money on for these fantasy one's as well. I guess it helped me increase the knowledge of some of the players and teams. It also helped enjoy watching them too, a bit more invested." – Participant sixteen, 24 years old, moderate risk gambling.*

Furthermore, some participants developed reduced risk perceptions towards gambling through learning how to weigh up the risks of winning and losing. Reduced risk perceptions were shaped through modelling the individuals in their social networks who regularly engaged in gambling, including their male family members and peers. For example, they learned about the technical aspects of sports betting through members of their social networks such as the meaning of specific odds and betting markets as well as how to place a bet. This was particularly captured in one participant's account of his early experiences:

> *"Well my stepdad, when I was younger he would explain to me that if it's paying $1.50, you're gonna (going to) get this back for it, you know, one of them with better odds and they're most likely to win. You'd ask – 'what's a quinella or an exacta' - and he'd give that to me and yeah, I guess I had like half an idea of what was going on." – Participant ten, 19 years old, moderate risk gambling.*

**The role of peer rivalry in sports betting risk perceptions**

Peer group rivalry played a role in participant's risk perceptions towards sports betting. This was particularly highlighted by participants who scored a 'no', 'low' or 'moderate' risk gambling. This routine involved competing against peer group members through betting. For some, peer group rivalry within social groups was shaped prior to formal and legal engagement in sports betting. For example, a few participants mentioned that they participated in informal gambling when they engaged in playing a team sport with their peers or when watching live sporting matches and predicting a winner:

> *"While we were all under 18 we might have little bets with each other – like I bet you my team is going to beat your team and the winner has to buy lunch or something – but nothing official on gambling websites." – Participant fifteen, 24 years old, non-problem gambling.*

Rivalry through sports betting enhanced peer connections, and this influenced some participants to be less inclined to consider risk in the context of their betting.

Nyemcsok *et al. BMC Public Health*    (2022) 22:867

Page 6 of 13

For example, the following quote illustrates how enthusiasm associated with peer group rivalry through sports betting was embraced and meant that there was less reflection on potential risks:

> "It's always good with your mates because if you watch a game with your mates and all your mates would have different bets on, so you're all like fuckin going at each other, trying to win a bit. It becomes like a competition." – Participant four, 18 years old, low risk gambling.

When asked to reflect on the impact of engaging in rivalry on their betting engagement, a few participants acknowledged that there were risks associated with this practice. For example, the following participant reflected that engaging in rivalry contributed to increased frequency of both his own and their peers' betting.

> "Definitely be an increase in betting overall because we're discussing it with each other. It would be some friendly competition between us and that way it would be a way for us to bond in general, but yeah, always increase our betting talking about it." – Participant fourteen, 22 years old, moderate risk gambling.

### The normalisation of gambling in everyday activities in reducing perceptions of risk

There were regular social cues to gamble that were embedded in participant's everyday lives, which alerted their attention to sports betting and in turn nudged their betting intentions and engagement. This was mentioned by participants regardless of gambling risk on the PGSI. The most typical social contexts were recreation, work, and educational environments. These social contexts had implications for risk because participants attached positive meanings that sports betting was more readily accepted and permitted within these settings. The following participant described in detail that there were multiple and regular cues in the social environments of young men that prompted their betting intentions and engagement:

> "I think gambling is just always around what young men are doing. Like most young guys love sports and so even if you're not into gambling because you're around sports, you always hear about it, you see about it. You're a young guy so you probably go out to the pub to drink and see gambling or you go to the city and you see the casinos. I think it's just the exposure to it, how gambling is seen a lot in young men's life." – Participant four, 18 years old, non-problem gambling.

Sports betting was also normalised within everyday recreational settings that were culturally and socially valued by the participants. For example, betting was intrinsically linked as part of a range of activities that were associated with watching live sport with friends. Furthermore, betting sometimes took place alongside other risky activities such as the consumption of alcohol. When some participants were asked to reflect on how alcohol consumption could influence their sports betting engagement, a few were guarded about the associated risks:

> "Not necessarily, you didn't want to go stupid if you got a bit too drunk, you didn't want to put too much more on a horse. So if you got too drunk and put like 100 bucks on something, that's silly, so no, I wouldn't say it impacted too much." – Participant two, 20 years old, low risk gambling.

Another participant acknowledged that the combination of these activities could influence risky patterns of sports betting and described that it required him to implement some limits on his spending to reduce monetary risks when consuming alcohol in social settings and engaging in betting:

> "I've got the limit, but if your mate's drunk as well then you don't care (laughs). So sometimes you end up getting a bit more money out. But the way I normally do it is I move a certain amount of money into my spending account and I lock off my bank account until the next morning. Then I can just look at my cash and be like – 'this is how much I have." – Participant four, 18 years old, non-problem gambling.

Some participants, in particular those who scored as 'moderate' risk or 'problem' gambling on the PGSI, indicated that their participation in betting was impacted by aspects such as conversations about betting and engagement in betting by peers. These aspects were described as difficult to escape due to their presence in multiple social settings including recreation settings, as well as their workplace and educational settings. This suggested that the boundaries of betting being a social activity were removed because it became part of settings that were not recreational spaces tied to watching sport. As a result, it contributed to risks associated with gambling being amplified. For example, one participant stated that due to the high number of his peers that held a betting account, conversations about sports betting were "*never ending*". Another stated that the regular occurrence of sports betting at his workplace during lunch breaks prompted his own betting, and this influenced him to engage in more frequent betting within this social context:

*"Just at lunch times really, all the guys at work were betting so I kind of just joined in because they're doing it. Because sometimes I work by myself and sometimes I work with others, and when I'm with the others I definitely bet more during the day because they're big on the horses." – Participant thirteen, 21 years old, problem gambling.*

There were also direct social cues that prompted engagement in betting. When together, young men showed each other information about betting on their phones. However, social messaging apps (SMA), such as WhatsApp and Messenger, enabled them to continue discussions about betting even when they were not together. Some participants described instances in which SMA nudged their own engagement with betting. For example, live sports often prompted participants to have discussions about betting on SMA and this in turn contributed to subsequent engagement in betting. Risk perceptions appeared to be reduced because the prompting of betting encouraged participants and their peers to feel united when they were betting. The following participant described that conversations about betting on SMA were frequent in his peer group and this contributed to his experience of risky betting:

*"Whenever the footy is on, we've got our group chat and we send our screenshots of our multi's (betting accumulator) or we'll do a joint multi and talk about it. I'd see all the screenshots of everyone's multi's and then I'd be like – 'they're wasting their money' – and then all of a sudden I've sent like 3 or 4 in a row and I'm like – 'shit' – and then you look at it and you've just wasted money" – Participant ten, 19 years old, moderate risk gambling.*

Furthermore, a few others identified that these regular nudges, and the social nature of SMA groups that facilitated these nudges, created risks because it prompted them to place bets when they were trying not to engage in gambling. For example, one participant described that group chats about betting made it difficult for him to avoid thinking about gambling even when he had tried to reduce his engagement:

*"I've tried to really back off of late, but it's hard. Just because you put yourself in position with friends that do it, and then you're in group chats and someone posts something and then that sort of triggers stuff, you're thinking about it again, and then you're like – 'I thought I was trying to not gamble' – and then you start gambling." – Participant five, 22 years old, moderate risk gambling.*

### The influence of knowledge, skill and control in risk perceptions about betting

Participants, regardless of PGSI score, actively engaged in reflexivity through weighing up the risks associated with sports betting in comparison to other forms of gambling. This in turn had important implications for control over their sports betting. For example, there was a common sentiment that outcomes tied with betting were less random and less associated with chance in comparison to electronic gaming machines and casino gambling, and sporting knowledge – particularly relating to sports they enjoyed and supported—played a key role in betting success and financial rewards:

*"I personally don't like casinos or the pokies because there's no knowledge that can help you win. I like to think that my knowledge can help put the odds bit more in my favour – whereas if you're spinning at a roulette table there's nothing really you can do to control that." – Participant three, 21 years old, low risk gambling.*

Perceptions of control were evident in participant's accounts of a range of strategies that they described could be used to reduce the risks associated with sports betting and enabled a competitive edge in winning money. They stated that these strategies could positively influence the outcomes of their bets, and also influenced the types of betting products and markets they favoured, with particular engagement in high-risk markets. As an example, many participants described engaging with 'same game multi' markets; a product that enabled the accumulation of multiple selections on different outcomes within one sporting event. They indicated that bets through this type of product could result in more immediate rewards. This, as well as the association between having a significant interest in sport and a perception that they had a high level of sporting knowledge, influenced the appeal of multi bets. This perception of control led a number of participants to perceive that engaging with this type of product reduced the risks associated with losing, describing these bets as *"low risk, high reward"*. However, as the following quote illustrates, these markets, alongside risk reducing promotions such as inducements and cash back offers, contributed to a few participants staking more money on these markets:

*"Same game multi's for me. There's a $50 cash back if one leg of your same game multi fails, so I do same game multi's when that promotion is on. I wouldn't do anything else. I tend to put more money on a same game multi if there's a promotion like that, so, I would say I'd put on an obvious multi, I would put 50 bucks instead of if the promotion wasn't there I'd*

*probably put 20 bucks." – Participant seven, 19 years old, problem gambling.*

Although participants indicated through their experiences that they engaged in sports betting regularly, some believed that they had control over their gambling in comparison to other young men in their social circle because they engaged in wagering in a way that reduced their risk. For example, a few of these participants stated that their sports betting was comparatively less frequent to their peers:

*"I think there's definitely a lot of guys out there that definitely bet a lot more than me." – Participant thirteen, 21 years old, problem gambling.*

Others claimed that they knew when to stop gambling in comparison to their peers:

*"I find it pretty easy to unattract myself, I find that I'm much better than people I know. I have one mate that is easy on spending $100. There's just no switch on them" – Participant nine, 19 years old, moderate risk gambling.*

A few perceived that they were more careful in the money they spent on betting:

*"The system I have in place, I'm not betting stupid amounts like I know my mates do. I'm not too heavily invested in it. I've got one mate who bets pretty large amounts and uses it as a way of making money" – Participant one, 19 years old, PGSI not measured.*

Participants who indicated that they had control over their finances and ability to limit the amount of money that they spent on gambling had a decreased perception of the risks associated with products. Most participants indicated that they allocated themselves a spend limit for their betting, with some specifically setting a fixed deposit limit within their betting app. However, some participants described situations in which they perceived that their fixed deposit limit was financially restrictive for their betting and subsequently increased this limit to allow for more regular betting or an increase in spend. Again, perception of control was exemplified by a few participants when rationalising this decision:

*"I had one (deposit limit) at the start but I bumped it up because I'm pretty good with my self-control." - Participant sixteen, 24 years old, moderate risk gambling.*

Finally, was the role of marketing and promotions in creating perceptions of knowledge, control, and reduced risk perceptions. Participants engaged with marketing and promotions through viewing a range of information about different betting products and markets, and promotional offers and inducements that encouraged engagement with betting markets. This shaped some participant's perceptions that being smart or strategic with promotions could contribute to gambling success. For example, some described actively looking for, and *"taking advantage"* of the best promotions and price discrepancies between companies, with one participant discussing that this was part of developing skill and knowledge about betting:

*"… if you're going to be smart with it or if you do it at all (betting), you'd want to get the best value for money." – Participant two, 20 years old, low risk gambling.*

Direct to consumer marketing encompassed betting promotions and inducements that participants perceived reduced the risks associated with betting (and losing their money). Participants regularly engaged with or were prompted by sports betting companies to view this content. Direct marketing came in a range of forms, including emails, text messages, push notifications, phone calls, in-app promotions, and social media marketing. A number particularly mentioned receiving matched deposit offers, in which a total deposited sum of money was matched as a bonus bet. The perceived benefits tended to outweigh considerations regarding the risks associated with taking up these offers:

*"That's where I made my first big deposits, because at the start I was probably depositing $5-10 a month or something. But then they would offer matched deposits that if you deposit $300, they'll match all $300." – Participant twelve, 23 years old, moderate risk gambling.*

However, a number of participants critically reflected on the risks associated with these promotions. For example, a few recognised that these were strategies that sought to encourage gambling. Others were concerned that these promotions would contribute to them engaging in more regular and risky patterns of gambling. While some talked about turning off notifications from their betting accounts, one participant talked about the fear of missing out on good promotional offers and deals:

*"It gets annoying and most aren't relevant. But I also don't want to turn them off in case they offer something that might appeal to me." – Participant eleven, 20 years old, low risk gambling.*

## Discussion

This study aimed to provide detailed information about how perceptions of risk are shaped by a range of individual circumstances, early experiences with gambling,

social contexts and pressures, and industry practices. These insights are important given the range of public health and health promotion interventions for this population sub-group appear to focus specifically on personal responsibility behaviours. Figure 1 depicts a model showing descriptive examples associated with four key themes relating to how young men weigh up the risks associated with sports betting, and how these risks could be prevented. The four themes relate to: the factors that shape how young men conceptualise risk associated with gambling; the normalisation of gambling in young men's everyday activities, and the social expectancies tied to sports betting; the role of knowledge, skill and control is risk perceptions; and key strategies that may prevent these risks. The findings raise three points for discussion.

First, the study showed that participant's conceptualisations of risk associated with sports betting were shaped by a range of social and commercial interactions with gambling and non-gambling activities during their adolescence. This aligns with a significant body of research conducted with young people prior to the legal age for gambling, that has highlighted how social contexts for gambling and commercial factors such as gambling marketing, influence young people's beliefs about risk and future gambling intentions [43–45]. As such, participants in this study may have developed attitudes towards sports betting through these interactions during their adolescence that were influential in the uptake of sport betting. This may be explained by the contention of social risk theorists who argue that risk perceptions are shaped and modified by social contexts and processes [17, 21]. The implication here is that prior to the legal age for gambling and as part of a comprehensive public health approach, public health messaging could be targeted towards informing young men about the risks associated with gambling, in turn countering the developing positive or normalised perceptions towards sports betting that may increase their risk for harm.

Second, the study found that there was a link between a range of social cues and social interactions associated with sports betting, and participant's sports betting motives and risk conceptualisations. Social theorists explain that the social environments people live within shape their understanding of risk as well as the



**Fig. 1** Understanding how young men weigh up the risks associated with sports betting, and strategies to prevent these risks

Nyemcsok *et al. BMC Public Health*     (2022) 22:867

Page 10 of 13

acceptability of taking risks [17, 21]. This means that regular social cues for sports betting in young men's environments may signify to them that betting is a normalised and accepted activity. Furthermore, people may also engage in risk behaviours as part of their identity formation and engage in risk activities to evaluate or protect their social position or status [21]. This suggests that a determinant of young men's motives for sports betting as a risk activity, may relate to maintaining their position within social and peer interactions. Public health researchers who focus on alcohol consumption, explain that there are limitations to public health measures that focus solely on risky alcohol consumption because drinking is not necessarily the defining feature within the social interactions of young people [46]. This lesson from alcohol control suggests that public health responses for gambling could target the influence of social contexts in young men's betting motives. Given that individuals may experience serious harms from gambling [2, 4], implementing this public health measure may help prevent harm among young men.

Third, the findings from this study indicated that knowledge, skill, and control reduced beliefs about risks and contributed to risky patterns of sports betting regardless of their individual risk or problem gambling status. This in part may be explained by the way perception of control is considerably dependent on the social conditions and structures that influence how a risk behaviour is learned, adjusted and then routinised through a process of reflexivity [21, 23]. Research shows that social conditions and structures for sports betting are continuing to evolve through advancements in mobile technology, inducement marketing, and structural changes to betting products [13, 47]. This suggests that young men are also adjusting their knowledge, skill, and control of sports betting through a process of reflexivity, which may have significant implications for their risk for harm. Lessons from public health research for alcohol consumption highlight that public health strategies that target alcohol consumption are therefore unlikely to effectively prevent risk behaviour. [18]. Similarly for young men and sports betting, strategies to address young men's risk for harm should be reflective of the many domains that may contribute to harm, moving beyond a sole focus on individual responsibility [48].

Fourth, the findings highlight a number of areas for intervention. As argued by public health researchers in obesity prevention, industries that promote personal choice and responsibility in their marketing and promotional messages associated with unhealthy products, must contain accurate and honest information about risk [49]. For gambling, this could mean evidenced-based risk information developed independently from the gambling industry that provides honest and clear information about gambling products, rather than the existing personal responsibility framing that is so dominant in current public education campaigns. These campaigns should focus on the risks associated with gambling, and gambling products. Research indicates that public health messaging through mass media in other areas of public health such as alcohol consumption, smoking, and physical exercise can have a positive effect as part of a comprehensive public health approach to harm prevention [50]. There are a few ways to ensure public health messages can better resonate with target audiences such as young men. For example, creating campaigns that focus on denormalising behaviour using social norm messages [51], as well as ensuring that public health messages are sustained and regularly encountered by target audiences [52]. Moreover, public education campaigns are more effective in preventing and reducing harm when they are implemented alongside upstream strategies of regulatory and policy reform [53]. For example, these upstream initiatives could focus on further regulation in relation to inducement-based marketing. There are some current measures in Australia to prevent sports betting operators from offering inducements relating to sign up promotions [54] and recent inquiries into gambling in the United Kingdom have recommended similar bans for inducements [55, 56]. Lessons from public health show that measures that target the availability and marketing of products, such as alcohol and unhealthy food, are more effective in preventing and reducing harm [57–59]. Given the risks associated with participant's interactions with inducements and sports betting products, we would argue for a similar approach to policies for gambling to prevent and reduce young men's risk for harm.

### Limitations

There are some limitations to consider when interpreting the findings. First, it is important to acknowledge that the study was mostly conducted during the COVID-19 pandemic and involved a specific group of young men who were mainly employed in the trades and services industry from Victoria, Australia. While the study provided an in-depth interpretation of the sports betting experiences of young men through a theoretical lens of risk, future research should consider investigating gambling and risk among young men in other settings and who have different characteristics, to broaden knowledge of this public health issue. Second, it is important to note that there may have been some social desirability bias in the responses participants gave during the interview. However, the use of open text responses and prompts to encourage open dialogue, and modifications to strengthen the interview schedule, indicated that it

contributed to detailed insights provided by participants and reducing socially desirable biased responses.

## Conclusion

There are a range of socio-cultural and commercial factors that shape young men's risk perceptions and contribute to their sports betting engagement. This study highlights the importance of broadening public health strategies that focus on individual determinants for gambling to the range of social and commercial determinants. A strong, independent evidenced-based approach is needed to ensure that public health responses to prevent and reduce gambling related harm among young men reflect the diverse meanings and experiences attached to their sports betting engagement.

### Abbreviations
PGIS: Problem Gambling Severity Index; RSL: Returned and Services League of Australia; SMA: Social messaging apps; WHO: World Health Organisation.

### Acknowledgements
We thank the organisations who kindly agreed to distribute study information to their networks of young men and allowed the researchers to attend their venues to provide them with information directly and invite participation. Most importantly, we thank the young men who participated for openly sharing their views and lived experiences.

### Authors' contributions
CN: Conceptualised the study, contributed to the study design, conducted interviews, data analysis and interpretation, drafting and revisions of the manuscript. HP: Contributed to the conceptualisation of the study design, contributed to interpretation of the data, and critical revisions of the manuscript. PK: Contributed to the conceptualisation of the study design, contributed to interpretation of the data, and critical revisions of the manuscript. ST: Study Principal Investigator. Contributed to the conceptualisation of the study design, contributed to data interpretation, drafting, and critical revisions of the manuscript. The author(s) read and approved the final manuscript.

### Funding
This research received no specific grant from any funding agency in the public, commercial or not-for-profit sectors.

### Availability of data and materials
The dataset analysed in the current study is not publicly available, or available on reasonable request from the corresponding author because participants explicitly consented to only have their data shared with the immediate research team.

## Declarations

### Ethics approval and consent to participate
All methods were carried out in accordance with the Declaration of Helsinki. The study received ethical approval from the Deakin University Human Research Ethics Committee (2019–402). Participants provided verbal informed consent prior to participation. This informed consent method was approved by the Deakin University Human Research Ethics Committee.

### Consent for publication
Not applicable.

### Competing interests
S.T. Currently receives funding from the Australian Research Council Discovery Grant Scheme, the Victorian Responsible Gambling Foundation, and the New South Wales Office of Responsible Gambling for research relating to public health responses to gambling harm prevention. She has previously received funding for gambling research from the Australian Research Council Discovery Grant Scheme, and the Victorian Responsible Gambling Foundation, and Deakin University. She has received travel expenses for gambling speaking engagements from the European Union, Beat the Odds Wales, the Office of Gaming and Racing ACT, and the Royal College of Psychiatry Wales. She is a member of the Responsible Gambling Advisory Board for LotteryWest, and the International Confederation of Alcohol and other Drug Research Consortiums. She has provided expert evidence to a range of parliamentary inquiries, most recently the All Party Parliamentary Group on Gambling Harm in the United Kingdom. She does not receive any financial compensation for these roles. H.P. has received funding from the Australian Research Council, Victorian Responsible Gambling Foundation, the New South Wales Office for Responsible Gambling and Deakin University. P.K. has previously received funding from the Australian Research Council, National Health and Medical Research Council. He has no conflicts of interest.

### Author details
[1] Institute for Health Transformation, School of Health and Social Development, Faculty of Health, Deakin University, Gheringhap St, Geelong, Australia. [2] Centre for Sport Research, School of Exercise & Nutrition Sciences, Faculty of Health, Deakin University, Gheringhap St, Geelong, Australia.

Received: 23 August 2021   Accepted: 29 March 2022
Published online: 30 April 2022

### References
1. van Schalkwyk M, Cheetham D, Reeves A, Petticrew M. Covid-19: we must take urgent action to avoid an increase in problem gambling and gambling related harms. In: The BMJ Opinion. 2020. https://blogs.bmj.com/bmj/2020/04/06/covid-19-we-must-take-urgent-action-to-avoid-an-increase-in-problem-gambling-and-gambling-related-harms/. Accessed 8 Jul 2021.
2. The Lancet. Problem gambling is a public health concern. Lancet. 2017. https://doi.org/10.1016/S0140-6736(17)32333-4.
3. Goyder E, Blank L, Baxter S, van Schalkwyk M. Tackling gambling related harms as a public health issue. Lancet Public Health. 2020;5:1.
4. Langham E, Thorne H, Browne M, Donaldson P, Rose J, Rockloff M. Understanding gambling related harm: a proposed definition, conceptual framework, and taxonomy of harms. BMC Public Health. 2016;16:80.
5. Blank L, Baxter S, Woods HB, Goyder E. Interventions to reduce the public health burden of gambling-related harms: a mapping review. Lancet Public Health. 2021;6:1.
6. Mazar A, Zorn M, Becker N, Volberg RA. Gambling formats, involvement, and problem gambling: which types of gambling are more risky? BMC Public Health. 2020;20:1.
7. GökceYüce S, Yüce A, Katırcı H, Nogueira-López A, González-Hernández J. Effects of sports betting motivations on sports betting addiction in a Turkish sample. Int J Ment Heal Addict. 2021;42:2.
8. Lamont M, Hing N. Sports betting motivations among young men: an adaptive theory analysis. Leis Sci. 2020;42:2.
9. Armstrong A, Carrol M. Gambling activity in Australia: findings from wave 15 of the Household, Income and Labour Dynamics in Australia (HILDA) survey. In: Australian Institute of Family Studies. 2017. https://aifs.gov.au/agrc/publications/gambling-activity-australia. Accessed 8 Jul 2021.
10. Rockloff M, Browne M, Hing N, Russell A, Greer N, Tran K, et al. Victorian population gambling and health study 2018–2019. In: Victorian Responsible Gambling Foundation. 2020. https://responsiblegambling.vic.gov.au/resources/publications/victorian-population-gambling-and-health-study-20182019-759/. Accessed 8 Jul 2021.
11. Seal E, Cardak BA, Nicholson M, Donaldson A, O'Halloran P, Randle E, et al. The gambling behaviour and attitudes to sports betting of sports fans. J Gambl Stud. 2022. https://doi.org/10.1007/s10899-021-10101-7.
12. Goldstein AL, Vilhena-Churchill N, Stewart SH, Hoaken PNS, Flett GL. Mood, motives, and money: an examination of factors that differentiate online and non-online young adult gamblers. J Behav Addict. 2016;5:1.
13. Deans E, Thomas SL, Daube M, Derevensky J. "I can sit on the beach and punt through my mobile phone": the influence of physical and online

Nyemcsok *et al. BMC Public Health*    (2022) 22:867

Page 12 of 13

environments on the gambling risk behaviours of young men. Soc Sci Med. 2016;166:110–9.

14. Deans E, Thomas SL, Daube M, Derevensky J. The role of peer influences on the normalisation of sports wagering: a qualitative study of Australian men. Addict Res Theory. 2017;25:2.

15. Deans E, Thomas SL, Derevensky J, Daube M. The influence of marketing on the sports betting attitudes and consumption behaviours of young men: implications for harm reduction and prevention strategies. Harm Reduct J. 2017;14:1.

16. McGee D. On the normalisation of online sports gambling among young adult men in the UK: a public health perspective. Public Health. 2020;184:89–94.

17. Rhodes T. Risk theory in epidemic times: sex, drugs and the social organisation of "risk behaviour." Sociol Health Illn. 1997;19:2.

18. Hennell K, Piacentini M, Limmer M. 'Go hard or go home': a social practice theory approach to young people's 'risky' alcohol consumption practices. Crit Public Health. 2021;31:1.

19. Room R, MacLean S, Pennay A, Dwyer R, Turner K, Saleeba E. Changing risky drinking practices in different types of social worlds: concepts and experiences. Drugs: Education, Prevention and Policy. 2021. https://doi.org/10.1080/09687637.2020.1820955.

20. Madsen W, O'Mullan C. Perceptions of community resilience after natural disaster in a rural australian town. J Community Psychol. 2016;44:3.

21. Zinn JO. The meaning of risk-taking–key concepts and dimensions. J Risk Res. 2019;22:1.

22. Venema TAG, Kroese FM, Benjamins JS, de Ridder DTD. When in doubt, follow the crowd? Responsiveness to social proof nudges in the absence of clear preferences. Front Psychol. 2020;11:1385.

23. Lupton D. Risk. 2nd ed. London: Routledge; 2013.

24. McCarthy S, Thomas SL, Pitt H, Bellringer ME. "You don't really see the dangers of it at the time" Risk perceptions and behaviours of older female gamblers. Soc Sci Med. 2021. https://doi.org/10.1016/j.socscimed.2021.113674.

25. Nyemcsok C, Pitt H, Kremer P, Thomas SL. Viewing young men's online wagering through a social practice lens: implications for gambling harm prevention strategies. Crit Public Health. 2022. https://doi.org/10.1080/09581596.2022.2031888.

26. Charmaz K. The power of Constructivist Grounded Theory for critical inquiry. Qual Inq. 2016;23:1.

27. John B, Holloway K, Davies N, May T, Buhociu M, Cousins AL, et al. Gambling harm as a global public health concern: a mixed method investigation of trends in Wales. Front Public Health. 2020;8:320.

28. Charmaz K. Constructing Grounded Theory: a practical guide through qualitative analysis. London: SAGE; 2006.

29. Charmaz K. Constructionism and the Grounded Theory Method. In: Holstein JA, Gubrium JF, editors. Handbook of constructivist research. New York: Guilford Press; 2008. p. 397–412.

30. Hodgins DC, Stevens RMG. The impact of COVID-19 on gambling and gambling disorder: emerging data. Curr Opin Psychiatry. 2021;34:4.

31. World Health Organisation. Adolescent health. In: World Health Organisation. 2022. https://www.who.int/southeastasia/health-topics/adolescent-health. Accessed 8 Jul 2021.

32. Green J, Thorogood N. Developing qualitative research proposals: sampling strategies. In: Seaman J, editor. Qualitative methods for health research. Thousand Oaks: SAGE; 2018. p. 49–81.

33. McCarthy S, Thomas SL, Pitt H, Daube M, Cassidy R. "It's a tradition to go down to the pokies on your 18th birthday" – the normalisation of gambling for young women in Australia. Aust N Z J Public Health. 2020;44:5.

34. Lamont M, Hing N. Intimations of masculinities among young male sports bettors. Leis Stud. 2019;38:2.

35. Ferris J, Wynne H. The Canadian Problem Gambling Index: final report. In: Canadian Consortium for Gambling Research. 2001. http://www.ccgr.ca/en/projects/resources/CPGI-Final-Report-English.pdf. Accessed 8 Jul 2021.

36. Green J, Thorogood N. In-depth interviews. In: Seaman J, editor. Qualitative methods for health research. Thousand Oaks: SAGE; 2018. p. 115–46.

37. Varpio L, Ajjawi R, Monrouxe LV, O'Brien BC, Rees CE. Shedding the cobra effect: problematising thematic emergence, triangulation, saturation and member checking. Med Educ. 2017;51:1.

38. Braun V, Clarke V. To saturate or not to saturate? Questioning data saturation as a useful concept for thematic analysis and sample-size rationales. Qual Res Sport Exerc Health. 2021;13:2.

39. Malterud K, Siersma VD, Guassora AD. Sample size in qualitative interview studies: guided by information power. Qual Health Res. 2016;26:13.

40. Braun V, Clarke V. Using thematic analysis in psychology. Qual Res Psychol. 2006;3:2.

41. Braun V, Clarke V. Conceptual and design thinking for thematic analysis. Qual Psychol. 2021. https://doi.org/10.1037/qup0000196.

42. Williams EN, Morrow SL. Achieving trustworthiness in qualitative research: a pan-paradigmatic perspective. Psychother Res. 2009;19:4–5.

43. Djohari N, Weston G, Cassidy R, Wemyss M, Thomas SL. Recall and awareness of gambling advertising and sponsorship in sport in the UK: a study of young people and adults. Harm Reduct J. 2019;16:1.

44. Bestman A, Thomas SL, Pitt H, Randle M, Daube M. Exploring children's experiences in community gambling venues: a qualitative study with children aged 6–16 in regional New South Wales. Health Promot J Austr. 2019;30:3.

45. Pitt H, Thomas SL, Bestman A, Daube M, Derevensky J. Factors that influence children's gambling attitudes and consumption intentions: lessons for gambling harm prevention research, policies and advocacy strategies. Harm Reduct J. 2017;14:1.

46. MacLean S, Dwyer R, Pennay A, Savic M, Wilkinson C, Roberts S, et al. The 'social worlds' concept: a useful tool for public health-oriented studies of drinking cultures. Addiction Research & Theory. 2021;29:3.

47. Lole L, Russell AM, Li E, Thorne H, Greer N, Hing N. Interest in inducements: a psychophysiological study on sports betting advertising. Int J Psychophysiol. 2020;147:100–6.

48. Abbott M, Binde P, Clark L, Hodgins D, Johnson M, Manitowabi D, et al. Conceptual framework of harmful gambling: an international collaboration, third edition. In: Gambling Research Exchange Ontario (GREO). 2018. https://www.greo.ca/Modules/EvidenceCentre/Details/conceptual-framework-of-harmful-gambling-third-edition. Accessed 31 Jul 2021.

49. Brownell KD, Kersh R, Ludwig DS, Post RC, Puhl RM, Schwartz MB, et al. Personal responsibility and obesity: a constructive approach to a controversial issue. Health Aff (Millwood). 2010;29:3.

50. Jepson RG, Harris FM, Platt S, Tannahill C. The effectiveness of interventions to change six health behaviours: a review of reviews. BMC Public Health. 2010;10:1.

51. Abioye AI, Hajifathalian K, Danaei G. Do mass media campaigns improve physical activity? A systematic review and meta-analysis. Arch Public Health. 2013;71:1.

52. Stead M, Angus K, Langley T, Katikireddi SV, Hinds K, Hilton S, et al. Mass media to communicate public health messages in six health topic areas: a systematic review and other reviews of the evidence. In: Public Health Research. 2019. https://pubmed.ncbi.nlm.nih.gov/31046212/. Access 10 Aug 2021.

53. Hastings G. Moving upstream. In: Hastings G, editor. Social marketing: why should the devil have all the best tunes? London: Elsevier/Butterworth-Heinemann; 2007. p. 107–27.

54. Department of Social Services. National consumer protection framework for online wagering in Australia - National policy statement. In: Department of Social Services. 2018. https://www.dss.gov.au/sites/default/files/documents/11_2018/national-policy-statement.pdf. Accessed 22 Jul 2021.

55. Authority of the House of Lords. Select Committee on the Social and Economic Impact of the Gambling Industry, Report of Session 2019–21: Gambling Harm - Time for Action. In: House of Lords. 2020. https://publications.parliament.uk/pa/ld5801/ldselect/ldgamb/79/79.pdf. Accessed 22 Jul 2021.

56. Gambling Related Harm All Party Parliamentary Group. Final report into the online gambling sector. In: Gambling Related Harm All Party Parliamentary Group. 2020. http://www.grh-appg.com/wp-content/uploads/2020/06/Online-report-Final-June-16-2020.pdf. Accessed 22 Jul 2021.

57. Marteau TM, Rutter H, Marmot M. Changing behaviour: an essential component of tackling health inequalities. BMJ. 2021. https://doi.org/10.1136/bmj.n332.

# EXHIBIT V: LETTER FROM JULIAN KATZ LPC

**Julian Katz LPC**
**1526 Wolf Street**
**Philadelphia, PA, 19145**

To Whom It May Concern:

All of Charles Mirarchi's files and records have been discarded.

Julian Katz, LPC

# EXHIBIT W: FAMILY PHOTOS





